# EXHIBIT NO. 2

Bradley C. Gage, Esq., S.B. No. 117808
(bgage@goldbergandgage.com)
Milad Sadr, Esq., S.B. No. 245080
(msadr@goldbergandgage.com)
**LAW OFFICES OF GOLDBERG & GAGE**
A Partnership of Professional Corporations
23002 Victory Boulevard
Woodland Hills, California 91367
(818) 340-9252  Fax: (818) 340-9088

Benjamin Crump, Esq. - *admitted pro hac vice*
(Court@BenCrump.com)
**BEN CRUMP LAW FIRM**
122 South Calhoun Street
Tallahassee, Florida 32301
Florida Bar Number 0072583

Jeffrey Spencer, Esq., S.B. No. 182440
Email: jps@spencerlaw.net
**THE SPENCER LAW FIRM**
2 Venture, Suite 220
Irvine, CA  92618
Telephone No: (949) 240-8595
Facsimile No: (949) 377-3272

Attorneys for Plaintiffs,
JASMINE WILLIAMS, JUWAN WHITE, JOSEPH NETT,
LAKISHA SWIFT, CAMERON ROGERS, SHEPHERD YORK  and the PUTATIVE CLASS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASMINE WILLIAMS, JUWAN WHITE, JOSEPH NETT, LAKISHA SWIFT, CAMERON ROGERS and SHEPHERD YORK   in Their Individual and Representative Capacities on Behalf of a Class of All Persons similarly situated,<br><br>                 Plaintiffs,<br><br>           vs.<br><br>CITY OF BEVERLY HILLS, SANDRA SPAGNOLI, formerly sued as Doe 1; DOMINICK RIVETTI formerly sued as DOE 2, CAPTAIN | CASE NO.:  2:21-cv-08698-FMO-(RAOx)<br><br>BEFORE THE HONORABLE FERNANDO M. OLGUIN COURTROOM 6D<br><br>**{Proposed} THIRD AMENDED COMPLAINT FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**<br><br>1.      VIOLATION OF PLAINTIFFS' PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS THROUGH MALICIOUS PROSECUTION/FALSE |

| | | |
|---|---|---|
| 1 | SCOTT DOWLING, SERGEANT | ) | | IMPRISONMENT |
| 2 | DALE DRUMMOND [FORMERLY D.D.], OFFICER JON ILUSORIO | ) 2. | VIOLATION OF CONSTITUTIONAL RIGHT TO BE |

SCOTT DOWLING, SERGEANT
DALE DRUMMOND [FORMERLY
D.D.], OFFICER JON ILUSORIO
[FORMERLY J.I], OFFICER
JONATHAN DE LA CRUZ
[FORMERLY J.D.], SGT. BILLY FAIR
[FORMERLY SUED AS DOE 3],
OFFICER JAMES KRUG
[FORMERLY SUED AS DOE 4],
OFFICER BILLY BLAIR
[FORMERLY SUED AS DOE 5],
OFFICER JERRY WHITTAKER
[FORMERLY SUED AS DOE 6],
OFFICER JESSE LYGA [FORMERLY
SUED AS DOE 7][ inclusive, all sued
in their individual and official
capacities,

           Defendants.

IMPRISONMENT
2.  VIOLATION OF
CONSTITUTIONAL RIGHT TO BE
FREE FROM UNREASONABLE
SEARCHES AND SEIZURES
3.  MUNICIPAL LIABILITY FOR
VIOLATION OF
CONSTITUTIONAL RIGHTS
4.  VIOLATION OF EQUAL
PROTECTION CLAUSE

**SECOND AMENDED COMPLAINT FOR MONETARY DAMAGES,**

**INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL**

    Plaintiffs assert the following claims and hereby demand a jury trial for themselves

and all members of the Class.

**I.    VENUE AND JURISDICTION**

1.    Plaintiffs JASMINE WILLIAMS, JUWAN WHITE, JOSEPH NETT,  LAKISHA

    SWIFT, CAMERON ROGERS and SHEPHERD YORK (hereinafter, collectively

    "Plaintiff," or "Plaintiffs") bring this action on their own behalf and on behalf of all

    persons within the class defined herein.  This Court has original jurisdiction

    pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs assert claims

    arising under the laws of the United States including 42 U.S.C. § 1983 and the

    Fourth and Fourteenth Amendments of the United States Constitution. Venue is

    proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this

    district and all incidents, events, and occurrences giving rise to this action occurred

    in this district.  The class representatives will not pursue any claims that are

    inconsistent with the class.

## II.   CLASS ALLEGATIONS

2.   The Class consists of the following: All Black people who were detained or arrested by the City of Beverly Hills Police Department ("BHPD") from August 30, 2019 through August 30, 2021 without being convicted of any crime.

3.   The BHPD is a subdivision of the Defendant City of Beverly Hills.

4.   There are two sub classes:

a.   The 80 Black Americans arrested by the City of Beverly Hills Police Department's "Rodeo Drive Task Force, ('RDT')"between August 29, 2020 and October 25, 2020.   According to Depositions taken May 8, 2023 and May 10, 2023 of Former Captain Dowling and Former Interim Police Chief Rivetti respectively, none of these 80 Black Americans was convicted after being arrested.  None of them plead guilty or no contest.

b.   The 99 Black Americans arrested by the  City of Beverly Hills Police Department's EDD Task Force ("EDD") between August 29, 2020 and October 25, 2020. According to Depositions taken May 8, 2023 and May 10, 2023 of Former Captain Dowling and Former Interim Police Chief Rivetti respectively, none of these 89 Black Americans was convicted after being arrested.  None of them plead guilty or no contest.

5.   On or about August 2020 the City of Beverly Hills and the BHPD formed the Rodeo Drive Team ("RDT") to eliminate the presence of Black Americans, referred to as the "criminal element out of the Rodeo Drive district. When the RDT was formed the BHPD invited the offers to bring their friends and "come out and play" to target Black Americans for minor infractions to get the "criminal element out of the Rodeo Drive district. One of the managing officers over the RDT referred to Black persons arrested as animals. The BHPD directed the RDT to look for minor infractions by Black Americans and treat all Black Americans stopped the same way and provided them with a cut and paste template for the arrests and EDD fraud. The BHPD characterized the arrests of Black Americans "a dime a dozen."

6.   Between  August 20, 2020 through August October 25, 2020 there were a total of

---

**[Proposed]  THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL      Page -3-**

197 people arrested by the BHPD. Of those 179 (90%) were Black Americans. Not a single one of these Black Americans arrested was convicted. None of them plead guilty or no contest. There was no known probable cause for any of those arrests. This was confirmed in Depositions taken May 8, 2023 and May 10, 2023 of Former Captain Dowling and Former Interim Police Chief Rivetti respectively.

7. Between August 31, 2020 through August 30, 2021 there were a total of 3,213 persons arrested and 1,088 of those persons were Black Americans which amounts to 34% of the persons arrested during the full class period. Captain Dowling was not aware of a single one of those African Americans arrested that were convicted. None of them plead guilty or no contest. There was no known probable cause for any of those arrests. However, Chief Rivetti claims there was probable cause and convictions for two of the 1,088 African Americans arrested during this time period. This was also confirmed in Depositions taken May 8, 2023 and May 10, 2023 of Former Captain Dowling and Former Interim Police Chief Rivetti respectively.

8. Following a common operational plan and top down policies from August 29, 2020 through October 24, 2020, the RDT arrested 90 people. The RDT arrests by race were listed as: "African American 80; Caucasian 3; Hispanic 4; Vietnamese 2; Other 1[1]." None of the arrested black individuals was convicted of any crime as admitted to by the policy maker, Chief Rivetti and the third highest employee, Captain Dowling. The RDT concentrated in the business district which included Rodeo Drive and Wilshire Blvd.

9. Following a common operational plan and top down policies from August 29, 2020 through October 24, 2020, the EDD arrested 107 people of which 99 were African

---

[1] Exh 1 page 1.

American; 2 were Caucasian; 4 were Hispanic and 2 were Vietnamese[2].

10. During the nearly two-month period of August 29, 2020 through October 24, 2020, the RDT and EDD combined arrested a total of 197 people. Of the total number of people arrested by these task forces, 179 were Black Americans.  Accordingly, **more than 90% of the total number of individuals arrested were Black. However, the City of Beverly Hills is only 1.95% Black** [3] and the State of California is a mere 5.8% Black[4].  Black Americans are members of a recognized protected class.  Since the top management at BHPD admits there were no convictions, this astounding disparity can only be attributed to racial profiling, illegal searches and seizures, violation of due process and violation of equal protection.

11. The disparate impact of arresting such a disproportionate percentage of Black Americans compared with other races is because of Defendants' top down policies, practices, common operational plan to target Black Americans for stops, searches and arrests.  Once the RDT's targeting  of Black Americans became  known, fewer Black Americans came to Beverly Hills, which pleased Decision Makers for the City of  Beverly Hills who exalted in the elimination of  Black visitors, proclaiming, "its beginning to look more normal again.."

12. There are exact numbers for the sub-classes because the City of Beverly Hills provided information to the media in response to its probing inquiries of its racial profiling during the RDT and EDD task forces. In Discovery to date the City has admitted 3,213 persons were arrested and 1,088 of those persons were Black Americans which amounts to 34% of the persons arrested during the full class

---

[2]Exh 1 page 2.

[3]Exh "2" shows the statistics of Black Americans in Beverly Hills

[4]Exh "3" based on the 2019 census, California is 5.8% African American.

period.   Two of those 1,088 African Americans were convicted.   Accordingly, the ascertainable class is comprised of approximately 1,086  Black Americans. These numbers are so numerous that the joinder of all such persons is impracticable and the disposition of their claims as a Class will benefit the parties and the Court.  The incredibly low conviction rate is unfathomable and can only be explained by a policy, practice and custom of long standing racial profiling and targeting Black Americans for selective enforcement.

13.   The BHPD directed, taught and instructed its officers to use pretext stops to target African Americans for minor infractions.   The typical practice was for BHPD officers to use their police powers, to stop, detain and search Black Americans for minor infractions such as an roller skating on the sidewalk, illegal U-turn, failing to stop behind the limit line, smoking, playing music or making loud noise, or  to name a few examples and then handcuff them, humiliate them by making them stand handcuffed on the sidewalk, then arresting them. In contrast when White people engaged in the same conduct the BHPD offices either ignored them, gave them a warning or gave them a ticket. They were not handcuffed, searched and arrested.   White people were allowed to stay in their cars when engaging in violations, or they were not even stopped at all, as shown by the video tape of officers allowing a white driver to pass the limit line without even being pulled over.  Black people are required to exit their vehicles.  White people are not handcuffed for minor infractions.  Black people are  handcuffed.   White people are not searched for minor infraction.  Black people are searched personally under the pretext of looking for weapons, and being pressured to "consent" to a vehicle search.   An excellent example is the detention at gun point of a black Versace Vice President after "jay walking."

14.   Under the policy, practice and training of BHPD between August 2019 and August 2021 (as well as before and after the class period)   While White people were not

searched, If a Black  motorist had no contraband, they would be set free, frequently with no documentation provided to allow for tracking of the race of individuals stopped and searched (in violation of RIPA rules).  If contraband was found, the Black person was then arrested.  Since the numbers of Black people subjected to searches was so much higher than white people, the number of arrests of Black people was also disproportionately high.  This was a common practice of the BHPD for the past several years.   Thus, during the full two year class period, approximately 1/3 of the people arrested were African American, but the City of Beverly Hills, has a population of only around 1.9% African American.  The reason for this disparity is that the defendants erroneously and stereo typically regarded Black people as inherently more suspicious.  The policy makers in charge of these arrests were Chiefs Spagnoli and Rivetti, though they delegated some duties  to Captain Dowling (who was specifically in charge of managing the RDT).   Dowling in discussing the formation of the RDT stated "these people" were causing problems on Rodeo drive spending marijuana money."  These people referred to Black Americans.  Dowling also used the N word according to his co-defendants testimony.  The RDT had an operation plan drafted by Fair and Nance and approved by Dowling and Rivetti.  Dowling also referred to black people as lazy.  The RDT was supposed to be responsible for all arrests on Rodeo Drive each day to provide for "consistency" also known as "commonality and typicality."

15.    The RDT accomplished its goals of targeting Black Americans for arrest for minor infractions. 90% of the persons it arrested were Black Americans. The arrests were improper and baseless as evidenced by the fact that none of the arrests by the RDT

resulted in a single conviction. All the RDT accomplished was to successfully target Black Americans and scare them out of the Rodeo Drive district.  Since the RDT's arrests of 80 Black Americans did not result in a single conviction it should have been considered a failure and a waste of resources. However, even though the RDT arrests of Black Americans didn't result in a single conviction, the City of Beverly Hills and the BHPD was so pleased with the way the RDT targeted Black Americans they gave the RDT an award for excellence.

### III.  COMPLIANCE WITH FEDERAL RULE 23

16.     The conduct of the RDT in targeting Black Americans for selective enforcement was directed, ratified and approved by the City of Beverly Hills and the BHPD. No BHPD officers were reprimanded or subjected to discipline for their work on the RDT targeting Black Americans and the City of Beverly Hills and the BHPD gave the RDT an award of excellence. The same police, directives and practices employed by the RDT toward Black Americans continued for the entire class period, yet no BHPD officers were reprimanded or subjected for discipline for targeting Black Americans during the entire class period.

17.     Federal Rule of Civil Procedure 23(a) provides the following requirements for class actions:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

        (1) the class is so numerous that joinder of all members is impracticable. Here, the class has at least 1,088 members and, the sub classes have 179 total members making joinder impracticable.

        (2) there are questions of law or fact common to the class. Here, the claims for all class members involve civil rights violations subject to the same law and facts.

        (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class. Here, because the claims all involved civil rights violations with the same law, the defenses and claims are all typical of those of the class.

(4) the representative parties will fairly and <u>adequately protect</u> the interests of the class.  They will not take an interest contrary to the class.

18.   The attorneys for the class are experienced lawyers in civil rights cases, and in class actions.

19.   Local Rule 23-2.2 sets forth similar requirements for class allegations. It provides that the Class Allegations section of a complaint "shall contain appropriate allegations thought to justify the action's proceeding as a class action, including, but not limited to:

"(a) The definition of the proposed class (the class and subclasses are defined above);

"(b) The size of the proposed class: 1,088 Black Americans with sub classes totaling 179 Black Americans;

"( c) The adequacy of representation by the representative(s) of the class. Here, the plaintiffs are adequate class representatives because they were arrested or detained during the class period, and they were not convicted of any crimes and did not plea to anything, just as the class members they represent;

(d) The commonality of the questions of law and fact (see above);

(e) The typicality of the claims or defenses of the representative(s) of the class are typical of all class members (see above)[5];

---

[5]There is nothing novel about pursuing a civil rights class action.  Indeed, for over 50 years, class actions have been among the most powerful tools to secure civil rights in America. *Brown v. Board of Education* 347 U.S. 483 (1954) which outlawed school segregation and set the stage for the entire civil rights movement was a class action.  More recent examples include the movie, "North County," based on the case of *Jenson v. Eveleth Mines* which was a class action sexual harassment lawsuit.  A class action suit was approved in *Aichele v. City of Los Angeles* (2013) 314 F.R.D. 478 where arrestees

---

(f) If proceeding under F.R.Civ.P. 23(b)(3), allegations to support the findings required by that subdivision are provided herein; and

(g) The nature of notice to the proposed class required and/or contemplated. Here, we propose notice via CPT Group, Inc. as Claims Administrator, or such other administrator as the Court approves.  The defendants are in possession of the names and addresses of all individuals in the class and thus can provide that information in order to give the class notice.)

20.   Plaintiffs and the Class will not be able to obtain effective and economic legal redress unless the action is maintained as a class action. Here, Plaintiffs and the Class will not recover economically from defendants without filing as a class. The numerous Plaintiffs makes individual recovery unlikely. Additionally, Plaintiffs are alleging widespread discrimination to a protected class of persons.

21.   There is a community of interest in obtaining appropriate legal and equitable relief for the common law and statutory violations and other improprieties, and in obtaining adequate compensation for the damages and injuries which Defendants' actions have inflicted upon each Plaintiff and the Class as a whole.  Here, identifying and remedying racist and discriminatory practice and treatment is of interest both economically and equitably as its both unconscionable and illegal in our Country under the United States Constitution.

22.   There is a community of interest in ensuring that the combined assets and available insurance of the Defendants is sufficient to adequately compensate the members of the Class for the injuries sustained, especially as to the individually named

---

filed a section 1983action against the city, county, mayor, police chief and officers alleging their arrests for participating in protest or failing to disperse violated their constitutional rights.  Similarly, a class action settlement was preliminarily approved in *Gonzalez-Tzita v. City of Los Angeles* 2019 WL 7790440 under 42 USC section 1983 for violations of the First and Fourth Amendments based on the City's seizures of the putative class members' vehicles.

---

**[Proposed]  THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL     Page -10-**

defendants. Here, the United States Constitution provides constitutional rights and equal protection of all its citizens. As such, there's a community interest in economically rectifying racist and discriminatory injuries the members of this protected class experienced[6].

23.   Without class certification, the prosecution of separate actions by individual members of the Class would create a risk of:

a.   Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants; and/or

b.   Adjudications with respect to the individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests, including but not limited to the potential for exhausting the funds available from those parties who are, or may be, responsible Defendants; and

c.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making monetary and injunctive relief appropriate with respect to the Class as a whole.

24.   Questions of law and fact common to all potential Class Members predominate over any questions affecting only individual Class Members.  Among the common

---

[6]Again, this is consistent with the policy of our great nation as expressed by Congress in legislation involving Title VII which is another type of civil rights act. As the legislative history of the Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103 (codified as amended at 42 U.S.C. § 2000e et seq.) reveals, Congress rebuffed an amendment to Title VII that would have restricted private class suits. See 118 Cong. Rec. 7168 (1972) (statement of Sen. Williams) ('A provision limiting class actions was contained in the House bill and specifically rejected by the Conference Committee.'). Rather, Congress 'agree[d] with the courts that Title VII actions are by their very nature class complaints, and that any restriction on such actions would greatly undermine the effectiveness of Title VII.'

---

questions of law and fact to the Class Members are:

    a.    Whether Defendants engaged in a common operation plan and implemented top down policies that violated Plaintiffs' procedural and substantive due process rights through racial profiling, malicious prosecution/false imprisonment.

    b.    Whether Defendants violated Plaintiffs' constitutional rights to be free from unreasonable stops and searches and seizures.

    c.    Whether Defendants engaged in a common operational plan the implemented top down policies and procedures that  violated Plaintiffs' constitutional rights to Equal Protection.

    d.    Municipal liability.

## IV.   PARTIES

25.   At all times relevant hereto, Plaintiff JASMINE WILLIAMS (hereafter also "Plaintiff" or "WILLIAMS"), was and is a Black American.   Because of Defendants' common operation plan, top down widespread policies, practices and customs, she was arrested or detained by the defendants.  She was handcuffed, jailed, arrested and maliciously prosecuted because of her identifiably protected characteristic-Black.  She was not convicted of any crime.  She did not enter any plea agreement after her arrest. All charges against her were dropped. WILLIAMS is a resident of Texas.

26.   At all times relevant hereto, Plaintiff JUWAN WHITE (hereafter also "Plaintiff" or "WHITE" or collectively part of "Plaintiffs"), was and is a Black American. Because of Defendants' common operational plan, top down widespread policies, practices and customs, he was arrested by the defendants.  He was handcuffed, jailed and maliciously prosecuted because of his identifiably protected characteristic-Black.  He was not convicted of any crime.  He did not enter any plea agreement after his arrest. All charges against him were dropped. WHITE is a resident of Texas.

27.  At all times relevant hereto, Plaintiff JOSEPH NETT (hereafter also "Plaintiff" or "NETT" or collectively part of "Plaintiffs"), was a resident of Los Angeles County. NETT is a Black American.  Because of Defendants' common operational plan, top down  widespread policies, practices and customs, he was arrested by the defendants.  He was handcuffed, jailed and maliciously prosecuted because of his identifiably protected characteristic-Black.  He was not convicted of any crime.  He did not enter any plea agreement after his arrest. All charges against him were dropped.

28.  At all times relevant hereto, Plaintiff LAKISHA SWIFT (hereafter also "Plaintiff" or "SWIFT" or collectively part of "Plaintiffs"), was a resident of Los Angeles County. SWIFT is a Black American.  Because of Defendants' common operational plan widespread policies, practices and customs, she was arrested or detained by the defendants.  She was handcuffed because of her identifiably protected characteristic-Black.  She was not convicted of any crime.  She did not enter any plea agreement after her arrest. All charges against her were dropped or not pursued.

29.  At all times relevant hereto, Plaintiff CAMERON RODGERS (hereinafter, "Plaintiff" or "RODGERS"  or collectively part of "Plaintiffs") is a resident of Arkansaw who came to Beverly Hills in August 2020 to celebrate his birthday. RODGERS is African American. As part of the BHPD common operational plan, he was driving a rental car when BHPD racially profiled him for being Black, pulled him over The police made him exit his vehicle, placed him in handcuffs and humiliated him, making him sit in public while handcuffed. Passersby said that he was being racially profiled. He was arrested on a claim of felony EDD fraud. He went to jail. Because of being jailed, he lost his job. There was no court proceedings after he was released from jail. He was not convicted of any crime. He did not plea to any crime. He was not even prosecuted.

30.  At all times relevant hereto, Plaintiff SHEPHERD YORK (hereinafter, "Plaintiff" or

"YORK"  or collectively part of "Plaintiffs") is a resident of Los Angeles, California and African American. He was employed by a law firm in Beverly Hills and was stopped by the BHPD while driving to work. He had his hair in dreadlocks and was Black, but did nothing wrong. As part of BHPD's common operational plan the BHPD pulled him over. When he asked why he was pulled over, the officers refused to tell him and were very aggressive. They finally told him it was because his license plates were expired. However, they were not expired. He was required to exit his vehicle. He was subjected to a non consensual pat down search of his person, and non-consensual search of his belongings and vehicle and was jailed for one night and his vehicle was impounded. He was never convicted of any crime.

### A.  CLASS REPRESENTATIVES

31.   The class action claims of class representatives, WILLIAMS, WHITE, NETT, SWIFT, ROGERS and YORK are typical of the claims of the Class they seek to represent.

32.   WILLIAMS, WHITE, NETT, SWIFT, ROGERS and YORK  will fairly and adequately protect the interests of the Class and Plaintiffs do not have any interests that are antagonistic to the Class.

33.   The claims or defenses of the representative parties are common to the claims or defenses of the class.

### B. DEFENDANTS

34.   At all times mentioned herein, Defendant CITY OF BEVERLY HILLS (hereafter also "CITY" or part of Defendants) was a public entity duly organized and existing under and by virtue of the laws of the State of California.  The Beverly Hills Police Department ("BHPD") is a part of the city.

35.   The policy makers in charge of implementing the common operational plan and top down the discriminatory policies and  practices were Police Chief SANDRA SPAGNOLI, formerly sued as Doe 1, her replacement, Interim Police Chief DOMINICK RIVETTI, formerly sued as DOE 2,  Captain SCOTT DOWLING,

sergeant DALE DRUMMOND and sergeant BILLY FAIR.  (Hereinafter also collectively referred to as "Defendants.")

36.   SANDRA SPAGNOLI was the main policy maker and Chief of the Beverly Hills Police Department from March 2016 to May 2020.

37.   DOMINICK RIVETTI was the Interim Chief of the Beverly Hills Police Department and its main policy maker from May 2020 to November 2021.

38.   DOWLING was a Captain and worked in conjunction with the chiefs  to set policy during the entire class period. DOWLING'S actions were also ratified by both SPAGNOLI and RIVETTI.

39.   SPAGNOLI and RIVETTI as the Chiefs of Police are individuals who acted under color of law.  Their actions deprived all of the plaintiffs of their rights under the laws of the United States and the United States Constitution. SPAGNOLI and RIVETTI had final policy making authority from Defendant CITY OF BEVERLY HILLS concerning these acts and when engaged in these acts, SPAGNOLI and RIVETTI were acting as the final policymakers for Defendant CITY OF BEVERLY HILLS and its Police Department.

40.   SPAGNOLI and RIVETTI both also delegated some of their final policy making authority to their subordinates, and ratified the decisions of their subordinates.  That is, SPAGNOLI and RIVETTI both ratified the actions of DOWLING and other subordinate employees, and specifically approved of the employee's acts.  One example of how the actions of subordinates was ratified is found in the 2020 Employee Excellence Awards for the category of "Outstanding Job Performance.[7]"

41.   Defendant SCOTT DOWLING,  sergeant

---

[7]Exh "4" shows under the category of "Team Nominees" that the Rodeo Drive Team (Sgt. BILLY FAIR, Sgt. DALE DRUMMOND, Officer JAMES KRUG, Officer BILLY BLAIR, Officer JONATHAN DE LA CRUZ, Officer JERRY  WHITTAKER, Officer JESSE LYGA and Officer JON ILUSORIO were nominated for their outstanding job performance (in arresting over 90% African Americans).

DALE DRUMMOND, Sergeant BILLY FAIR, and each of them were managerial level or supervisory level employees of the BHPD. As Captain, DOWLING was the third highest ranking employee of the police department during the entire class period. DOWLING,  DRUMMOND, and FAIR were officials with final policy-making authority whose edicts or acts could fairly be said to represent official policy, and were officials with final policy-making authority that was delegated to them by RIVETTI and SPAGNOLI.  Moreover, RIVETTI and SPAGNOLI ratified and approved of the decisions of DOWLING,  DRUMMOND and FAIR and all employees from the RDT and EDD Task Forces.

42.   At all times relevant herein, SPAGNOLI, DOWLING, RIVETTI  were residents of the County of Los Angeles.  At all times relevant hereto, said defendants were acting within the course and scope of their employment as captains chiefs, policy makers of defendant City.

43.   At all times relevant herein, defendants Sgt. DALE DRUMMOND (hereafter also "DRUMMOND"),  and FAIR  were residents of the County of Los Angeles.

44.   DRUMMOND, ILUSORIO, DE LA CRUZ, FAIR, KRUG, BLAIR, AND LYGA constituted the city of BHPD's "Rodeo Drive Task Force, ('RDT') between August 29, 2020 and October 25, 2020 and were residents of the County of Los Angeles.

45.   On information and belief, DRUMMOND, ILUSORIO, DE LA CRUZ, FAIR, KRUG, BLAIR, and LYGA constituted the  City of BHPD's EDD Task Force ("EDD") between August 29, 2020 and October 25, 2020. Plaintiffs are without the benefit of discovery to confirm City of BHPD's EDD Task Force members.

46.   At all times relevant herein, all of the defendants engaged in the conduct alleged herein under color of law, and through the auspices of the City of Beverly Hills and BHPD. Plaintiffs allege that the conduct and actions of defendants as alleged herein occurred during defendants  normal working hours as Beverly Hills Police Officers,

Supervisors, Managers, Captains or Chief or occurred under the pretense that either was acting as a BHPD employee or was made possible solely because of his/her/their position as a BHPD Officers, Supervisors, Managers, Captains or Chiefs.

## V.  FACTUAL ALLEGATIONS

47.  The City of Beverly Hills has a widespread, policy, practice and custom of  racial profiling against Black Americans resulting in unconstitutional detentions, arrests, and, illegal searches and seizure. These are violations of the Due Process rights and Equal Protection rights afforded in the U.S. Constitution. In the City of Beverly Hills.   Non-Black Americans are not subject to such profiling. This is demonstrated by the fact that over 90% of all arrests reported during the RDT and EDD subclass and 34% over the entire class period are of Black Americans while the City itself is only 1.9% Black.   Chief Rivetti was told by Assistant Chief Coopwood that 90% of the people arrested by the RDT were Black.  He was not concerned.  Indeed, he believed that the RDT accomplished his objective.  He approved awards for them. Captain Dowling testified that he was not concerned about 90% of the arrests being black, but he was worried that an attorney would look at the numbers and file a lawsuit.  Captain Dowling admitted that BHPD officers were taught they could use minor infractions like illegal U turns, or jay walking to justify detentions and searches of Black Americans that could lead to an arrest.  This is known as pretext stops. Something that unbelievably, Chief Rivetti testified he had never heard of despite 40 years in law enforcement.

48.  The constitutional violations of the civil rights of Black Americans were based on instructions from officials with final policy-making authority, whose edicts represented official policy.  Additionally, the actions of officers targeting Black Americans was ratified by the policy makers of the BHPD and City.  Illustratively, the RDT members were nominated for, and then received the "Employee Excellence Award" in 2020, demonstrating that the custom, policy and practice of

authorizing racial profiling was ratified and authorized by the city[8].  The awards from the BHPD was for the outstanding work by the RDT and EDD of racial profiling Black Americans. The accolades were only the most recent example of ratification and widespread policies, practices and customs.

49.   Indeed, the targets of the RDT and EDD were Black Americans  repeatedly described as the "criminal element."  The Rodeo Drive Team or task force was formed because of the "criminal element" coming to Beverly Hills.  "Criminal element" was code for Black people.  Yet, that philosophy perpetuates the racial stereotype that all Black people are "criminals."  Lieutenant Nance and/or Captain Dowling emailed police officials about establishing a "core group of officers and supervisors assigned to Rodeo Drive to **allow for consistency....**" That is the RDT and EDD Task Force[9].  The direction "has stemmed from the chief."  The Department based on information and belief claimed that Rap songs bragged and educated listeners to come to Beverly Hills and commit fraud. Apparently, Defendants believed that music frequently associated with African American's was enticing criminal acts in their city by the class of Black Americans.

50.   Once many Black American's were arrested there was a decrease in Black Americans visiting the City.    Assistant Chief Coopwood in an email dated October 1, 2020 the City  Manger (George) (Tr. Exh 70) stated under "Rodeo Drive Enforcement Review and EDD Fraud Review) Hi George - ¶ "The quality of life

---

[8]Exh "5" is the City of Beverly Hills Employee Excellance (sic Excellence) Awards 2020 for Outstanding Job Performance.  Among the recipients was the "Police Department's Rodeo Drive Team."  The statistics for the RDT and EDD were kept together. See e.g., Exh "1"

[9]The EDD Task Force denotes the fact that while the focus of the RDT morphed into EDD arrests, Chief Rivetti added a couple of additional officers to carry out the common EDD arrests. Which were so common and typical, they were described as a "dime a dozen" and the reports were prepared with cut and paste for a "common modus operandi."

---

issues along Rodeo Drive are beginning to diminish.  It is beginning to look more normal again.  Our EDD arrest and seizures are decreasing as a result; which is a very good thing...."  The fact the city was starting to look normal again, was a reference to a reduction in Black American visitors.

51.   Denying Black Americans equal protection has existed in Beverly Hills for over 25 years demonstrating a governmental policy and longstanding custom or practice of violating the Civil Rights of Black Americans and also supports the need for an injunction.

52.   As noted in the *Los Angeles Times*[10], between 1990 and 1995, Black Americans filed five lawsuits and more than a dozen claims against Beverly Hills, alleging that police unjustifiably stop and harass minorities.   In one case, a Black motorist accused BHPD officers of pointing a gun at his head during  a traffic stop.  Another man alleged that his car was ransacked in a vain search for drugs.  Such lawsuits demonstrate Defendants' knowledge of the practice of profiling Black people that has existed for decades in Beverly Hills.  (The defendants knew of this lack of proper accountability, but was deliberately indifferent to the repeated violations of rights of Black Americans.)

53.   As part of this long standing policy, practice and custom, Defendants used minor infractions like broken tail lights to justify its practice of targeting Black people for unconstitutional detentions and arrests.

54.   Between 1993 and 1995 the Beverly Hills-Hollywood chapter of the NAACP received 75 complaints about Beverly Hills police officers targeting Black Americans[11].

---

[10]Exh "6", Blacks have filed five lawsuits and more than a dozen claims alleging BHPD unjustifiably stop and harass minorities.

[11]Exh "6" discusses the reputation of Beverly Hills is that they keep minorities on the move.  That has been their unspoken policy in the past, as noted by Police Watch, a Los Angeles-based organization that tracks complaints about police. Billie Green from the

55.   In defending the City's targeting of Black Americans, former mayor Chuck Aronberg said, "Blacks have a chip on their shoulder. [They] think bad things happen to them because they're Black." And Mr. Aronberg was exactly right, in Beverly Hills - bad things do happen to Black people.

56.   Illustratively, Jerry Lafayette, a Black American in Beverly Hills, was pulled over more than 20 times in 18 months for simply being Black.

57.   In 1995 the City, its Mayor, Council member, Chief and Captain were sued for having "engaged in a conscious policy of deliberate indifference" by allowing police harassment of African Americans to go unchecked.   There Defendants were made aware of constitutional violations, and with deliberate indifference ratified the wrongdoing.  Defendants failed to provide adequate training to safeguard the constitutional rights of Black Americans and provide them equal protection. Instead, the City continued and ramped up its' targeting and discrimination against Black Americans in Beverly Hills.

58.   The training policies of Defendant CITY OF BEVERLY HILLS were not adequate to train its police officers to handle the usual and recurring situations with which they must deal.  Defendant CITY OF BEVERLY HILLS was deliberately indifferent to the obvious consequences of its failure to train its police officers adequately.

59.   The failure of Defendant CITY OF BEVERLY HILLS to provide adequate training caused the deprivation of the rights of all plaintiffs by the actions of Defendant CITY OF BEVERLY HILLS' police officer employees.  That is, the Defendants failure to train is so closely related to the depravation of the plaintiffs' rights as to be the moving force that caused each of them the ultimate injuries such as detentions and arrests without reasonable suspicion and probable cause.  False arrest, false imprisonment, fabrication of evidence, and malicious prosecution of

NAACP confirmed receiving about 75 complaints in two years against BHPD.

Black people for alleged criminal acts they were never found guilty of.

60. In 1995, a civil rights lawsuit was filed by six Black Americans. Five of the Black Americans suing were teenagers who lived in Beverly Hills and attended local schools, and the sixth was a maintenance man at a Beverly Hills church. The BHPD stopped and harassed Black Americans without "reasonable suspicion," often pulling over Black-American motorists for violations such as broken taillights or detaining minors who were out past the City's 10 p.m. curfew. In 2000, a settlement was reached, which included the City of Beverly Hills setting up a Human Relations Commission to deal with issues of racial profiling.

61. Indeed, a former Beverly Hills Mayor, Robert Tanenbaum, sued the City for racial profiling, claiming that his "case is about people's rights to walk the street, to ride cars on public roadways without being terrorized, harassed or abused." "All we are saying is, treat Black folk like White folk."

62. Although Captain Dowling spent 37 years employed by the BHPD, only retiring after the RDT fiasco became public, he testified on May 8, 2023 that he was not aware of a single meeting by the Human Relations Commission from 2002 to the present. He was not aware of a single person on that commission, or any papers, policies or suggestions implemented by that commission. In short, it was simply a farce designed to deflect the history of racial profiling that has plagued the city. It does explain why an injunction to deter future racial profiling is so vital in this case. Indeed, Captain Dowling testified despite the disproportionate profiling of African American's by the RDT there has been no change to the defendants policies since the RDT and they are continuing to engage in the deprivation of the civil rights of Black Americans. Thus it is business as usual. Profiling Black Americans like usual. Requiring an injunction because racial profiling should NOT be business as usual.

63. Captain Dowling testified that no officer was disciplined for the actions of the RDT. Neither he nor Rivetti testified about any officer who has been disciplined for racial

profiling, ever. Thus, without damages and an injunction the denial of equal protection to Black Americans will continue into the future.  None of the officers were engaged in these racial profiling arrest outside of their duties. In other words, all of the arrests by the RDT that resulted in 90% of the arrests being Black (and no convictions) were performed according to BHPD common directives, policies, practices and training. because the arrests by the RDT officers were performed in accordance with their training, and the policies, all of their arrests were approved of and ratified.  But they should not have been. What kind of police department approves of racial targeting?  It is unconstitutional. It is no wonder why BHPD Mangers called the black people arrested during the class period, "Domestic terrorists."

64.   In 1998, then-Assemblyman Kevin Murray, a Black American, filed suit after his car was stopped by police on his way to celebrate a primary election victory[12].

65.   In August 2014, there was a potentially dangerous wrongful arrest of noted Black American film maker and producer Charles Belk.  In stereotypical fashion, the BHPD thought the film maker "fit the description" of a bank robbery suspect because Belk was "tall, bald, Black and male."  Objectively, thousands of Black men would fit such a vague description.  When stopped, Belk behaved in exemplary fashion.  He stated why he was in the city.  He related his impressive academic, business and artistic credentials that could have been easily and quickly checked. The BHPD officers did not care.  Mr. Belk had to suffer the indignity of being handcuffed and forced to sit on the curb in public.  Then the PD successfully imposed an exorbitant amount of bail, forcing Mr. Belk to sit in jail for hours before

---

[12] Exh "7" The article confirms that a group of civil rights activists called on Beverley Hills to enact a "racial profiling prohibition."   Civil Rights organizations for years received numerous complaints of BHPD officers targeting black males for unwarranted stops, frisk and harassment. The article also indicates there were two Federal lawsuits for racial profiling in the 1990's.

he could even speak to an attorney.  Belk was never even given his Miranda Rights. At the time, Belk (51 years old) was working at a pre-Emmy Awards gifting suite before going to dinner.  He was arrested when he walked away from a restaurant on Wilshire Blvd[13].

66.   In approximately June 2015, a video entitled "Yellow Fever with Soul" was prepared by Officers Charles Yang and Stanley Shen and posted on "You Tube."  It made fun of Black Americans and Asian Americans.  The "Yellow Fever with Soul" video used a racial stereotype of a Black American man holding a chicken leg in his hand. The video referenced racial stereotypes of the sizes of Black men's penis' Officer Yang was shown holding a woman's buttocks in the video.  Stanley Shen made comments about slavery and "master" derogatory towards Black Americans. Yang was not punished for this at all.  Shen had been fired for a different act of misconduct, but after the Yellow Fever video was publicized, he was reinstated by SPAGNOLI.  He has since been promoted to Detective and Sergeant (supervisor) by BHPD's Chief Spagnoli who apparently saw nothing wrong with the video. However, Chief Rivetti testified on May 10, 2023 that the video was improper [14]. Sgt. Shen, along with a Lieutenant (Andrew Myers)  authored a police report about a peaceful protest about the killing of George Floyd, comparing a protest by mostly black people as the same as the Holocaust where 6,000,000 Jews were killed by the Nazi's and to the Iranian Revolution where Persians were slaughtered in the streets. 25 people were arrested in that protest for "curfew violations."   All of those arrests were thrown out of court as being unconstitutional

67.   DOWLING laughed about the "Yellow Fever with Soul"  video when he saw it in the BHPD.

68.   In March 2016, Sandra SPAGNOLI became the chief of police.  There were three

[13]Exh "8"

[14]The Yellow Fever with  Soul video too large to attach to this complaint.

finalists for the position. The top candidate was a Black American police chief with Oxnard PD, but she was passed over for promotion because city council members did not want the Black woman to be "the face of Beverly Hills."   SPAGNOLI was hired instead.  Before she was hired, defendants knew that SPAGNOLI was sued repeatedly while she was the chief at San Leandro, including for various civil rights violations and discrimination.

69.   As the Chief of Police, not only was SPAGNOLI the final policy maker at the time, but she implemented policies, customs and practices designed to deprive Black Americans of their constitutional rights and with deliberate indifference to the rights of Black Americans which was a moving force behind the constitutional violations suffered by the class as a whole.

70.   SPAGNOLI also created customs and practices to violate the constitutional rights of Black Americans by ratifying  discriminatory treatment of Black Americans by BHPD police officers.  Illustratively, SPAGNOLI set the tone of treating Black Americans unconstitutionally by ratifying the "Yellow Fever with Soul" video displayed by members of the BHPD.  The "Yellow Fever with Soul" video was put on the Internet.  Portions of it were later played on television because the media saw how racist and improper the video was.  That video promulgated racial stereotypes of the size of Black mens penis' and stereo types of foods that Black Americans supposedly eat like fried chicken.

71.   Instead of taking corrective action, SPAGNOLI sent a message to the troops that she approved of the video, setting an example for others to follow - that treating Black Americans differently is acceptable, and condoned.  Those who shared SPAGNOLI's racist views, were promoted.  Accordingly, the "Yellow Fever" creator, Stanley Shen was promoted to Detective by SPAGNOLI.  This gave him a raise in pay.  Shen was assigned to a specialized unit (CIT) by SPAGNOLI.  SPAGNOLI knew that the female officer that Shen was promoted over (Officer Lunsman) is married to a Black American.

72.   Yet, Yellow Fever was not the only way that SPAGNOLI created a custom and practice of encouraging racism and rewarding those officers who treated Black Americans differently.   SPAGNOLI received  complaints about DOWLING's racist attitudes from Lt. Foxen and Lt. Nutal.  They both advised SPAGNOLI that DOWLING referred to Black Americans as "lazy" and used other derogatory stereotypes towards Black Americans.  Within days of being told about DOWLING's racist comments which were well known in the BHPD, SPAGNOLI promoted DOWLING to Lieutenant and later, captain.   This ratification of racist comments and statements by DOWLING help to show the custom and practice of targeting Black Americans for illegal treatment and is relevant to the class action claims because DOWLING was in charge of the EDD and RDT task forces also known as Operation Safe Street.

73.   Thus, DOWLING implemented the EDD, RDT and other practices to target Black Americans with illegal stops, arrests, jailings' and prosecutions.   Demonstrating how the defendants had widespread practices and customs to violate the civil rights of Black Americans, and the deliberate indifference towards those civil rights violations as well as the discriminatory moving force targeting Black Americans in the RDT and EDD task forces DOWLING specifically referred to the Black American individuals arrested by the RDT, as "**terrorists and animals.**"

74.   Black Americans are NOT terrorists or animals, and they should not be treated as such.  But, Black Americans are a recognized protected class.  The discriminatory animus and prejudice against Black Americans explains why over 90% of the people arrested were during the subclass periods and 34% over the total class period were Black, while only 1.9% of the residents of Beverly Hills are Black.  The defendants' common operational plan, top down policies and  treatment affects a discrete and identifiable group of citizens differently from other groups - Black Americans were stopped, arrested, imprisoned and maliciously prosecuted because

of their protected characteristic - Black.   The widespread top down policy of violating the constitutional rights of Black Americans is shown by the City giving an award of excellence to the RDT and EDD arrests, which targeted Black Americans by arresting 197 Black Americans which were 90% of all persons they arrested Americans. The task forces only resulted in two convictions via Nolo pleas and accomplished nothing other than successfully targeting Black Americans to scare them into staying our of Beverly Hills.

75.   The unconstitutionality of the actions towards the class as a whole was done with discriminatory intent had discriminatory impact as is demonstrated by the fact (based on information and belief) of the 1,088 Black American's arrested, only 2 of them were ever convicted of anything.  Prosecutors repeatedly refused to pursue charges, or after investigating further, dismissed the claims in the interests of justice.

76.   BHPD's ratification of employees with racist views against Black Americans created a discriminatory effect.  The Task Forces and arrests of Black Americans was motivated by a discriminatory purpose.  The discriminatory employment actions help to demonstrate the discriminatory motivation because it is strong circumstantial evidence of the racist views.

77.   Black Americans were unquestionably treated differently than similarly situated members of other classes because of their race - Black and membership in the protected class of Black Americans.  How else can one explain how 1.9% of the City is Black, but more than 90% of the people arrested by the task forces and 34% over the whole class period were Black? Black people were treated differently than members of other races because of their race - Black.

78.   When the City ratifies Dowling's reference to Black People as "animals" "terrorists," "lazy" and other racial stereotypes, a deliberate indifference to the constitutional rights of Black American's is clearly demonstrated, as is the Defendants' discriminatory purpose and discriminatory motive.  Violating the

constitutional rights of Black Americans was part of defendants policy, widespread custom or practice that was ratified by the police Chiefs.

79. Former Mayor, Nancy Krasne described Terry Nutall, the highest ranking Black American BHPD officer as "scary looking", "if you saw him in the hood you would run the other way."  He is a big guy.  He looks like an ex-Marine.  He's huge and he's a bad influence."   As the Mayor, Krasne was a policy maker for the city[15].

80. In approximately August, 2019, there were a series of emails between SPAGNOLI and residents of Beverly Hills regarding the racial profiling of a dark complected individual Defendants believed was Black (and later learned to be Latin American.) The young man was repeatedly pulled over by members of the BHPD when they believed him to be a Black American.  Once the officers learned the man was Latin and not Black, the unconstitutional searches and seizures stopped.

81. But, the profiling of Black Americans did not stop.  Accordingly, on February 9, 2020, Ashley Blackmon, a Black-American female, was driving in a Toyota Rav-4 through Beverly Hills around 9:30 a.m. on her way to a Sunday morning yoga class. Blackmon was thirty years old and had recently moved from New York City to Marina Del Rey for a job at Red Bull corporate headquarters as a brand manager. BHPD officers ordered her to pull over. Blackmon immediately complied with all instructions. Yet, five BHPD officers pointed their guns at Blackmon or her car during that stop. All of these BHPD officers  had either seen her driving the car alone or had been made aware that the lone driver was Black. Prior to pulling Blackmon over at gunpoint, BHPD officers noted her race on the radio to dispatch and requested air support. Moreover, BHPD officers admitted before the stop that Blackmon and/or her car did not materially match any suspects they were looking out for. Blackmon was released. No reasonable suspicion or probable cause existed

---

[15]Exh "9" contains relevant pages from a prior deposition of Ms. Krasne referring to the highest ranking Black BHPD officer as "scary looking" and other derogatory terms.

to ever stop her. She was not convicted of any crime.  She did not plea to any crime.

82.  For 25 years the City has continued to treat Black folks differently than White folks because of a widespread policy, custom and practice.  It is time to put such conduct to an end.

## A.   THE VIOLATION OF CONSTITUTIONAL RIGHTS IN THE RDT AND EDD SUBCLASSES.

83.  Two of the plaintiffs in this case were arrested for allegedly riding a scooter on the sidewalk.  Ironically, during a press conference on this very case, in front of City Hall and right next to the Police Department where police officers were present, a white person rode by on a scooter.  Not only was he not arrested by the BHPD, the White man was not stopped, detained, or even asked to ride on the street.

84.  Two of the plaintiffs in this case were detained when their car stopped less than one inch over the limit line.  Once again, during a press conference on this very case in front of City Hall and next to BHPD headquarters, several White motorists did not stop vehicles behind limit lines.  The White motorists were not stopped, handcuffed or arrested, but Black Americans were.  White motorists in Beverly Hills are not required to exit their cars when stopped for minor traffic infractions like two inches over the limit line, but Black motorists are.  White motorists are not jailed in Beverly Hills after stopping inches over the limit line, but Black motorists are.  As a class Black Americans had their constitutional rights violated while non-Black Americans did not because of the widespread practices and customs that had a discriminatory effect in deliberate indifference to the constitutional rights of Blacks.

85.  On May 15, 2020, SPAGNOLI was forced to retire due to over a dozen lawsuits alleging misconduct by her including her making derogatory comments against, and discrimination of various "minorities" including Black Americans, resulting in approximately $8,000,000.00 in judgments, verdicts and settlements against the city of Beverly Hills.  After SPAGNOLI was forced out, RIVETTI became the Interim Police Chief.   RIVETTI then ratified and approved of the creation of two task

forces - the RDT and EDD (collectively, "Operation Safe Streets.")

86. Between August 29, 2020 and October 24, 2020, the RDT focused on detaining and arresting Black American's for violations of "crimes" that White people were not detained or arrested for, such as: CVC 21955 (jaywalking); CVC 21456 (crossing against red hand/signal at cross walk); HSC 113.62 (smoking marijuana, and possessing cannabis products); smoking tobacco in a public right of way (including on the sidewalk or alleyway); smoking in a city park; CVC 23111 throwing out even an unlit cigarette; California Penal Code § 415 (playing loud music); CVC 27150(a) (having a loud exhaust); CV 22102 (illegal U-turn in business district); BHMC 5-6-801 (Riding a bicycle, skateboard, or roller skates on sidewalks in the business district (not specifically included in the statute is riding of a scooter, so Black Americans on scooters were arrested with the false charge of riding roller skates on the sidewalk)).

87. Other statutes that were enforced against Black Americans because of their race included: solicitation for charitable purposes without a permit; filming without a permit which includes still photography on private or public property without a permit. However, as demonstrated by the defendants' own statistics, non-Black Americans were not get stopped, detained, handcuffed, jailed or maliciously prosecuted. Each of these detentions and arrests of Black people in Beverly Hills was part of a widespread custom and practice or policy of the defendants.

88. None of the Black people arrested by the RDT and EDD task forces were convicted. Most of those cases were not even prosecuted because the arrests lacked probable cause and/or were otherwise unconstitutional and maliciously prosecuted.

89. On or about October 1, 2020, the RDT participated in a traffic stop of a Black driver and passenger near Rodeo Drive. The stop involved at least four officers and three police vehicles; two of the officers repeatedly refused to give their names when asked by a bystander, who was attempting to film them, and treated the would-be videographer with obvious hostility. Ultimately, the officers let the Black driver and

passenger go without even a citation because there was not a reasonable suspicion to stop the motorists other than their race.   There was no  probable cause to arrest them.  Nevertheless, the Beverly Hills officers asked the passenger for his identification as well as the driver. This is part of the wide spread custom and practice in Beverly Hills to try and find any little thing they can on Black Americans while not doing the same to non-Black Americans.  Thus Black Americans are subjected to more intrusive policing and entanglement with the criminal justice system than white people.  White people do not have a swarm of BHPD officers arrive for minor infractions, but they swarm for Black people.  White people are not searched for weapons when jaywalking or other minor infractions, but Black people are.

90.   On or about October 2, 2020, the RDT stopped and searched Versace's Vice President of Mens Footwear, Salehe Bembury. At the time, he was holding a Versace shopping bag near Rodeo Drive. Allegedly, he had jaywalked by going less than one foot out of the cross walk. BHPD officers surrounded him and searched him. They then asked for his ID and ran his name for warrants. Defendants believed that Bembury was suspicious because he was Black and shopping in Beverly Hills. In actuality, Bembury was and is a Vice President of Versace and works in Beverly Hills.   While it is common for defendants to stop, surround, question, and search Black Americans for  jaywalking near Rodeo Drive, non-Black Americans do not undergo the same treatment.  When black people are stopped for minor offenses such as jaywalking they are consistently asked for ID and a warrant check is done, this does not happen for non-black people. Clearly, Black Americans are treated differently and unequally in deliberate indifference to their constitutional rights because of widespread customs and practices with discriminatory effect on Black

Americans[16].

91.  Because racism is so rampant at BHPD, over 12 employees of the police department
filed  lawsuits. DOWLING was deposed.  In his deposition, he admitted to calling
two Black American employees "lazy" and other racial stereotypes, "probably
several times over the years."  Further, DOWLING referred to the highest ranking
Black American in the BHPD at the time, Terry Nutal as "lazy.[17]"  At the time,
Nutal was a lieutenant and a superior to DOWLING.

92.  Chief SPAGNOLI was advised by two different Lieutenants (Foxen and Nutal) that
they were concerned about DOWLING being racist, but SPAGNOLI promoted him
from Sergeant (a supervisor position) to Lieutenant (a manager position) despite
their concerns. Subsequently, SPAGNOLI promoted DOWLING to captain.
Accordingly, SPAGNOLI as the head of the agency, ratified and condoned the
statements and actions of DOWLING.  RIVETTI was aware of the claims against
DOWLING, yet allowed him to remain a Captain and thus in charge of both the
EDD and RDT task forces.

93.  Thus, from August 29, 2020 to October 24, 2020, the RDT targeted Black
Americans.  Over 90% of the arrests were of Black Americans.  Defendants
authorized and ratified the constitutional violations of the rights of Black
Americans.  To accomplish their goals, the "crimes" were fabricated.  For example,
WILLIAMS and WHITE were arrested for roller skating on the sidewalk even
though they were not on roller skates.  Hundreds of white persons committed the
same "crimes" as Black Americans, but did not get detained, arrested, jailed or

---

[16]A copy of the video of this arrest is available at
https://www.instagram.com/accounts/login/?next=/salehebembury/ and in possession of
plaintiffs.

[17]Nutal is the same Black lieutenant that Mayor Krasne called "scary looking." Relevant
portions of two depositions containing DOWLING'S admissions are attached hereto as exhs "10"
and  "11"and incorporated by this reference.

prosecuted.  Defendants were singularly focused on Black Americans because Black Americans as a race were unlawfully and unfairly deemed to be "criminals" Black Americans as a class were subjected to excessive force, false arrest, false imprisonment and malicious prosecution.

94.   SPAGNOLI, DOWLING and RIVETTI set in motion a series of acts by their subordinates, or knowingly refused to terminate a series of acts by their subordinates, that each knew or reasonably should have known would cause the subordinates to deprive Black Americans of their rights under law. Having learned of the unconstitutional conduct by BHPD officers, Defendants failed to act to prevent their subordinates from engaging in such conduct.

95.   Defendants DRUMMOND, ILUSORIO, DE LA CRUZ, FAIR, KRUG, BLAIR, WHITTAKER and LYGA were SPAGNOLI, RIVETTI, and DOWLING's subordinates, and following their orders, directions, policies, practices  and customs to deprive the class of Black Americans of their constitutional rights and based on information and belief were involved in the detention and arrest of the Plaintiffs and class members.

96.   Accordingly, Defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by the subordinates of the rights of Black Americans.

97.   On or about August 5, 2020, NETT and SWIFT were driving through Beverly Hills on Wilshire Boulevard, on their way to the beach, when they were followed by BHPD officers.   SWIFT was driving.  NETT was a passenger.  After approximately one mile of being followed, defendants pulled them over  based on the pretext that they were approximately three inches over the limit line.   NETT and SWIFT were both handcuffed and detained.  NETT was taken to jail and held there for more than 72 hours.  Neither NETT, nor SWIFT were ever charged with any criminal act. Despite spending three days in jail, Defendants claimed NETT was  "merely detained." and not arrested.  Neither of them were convicted of any charges. Neither of them plead to any crimes.

98.  Like other members of the class, NETT and SWIFT were detained, falsely arrested, grabbed, handcuffed, and/or jailed by the defendants who deprived plaintiffs of their constitutional rights.

99.  On or about September 7, 2020,WILLIAMS & WHITE were riding a scooter and not violating any laws. Nevertheless, they were detained, falsely arrested, subjected to excessive force, grabbed and threatened with being tased, handcuffed,  jailed, and maliciously prosecuted with false charges all of which were then dismissed by the prosecution in the interest of justice.  Before being arrested and handcuffed, Ms. WILLIAMS was pushed, hit or struck by a male officer then jailed.  Neither WHITE nor WILLIAMS was convicted of any crime.  Neither of them plead to any crimes.

100.  On or about August 5 and September 7, 2020 and on other dates over the two month Task Force, Defendants DALE DRUMMOND, JON ILUSORIO, JONATHAN DE LA CRUZ were working as members of the RDT task force following the polices and directions of their superiors, and detained plaintiffs and the Class Members without any reasonable suspicion and arrested them without any probable cause.

101.  Defendants and each of them had a policy, practice and widespread custom to demand identification of Black People, search them for weapons, detain them and falsely arrest them with excessive force and false charges when they would not engage in similar conduct to other racial groups.

102.  The false arrests, deliberate fabrication of charges and malicious prosecution of Black Americans resulted in the deprivation of liberty to all class members.   The actions of the defendants were the cause in fact of the deprivation of each plaintiffs' liberty.  In other words, the injuries and handcuffing of all of the plaintiffs would not have occurred in the absence of the conduct.  The actions of the defendants in racially profiling all of the plaintiffs in the class because of their race is a violation of constitutional rights and was the proximate or legal cause of the injuries.   A reasonable person would see the actions of the defendants and the resultant injury to the plaintiffs as a likely result of the conduct in question.

103. After prosecutors reviewed the (fabricated) police reports and the incidents, all charges against each class member were dropped or they were found not guilty. Thus, once prosecutors evaluated the arrests and charges, they found there was no probable cause for the arrests of each class member, or Judges and juries determined that each class member was not guilty of *any* crime.

104. Each of the plaintiffs in this action and class members have suffered harm and injuries as a direct and legal result of the actions of the defendants and each of them. The plaintiffs are entitled to economic and non-economic damages in a sum in excess of the minimum jurisdiction of this court, to fees, costs, penalties, fines, and such further relief as the court deems just. Punitive damages are justified against the individual defendants.

105. An injunction is requested to compel the City of Beverly Hills to only arrest Black Americans in accordance with Federal Constitutional requirements, to stop repetitions of unconstitutional conduct towards Black Americans.

**FIRST CAUSE OF ACTION**
**VIOLATION OF PLAINTIFFS' PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS THROUGH MALICIOUS PROSECUTION/FALSE IMPRISONMENT ON BEHALF OF ALL PLAINTIFFS AGAINST ALL DEFENDANTS EXCEPT THE CITY**

106. Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

107. The defendants acted under color of law.

108. The acts of the defendants deprived the plaintiffs of their rights under the laws of the United States and United States Constitution.

109. This claim is brought pursuant to 42 U.S.C. §1983 and the Fourteenth Amendment of the United States Constitution for violation of Plaintiffs' procedural and substantive due process rights and the violation thereof resulting from the malicious prosecution by the defendants named herein and resulting false imprisonment of Black Americans.

110. As delineated above,  WILLIAMS, WHITE, NETT, SWIFT, ROGERS, YORK and all class members were wrongfully detained, handcuffed and/or arrested without probable cause, and detained without any justification and/or charged with multiple criminal counts based upon the false charges, statements, police reports, evidence and testimony pursuant to Defendants policies and common operational plan.

111. WILLIAMS & WHITE were wrongfully detained, handcuffed and/or arrested without probable cause, and detained without any justification and/or charged with multiple criminal counts based upon the false charges, statements, police reports, evidence and testimony pursuant to Defendants policies and common operational plan.

112. On information and belief, NETT, SWIFT, ROGERS, YORK and subclass members were wrongfully detained, handcuffed and/or arrested without probable cause, and detained without any justification and/or charged with multiple criminal counts based upon the false charges, statements, police reports, evidence and testimony pursuant to Defendants policies and common operational plan.

113. Defendants directed subordinates in actions that deprived the plaintiffs and class members  of their constitutional rights.

114. Additionally, the defendants set in motion a series of acts by their subordinates that the supervisors, managers and policy makers knew or reasonably should have known would cause the subordinates to deprive the plaintiffs of their rights, or defendants knew or reasonably should have known that their subordinates were engaging in conduct that would deprive the plaintiffs of their rights and the defendants failed to act to prevent the subordinates from engaging in such conduct.

115. Between August 30, 2019 and August 30, 2021 based on information and belief BHPD arrested 3,213 people of which 34% or 1,088 were Black.   Based on information and belief only 2 of the 1,088 Black people arrested were prosecuted or convicted.

116. All class members were wrongfully detained, handcuffed and/or arrested without justification and criminally charged based upon the false charges, statements, police reports, evidence and testimony presented by Defendants.

117. Defendants had a widespread custom and practice in violation of Penal Code section 118.1 to knowingly file materially false police reports, and make materially false statements to target Black Americans because of their race with illegal detentions, arrests, imprisonments and prosecutions.

118. At no time did said defendants have probable cause to detain, arrest and/or charge any class members for any crime or to recommend that they be prosecuted. Notwithstanding this, with malice and conscious disregard for their rights to due process, said defendants presented false evidence and recommended all class members be charged and prosecuted. Thereafter, they meaningfully participated in the prosecution to ensure their wrongful conviction and wrongful imprisonment. But the class members were never convicted of any crime.

119. As the actual and proximate result of the acts and omissions of said defendants as described herein, Plaintiffs were made to lose their freedom and liberty, this in violation of the Fourteenth Amendment's procedural and substantive due process guarantees.

120. As a direct and legal result of the actions of defendants and each of them, plaintiffs suffered harm and economic and non economic damages in a sum according to proof and in excess of the minimum jurisdiction of this court and are entitled to costs of suit. Further, plaintiffs have incurred attorneys fees and costs for defending the criminal claims. Plaintiffs have also incurred costs in relation to the criminal case, including without limitation charges for bail, attorneys fees and other special damages all in a sum according to proof at time of trial.

121. Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendants will continue to falsely imprison and/or maliciously prosecute Black Americans who travel through the City of Beverly Hills. It is extremely likely that

defendants will continue with such unconstitutional violations.

122.  Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health.  "There's evidence to show that worsened mental health can occur even after lower levels of contact not involving an arrest or incarceration ."[18] These seemingly minor police interactions can trigger a variety of responses such as harmful stigma, stress and depressive symptoms. Further, studies show a significant association between police interactions and lowered mental health, including "psychotic experiences, psychological distress, depression, post-traumatic stress. disorder, anxiety, suicidal ideation and attempts, indicating a nearly twofold higher prevalence of poor mental health among those reporting a prior police interaction compared to those with no interaction ."[19] "Racial discrimination has been associated with a range of poorer health outcomes including respiratory conditions, diabetes, somatic complaints and chronic health conditions ." A 2019 study suggests that racism can lead to increased inflammation, increased risk of developing heart and kidney. disease and decreased quality of sleep.[20] The effects of defendants actions have harmful and severe health implications.

123.  The aforementioned acts of said defendants were willful, wanton, malicious, despicable and oppressive and said misconduct shocks the conscience thereby justifying the awarding of exemplary and punitive damages against the individual defendants.  (No punitive damages are sought against the city as it is statutorily

---

[18]Fair, Taneisha, The impact of policing on Black mental health., The Center for Community Solutions. Blog (June 22, 2020). https://www.communitysolutions.com/impact-policing-black-mental-health/

[19]*Id.*

[20]Paradies, Yin et al. Racism as a Determinant of Health: A Systematic Review and Meta-Analysis. PloS one vol. 10,9 e0138511. 23 Sep. 2015, doi:10.1371/journal phone.0138511.

immune.)

### SECOND CAUSE OF ACTION
### VIOLATION OF CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES ON BEHALF OF ALL PLAINTIFFS AND AGAINST ALL DEFENDANTS EXCEPT CITY

124.   Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

125.   This action is brought pursuant to 42 U.S.C. §1983 and the Fourth Amendment of the United States Constitution.

126.   At all times relevant hereto, Plaintiffs possessed the right, guaranteed by the Fourth Amendment of the United States Constitution, to be free from unreasonable searches and seizures by peace officers acting under the color of law.

127.   As described in above, Defendants violated all class members' Fourth Amendment rights by unlawfully and unreasonably detaining, handcuffing, arresting and imprisoning them without reasonable suspicion or probable cause.  Moreover, race was a motivating reason for stopping, detaining, handcuffing, jailing and/or arresting the plaintiffs.  All of the arrests to the class members were without a warrant.  They were intentional and the seizures were unreasonable.

128.   WILLIAMS & WHITE NETT, SWIFT, ROGERS and YORK  and all class members were wrongfully seized and searched by Defendants

129.   In general, a search of a person (or his/her their vehicles and property) is unreasonable under the Fourth Amendment, where as here, the search is not authorized by a search warrant.

130.   In doing the things described herein, said defendants acted specifically with the intent to deprive  all class members of their constitutional rights under the Fourth Amendment to be free from unreasonable seizures including unreasonable, excessive force.

---

**[Proposed]  THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL      Page -38-**

131.   At all relevant times herein, Defendants were policy makers or subordinates under the direction and control of the policy makers, and were acting under color of law.

132.   Defendants further set in motion a series of acts by their subordinates, or knowingly refused to stop unconstitutional actions by the subordinates, that they knew or reasonably should have known would cause the subordinates to deprive the civil rights of all class members, but failed to act to prevent their subordinates from engaging in such conduct.

133.   Accordingly, the defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by the subordinate of the rights of others.

134.   Defendants' conduct was so closely related to the deprivation of all class members' rights as to be the moving force that caused the ultimate injuries to each class member.

135.   Said defendants subjected  all class members to the aforementioned deprivations by either actual malice, deliberate indifference or a reckless disregard of their rights under the U.S. Constitution.

136.   As a direct and legal result of the actions of defendants and each of them, plaintiffs suffered harm and economic and non economic damages in a sum according to proof and in excess of the minimum jurisdiction of this court.  Plaintiffs are entitled to costs of suit and attorneys fees.

137.   Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendants will continue unreasonable searches and/or seizures of Black Americans who travel through the City of Beverly Hills. It is extremely likely that defendants will continue with such unconstitutional violations.  Indeed, according to statements to the media, Beverly Hills plans on setting up further task forces in the future that will continue to perpetuate racial stereotypes and racial profiling if not enjoined.

138.   Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health. *Supra,* ¶126.

139.   The aforementioned acts of said defendants were willful, wanton, malicious,

despicable and oppressive and said misconduct shocks the conscience thereby justifying the awarding of exemplary and punitive damages against the individual defendants.   Because the City is immune, punitive damages are NOT sought against City.

### THIRD CAUSE OF ACTION
### MUNICIPAL LIABILITY FOR VIOLATION
### OF CONSTITUTIONAL RIGHTS
### ON BEHALF OF ALL PLAINTIFFS
### AGAINST DEFENDANT CITY OF BEVERLY HILLS

140.   Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.  However, there are no punitive damages sought against the City.

141.   This action is brought pursuant to 42 U.S.C. §1983 for violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments.

142.   From March 2016 to May 2020, SPAGNOLI was the chief of the BHPD. Defendant RIVETTI became the Interim Chief after SPAGNOLI was forced to resign following her misconduct.

143.   RIVETTI  was the Interim Chief From May 2020 to November 2021, of the BHPD.

144.   While serving as police chief, SPAGNOLI and RIVETTI, respectively, were the final policy-making authorities for police policy in the City of Beverly Hills.[21]

145.   RIVETTI like his predecessor SPAGNOLI exercised control and management over the City's police department and they were the final policymakers for Defendants. DOWLING was allowed to set policy by RIVETTI and SPAGNOLI.  At all relevant times, each defendant acted under color of law.

146.   As police chief, SPAGNOLI and RIVETTI promulgated policies wherein police

---

[21]*Harper v. City of Los Angeles*, 533 F.3d 1010, 1025 (9th Cir. 2008) (police chief is final policymaker for City of Los Angeles, rendering City liable for police chief's "decision that deprived plaintiffs of their constitutional rights"); *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) ("As to matters of police policy, the chief of police ... may be considered the person possessing final policy-making authority.").

officers were ordered and encouraged to stop, detain, arrest, forcefully seize, and/or prosecute Black Americans who visited the City of Beverly Hills. SPAGNOLI and RIVETTI implemented policies, procedures and practices that deprived Black Americans of their rights under the laws of the United States and the United States Constitution.

147.   Defendants espoused the false belief that Black Americans were a criminal threat in the City.  This is demonstrated by the long standing practice and custom of racially profiling Black Americans, with detentions and arrests that did not lead to any convictions.

148.   To further their discriminatory policies, SPAGNOLI and RIVETTI promoted and delegated implementation of their policies to DOWLING. SPAGNOLI and RIVETTI were both aware DOWLING harbored racial beliefs towards Black Americans and other minorities. However, DOWLING was continually rewarded and delegated policymaking authority by SPAGNOLI and RIVETTI.

149.   SPAGNOLI and RIVETTI were aware of the racial profiling and constitutional violations of Black Americans because of complaints received from citizens, various lawsuits and newspaper articles.   Moreover, SPAGNOLI and RIVETTI were aware of continuous prosecutorial rejections for charges against Black Americans improperly arrested and charged by BHPD. However, SPAGNOLI and RIVETTI implemented an express policy, custom, or widespread practice of targeting Black Americans as criminals rather than engaging in constitutional policing.  The defendants had deliberate indifference to the violations of constitutional rights for Black Americans.  BHPD had a policy to violate Federal Law and the US Constitution by deprivation of equal protection, substantive and procedural due process rights and illegal searches and seizures.

150.   At all relevant times herein, class members suffered constitutional deprivations by Defendants DRUMMOND, ILUSORIO, DE LA CRUZ, FAIR, KRUG, BLAIR, WHITTAKER, LYGA because these named officers and sergeants

were implementing the unconstitutional policies of Chiefs Spagnoli & Rivetti, and the City of Beverly Hills.

151. SPAGNOLI and RIVETTI ratified the unconstitutional actions of subordinates by continually rewarding officers for unconstitutional conduct through awards, positive evaluations, better assignments, promotions, and increased income/overtime. For instance, Defendants DRUMMOND, ILUSORIO, DE LA CRUZ, FAIR, KRUG, BLAIR, WHITTAKER and LYGA the members of the RDT received awards, accolades, positive evaluations, better assignments, promotions, and increased income/overtime from the City and its' police chiefs because they implemented the CITY OF BEVERLY HILLS AND BHPD's unconstitutional policies.

152. Thus, the policy, practice and custom of defendants resulted in violating the rights of Black Americans to be free from equal protection, unreasonable seizures, unlawful arrests, and excessive force.  Thereafter in violation of Plaintiffs' due process rights Defendants proceeded to falsify evidence, and submit false police reports so as to ensure that Plaintiffs and the Class would be wrongfully convicted.

153. At the time of these constitutional violations, defendants CITY OF BEVERLY HILLS had policies in place, and had ratified customs and practices which permitted and encouraged their police officers to violate the US Constitution.

154. Said policies, customs and practices also called for the City of Beverly Hills and its Police Department not to discipline, prosecute, or objectively or independently investigate known incidents and complaints of unconstitutional violations of the rights of Black individuals' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.  These violations were exacerbated by defendants lack of properly training its officers in constitutional policing.

155. Defendant CITY OF BEVERLY HILLS was aware of and deliberately indifferent to a pervasive and widespread pattern and practice within the BHPD, and particularly the RDT and EDD task forces to violate the rights of Black individuals' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.  Said defendants

failed to take any reasonable measures to correct this pattern and practice and as a result ratified the actions, and Defendants have been deliberately indifferent to the civil rights violations which resulted to Black Americans as a class, including those which are described herein.

156. Said customs and practices called for said defendants, by means of inaction and coverup, to encourage an atmosphere of lawlessness within the police department and to encourage their police officers to believe that engaging in illegal searches, seizures, due process violations and violations of Equal Protection was permissible, and that such conduct would be overlooked or would not result in any discipline for BHPD employees violating the civil rights of Black Americans demonstrating ratification of these customs and practices towards Black Americans as a group.

157. Said policies, customs and practices of said Defendants and each of them evidenced a deliberate indifference to the violations of the constitutional rights of Plaintiffs. This indifference was manifested by the failure to change, correct, revoke, or rescind or otherwise address said customs and practices in light of prior knowledge by said defendants and their subordinate policymakers of indistinguishably similar incidents of unjustified, unreasonable and unlawful arrests, falsification of evidence and  police reports, excessive force and other constitutional violations against the class of Black citizens.

158. Defendants and each of them demonstrated a deliberate indifference to the civil rights of Black victims of the BHPD's actions as further evidenced by defendants ignoring the history and pattern of prior civil lawsuits alleging civil rights violations, similar to those alleged herein, arising from such misconduct and the related payment of judgments or settlements of such suits, including those alleging racial  discrimination and harassment, which revealed racial animus harbored by SPAGNOLI, DOWLING and others at BHPD showing a belief by them that African Americans are inferior to other groups and ratification of racial animus towards the class of Black Americans.

159.   Deliberate indifference is also evidenced by an absence of or by maintenance of an inadequate system of tort claims tracking and by maintaining an inadequate system of officer discipline and independent and objective investigation by the City of Beverly Hills and its police department which failed to identify and investigate instances of false and unlawful arrests, excessive force, falsification of evidence, denial of equal protection and other acts of wrong doing towards Black Americans.

160.   Deliberate indifference to the civil rights of victims of the BHPD's unlawful arrests and falsified evidence was also evidenced by the failure of  said defendants to adequately train and more closely supervise or retrain officers and/or discipline or recommend prosecution of those officers who engaged in unconstitutional actions towards Black Americans.

161.   Other systemic deficiencies of said defendants which indicated, and continue to indicate, a deliberate indifference to the violations of the civil rights by the officers of the BHPD towards Black Americans include:

a.   Illegal detentions and arrests without reasonable suspicion or probable cause.

b.   preparation of untrue police reports and investigative reports designed to vindicate and/or justify false and unlawful arrests;

c.   preparation of investigative reports which uncritically rely solely on the word of BHPD officers involved in unlawful arrests or in the planting of evidence and which systematically fail to credit testimony by non-officer witnesses;

d.   preparation of investigative reports which omit factual information and physical evidence which contradicts the accounts of the officers involved;

e.   issuance of public statements exonerating officers involved in such incidents prior to the completion of investigations of wrongful arrests or that are contradicted by actual evidence;

162.   Said defendants also maintained a system of grossly inadequate training pertaining to the lawful making of arrests, police ethics, the law pertaining to searches and seizures, testifying in trial and perjury, the collection of evidence, and the

preparation of police reports regarding the arrests of Black Americans.

163. The foregoing acts, omissions, and systemic deficiencies are practices and customs of said defendants as such caused, permitted and/or allowed under official sanction Defendants SPAGNOLI, RIVETTI, and DOWLING to be unaware of, or intentionally overlook and ignore, the rules and laws governing the unconstitutional actions towards African Americans.

164. The foregoing acts, omissions, and systemic deficiencies are practices and customs of said defendants which caused, permitted and/or allowed under official sanction said police officer defendants to believe that unconstitutional arrests would not result in any discipline of them.

165. Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendant City will continue with its unconstitutional policy towards Black Americans.  It is extremely likely that defendants will continue with such unconstitutional violations.  Defendant has indicated it plans to set up new task forces which are likely to harm the civil rights of Black people.

166. Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health. *Supra,* ¶126.

167. As a direct and legal result of the defendants actions, the plaintiffs were harmed, and are entitled to economic and non economic damages in excess of the minimum jurisdiction of this court, to attorneys fees, litigation costs, fines, penalties, interest and such other relief as the court deems just and proper.

**FOURTH CAUSE OF ACTION**
**FOR VIOLATION OF EQUAL PROTECTION**
**ON BEHALF OF ALL PLAINTIFFS**
**AGAINST DEFENDANT CITY OF BEVERLY HILLS**

168. Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.  However, there are no punitive damages sought against the City.

169. 1,088 Black People were treated differently than other people because of their race

in violation of their rights to Equal Protection.  Based on information and belief, of those 1,088 Black Americans arrested, 1,086 were never convicted of the crimes they were accused of, or of any crimes whatsoever.

170. Equal Protection Class Action claims can be brought where one class of people is treated  differently than another by a Federal, state or local government or its officials. This is the case when "minorities" bring discrimination claims against governmental  entities.  Here, the "minorities" are Black Americans. Violations of Equal Protection are particularly appropriate for class action treatment. Illustratively, courts even recognize "class of one" claims.[22] If an individual can show that he or she has been "singled out" for irrational or differential treatment by a Federal, state or local government entity or official, Section 1983 can be used in filing a "class of one claim."[23]  Here 1,086  members of the class and 179 members of the subclass were  singled out for irrational or differential treatment by Defendants in the same way, making their claims typical of one another.

171. Here, there is an identifiable class of the 1,086 Black individuals who because of wide spread policies, practices and customs were arrested or detained by Defendants during the class period without a conviction of any crime, and no plea agreement. There are two identifiable sub classes totaling 179 Black Americans.

172.  A Class action is the preferred method to resolve the Equal Protection claim because there are multiple parties with essentially identical claims.

173. Plaintiffs are part of a recognized, identifiable and protected class.

174. Defendant City had a widespread practice and custom of treating Black people differently than other races in Beverly Hills.  Black people were viewed by Defendants as "suspicious," "terrorists" "animals" "lazy" part of the "Black mafia" as "criminals" and otherwise inferior to White people and those who were not

---

[22]*Olech v. Village of Willowbrook*, 528 U.S. 562 (2000).

[23]*Id.*

Black.

175. Defendant City was deliberately indifferent to the discriminatory treatment towards Black Americans - a recognized class.

176. The policy of the City to view Black people as inferior, suspicious, "terrorists," "animals" and otherwise differently than non Blacks was a moving force behind the constitutional violations alleged herein, and explains why 1.9% of the City is Black, and under 6% of the State is Black, but over 90% of the people arrested in the RDT and EDD Task Forces (collectively "Operation Safe Streets") were Black. Defendants wanted to make their streets safe - their policy, practice and custom was to arrest Black people to accomplish their "safe street" objective.

177. The City's policies, practices and customs had a discriminatory effect and intent - over 90% of the arrests during the RDT and EDD subclass period and 34% over the total class period were of Black people while less than 2% of the people in Beverly Hills are Black.  Black people are part of an identifiable group of citizens.  They were treated differently than other races.

178. Black people are readily apparent as a race, and the Courts have treated race as a protected characteristic.

179. Here, characteristics that identify the plaintiffs in this class as Black are ascertainable and demonstrate that Black Americans suffered discrimination because of their race.   (179 out of 197 people  arrested by the RDT and EDD Task Forces are Black (90%) and 34% of the persons arrested in the total class period were Black.)

180. Based on information and belief:  In the two years of the class approximately 3,213 people arrested and approximately 1,088 were Black.  **1,086 of those Black individuals were not convicted of any crime.   If there was not a wide spread custom and practice to target Black American's, based on the statistics in Beverly Hills that less than 2% of the City is black, the EDD and RDT task**

**force should have arrested 4 Black American's.  During the two year period when 3,213 people were arrested, only 64 of them should have been arrested, not 1,088.**

181.  Defendant City's policies and widespread practices and customs had a discriminatory effect or discriminatory intent.

182.  Plaintiffs lawfully sought to travel through or visit the City of Beverly Hills.

183.  Under the guise of various euphemisms, Defendants believed Black Americans were an undesirable presence in the City of Beverly Hills. Defendants adopted the false belief of constituents that Black Americans had criminal propensities. As such, Black individuals, in sharp statistical contrast to any other racial group, were racially profiled and regularly stopped and harassed for engaging in innocent conduct. Other racial groups were not stopped and harassed for similar conduct. The arrests of the members of the class and sub classes were unconstitutional as demonstrated by the lack of convictions for any alleged crime.

184.  Defendants prevented Plaintiffs from lawfully walking in, driving through or otherwise visiting the City of Beverly Hills because Plaintiffs were Black Americans. Defendants implemented a policy to intimidate and deter Black Americans from coming to the City. Defendants utilized the BHPD to violate the constitutional rights of Plaintiffs because of their race which resulted in deterring Black individuals from visiting or traveling through the City of Beverly Hills.

185.  Defendants did not take similar actions against White people and non- Black Americans.  Black Americans were treated differently than similarly situated White and non-Black Americans.

186.  Illustratively, Black Americans were falsely stopped, detained, arrested, imprisoned, maliciously prosecuted and subjected to false, and perjured police reports for "crimes" that only Black people were detained or arrested for, specifically:  "Roller Skating on the Sidewalk" when they were not even on Roller Skates; stopping one inch or less over a limit line in a car;  For J-walking one inch out of a cross walk

just before stepping onto the curb;  For making a U turn.  For smoking cigarets. White people were not stopped for these same types of activities.  The discriminatory impact, coupled with years of racially insensitive and derogatory comments, and repeated acts of discrimination shows conclusively that Defendants had a discriminatory purpose which was a motivating factor of the policy and widespread practices and customs to target and treat Black people differently than any other racial group.

187.   Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendant City will continue to treat Black Americans worse, i.e., violate their constitutional rights, who travel through the City of Beverly Hills. It is extremely likely that defendants will continue with such unconstitutional violations.

188.   Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health. *Supra,* ¶126.

189.   As a direct and legal result of the defendants actions, the plaintiffs were harmed, and are entitled to economic and non economic damages in excess of the minimum jurisdiction of this court, to attorneys fees, litigation costs, interest, penalties and such other relief as the court deems just and proper.


WHEREFORE, Plaintiffs pray for the following:

1.   Compensation for both economic and non-economic damages suffered and to be suffered in a sum according to proof at time of trial;

2.   Medical, legal and other expenses incurred by Plaintiffs;

3.   Compensatory damages and nominal damages caused by deprivation of Plaintiffs' constitutional rights;

4.   Litigation costs;

5.   Attorneys' fees, as allowed by statute;

6.   Interest;

7.   Civil Penalties as allowed by law.

8.     Punitive damages against individual defendants but not as to Defendant
CITY;

9.     Injunctive Relief in the form of a consent decree to prevent BHPD from
engaging in racial profiling of Black Americans again in the future.

10.    Any other relief or damages allowed by law, or statutes not set out above, and
such further relief as this Court deems just and proper at conclusion of trial.

Dated: May 26, 2023                    Respectfully Submitted,
                                       Law Offices of GOLDBERG & GAGE
                                       A Partnership of Professional Law Corporations
                                       The BEN CRUMP LAW FIRM and
                                       The SPENCER LAW FIRM

                            By /s/ Bradley C. Gage

                                       Bradley C. Gage
                                       Ben Crump
                                       Milad Sadr
                                       Jeffrey Spencer

                                       Attorneys for Plaintiffs

**"Exhibit 1"**

**RODEO DRIVE TEAM (RDT) ARREST INFORMATION**

- RDT START/END DATES: AUGUST 29, 2020 THROUGH OCTOBER 24, 2020
- RDT ARREST TOTAL:     90
- RDT ARREST DATES:     AUGUST 29, 2020 THROUGH OCTOBER 24, 2020

RDT ARRESTS BY RACE

- AFRICAN AMERCIAN:   80
- CAUCASIAN:          3
- HISPANIC:           4
- VIETNAMESE:         2
- OTHER:              1

RDT ARRESTS BY GENDER

- MALE:               83
- FEMALE:             7

RDT ARRESTS BY AGE

- 18 TO 25 YOA:       51
- 26 TO 30 YOA:       22
- 31 TO 40 YOA:       14
- 41 TO 50 YOA:       3

RDT ARRESTS BY CHARGE

- 530.5(a) PC:        59
- 182 PC:             36
- 381 PC:             1
- 484(a) PC:          4
- 487 PC:             1
- 11350(a) H&S:       5
- 11377(a) H&S:       2
- 11357(a) H&S:       1
- 11357(c )(1) H&S:   1
- 11360(a) H&S:       3
- 11364 H&S:          1
- 647(f) PC:          1
- 14601.1(a) VC:      5
- 14601(a) VC:        1
- 12500(a) VC:        2
- 69 PC:              3
- 148(a)(1) PC:       1
- 148 PC:             1
- 148.9(a) PC:        3
- 243(b) PC:          1
- 537(a)(1) PC:       1
- 530.5 (e ) PC:      2

- 485 PC:                   2
- 472 PC:                   3
- 1275.1 PC:                1
- 25850(a) PC:              3
- 25850(c )(6) PC:          1
- 40302(a) VC:              2
- 21954(a) VC:              2
- 25400(a)(2) PC:           6
- 25400 (a)(1) PC:          6
- 23222(a) VC:              2
- 29800(a)(1) PC:           4
- 30305(a)(1) PC:           1
- 25300(a)(1) PC:           1
- 4461(a) VC:               1
- 135 PC:                   1
- 32310 PC:                 1
- 5-4-12 BHMC:              1
- 4-3-101 BHMC:             3
- 5-6-801 BHMC:             2
- 4-2-701 BHMC:             1
- OS Misd Warrant:          2
- OS Fel Warrant:           1

**EDD ARREST INFORMATION**

- EDD ARREST TOTAL:      107

EDD ARRESTS BY RACE

- AFRICAN AMERICAN:    99
- CAUCASIAN:           2
- HISPANIC:            4
- VIETNAMESE:          2

**"Exhibit 2"**

World Population Review



These Amazing Flying Snakes Glide Through the

I Think a Tornado Just Went Over My Head



**Beverly Hills, California Population 2022**     Show Sources

## Beverly Hills, California Population 2022

## 33,015

| | |
|---|---|
| **State** | California |
| **County** | Los Angeles County |
| **Land Area (mi²)** | 5.7 sq mi |
| **Density (mi²)** | 5,784.0/sq mi |
| **2020 Growth Rate** | -0.78% (-259) |
| **Growth Since 2010** | -3.21% (-1,094) |
| **Rank In State** | 229th |
| **Rank In Country** | 1202nd |

The current population of Beverly Hills, California is **33,015** based on our projections of the latest US Census estimates. The US Census estimates the 2018 population at **33,015**. The last official US Census in 2010 recorded the population at **34,109.**

Beverly Hills is a city located in Los Angeles County California. With a 2020 population of **33,015**, it is the **229th** largest city in California and the **1202nd** largest city in the United States . Beverly Hills is currently declining at a rate of -0.78% annually and its population has decreased by -3.21% since the most recent census, which recorded a population of **34,109** in 2010. Spanning over 6 miles, Beverly Hills has a population density of 5,784 people per square mile.

The average household income in Beverly Hills is $195,716 with a poverty rate of 8.25%. The median rental costs in recent years comes to $2,244 per month, and the median house value is $2.00 Mn. The median age in Beverly Hills is 44.8 years, 41.6 years for males, and 46.3 years for females.

**Beverly Hills Demographics**

According to the most recent ACS, the racial composition of Beverly Hills was:

- White: 81.93%
- Asian: 9.06%
- Two or more races: 4.91%
- Other race: 1.97%
- Black or African American: 1.95%
- Native American: 0.18%



**Beverly Hills Population by Race**                                    Show Source

## Population by Race ⃝

| Total | Hispanic | Non-Hispanic |

| Race | Population ▾ | Percentage |
|------|------------|------------|
| White | 28,008 | 81.93% |
| Asian | 3,097 | 9.06% |
| Two or More Races | 1,680 | 4.91% |
| Some Other Race | 674 | 1.97% |
| Black or African American | 665 | 1.95% |
| American Indian and Alaska Native | 62 | 0.18% |

Race

81.9%

9.1%

■ White  ■ Black or African American  ■ American Indian and Alaska Native
■ Some Other Race  ■ Two or More Races

---

**Beverly Hills Population by Age**                                    Show Source

**Beverly Hills Population Pyramid $2022**

**Beverly Hills Median Age**

44.8    41.6    46.3

    

Total    Male    Female

**Beverly Hills Adults**

There are 27,250 adults, (7,302 of whom are seniors) in Beverly Hills.

**"Exhibit 3"**

WIKIPEDIA

# African Americans in California

**African-American Californians** or **Black Californians** are residents of the state of California who are of African ancestry. According to 2019 U.S. Census Bureau estimates, those identified solely as African American or black constituted 5.8% or 2,282,144 residents in California. Including an additional 1.2% who identified has having partial African ancestry, the figure was 7.0% (2.8 million residents).[2][3]

The Black community is prevalent in Alameda, Contra Costa, San Francisco, and Solano Counties in the San Francisco Bay Area, Sacramento County, and San Joaquin County. In Southern California, the population is concentrated in Los Angeles County, San Bernardino County and San Diego County.

### African Americans in California



**Regions with significant populations**

Fillmore District and Bayview-Hunters Point in San Francisco; Oakland and the East Bay Area; Compton, South Los Angeles, Palmdale, Lancaster, Long Beach and Inglewood; Southeast San Diego; San Bernardino and Moreno Valley and other Inland Empire cities;,[1] Stockton and Sacramento; North Bakersfield and North Fresno

**Languages**

California English, African languages, Spanish, African-American Vernacular English

**Religion**

Christianity, Islam, atheism

## Contents

**History**

**Media**

**Education**

**See also**

**References**

**External links**

## History

People of African-descent first appeared in California from Mexico due to the Spanish Conquest.[5] The first census recorded of African Americans in California appeared in 1850 with 962 people and 1860 with 4,086 people.[6] Then, in 1910 the number rose to 22,000.[7] African Americans totaled to less than one percent of California's population before the Second World War.[7] The population of African Americans grew slowly with other minorities in California, with only 21,645 African American residents in 1910 compared to two million white residents.[8] Post-WWII, African Americans boosted their population enormously in California.[7] African Americans migrated to California from Arkansas, Louisiana, Oklahoma and Texas to work in the defense industry.[9] In the 2010s, California was a net loser of black migration for the first time in three decades. Most exiting California blacks are returning to the south especially Texas and the Atlanta metropolitan area.[10] There are Black neighborhoods and cities with Black populations surpassing 15% in Southern California like in Compton, South Los Angeles and Inglewood, and in Northern California like Stockton,[11] Oakland, and Vallejo.[12]

Oakland has been noted for being a center of Northern California's Black population, with it being at least 25% Black as of 2020. Many African Americans who settled in California, likewise in Oakland, worked on the railroad in Oakland and East Bay areas in the early-to-mid 1900s.[13]

## Media

African American residents of California were first mentioned in 1919 by black Californian historian Delilah Beasley, and later on Rudolph Lapp, others.[7] More information appeared in journals such as *The Journal of Negro history* and *The Journal of African American History*. (3)[14] Other Californian publications about African Americans include the *California Eagle, California Voice*, and *Los Angeles Sentinel*.[7]

## Education

After a petition sent by African Americans to the Los Angeles Board of Education in 1872, the California Supreme Court ruled *Ward v. Floor* current segregation in educational practices as unconstitutional, breaching U.S. Constitution's 14th and 15th amendments.[8] African American students in lower education increased from 24 in 1870 to 183 by the late 19th century, and ranked highest performing students in literacy subjects in 1900.[8] In 1994, California's African American students made up about seven percent of higher education, compared to nine percent in the country.[15]



Racial/Ethnic Makeup of California treating Hispanics as a Separate Category (2017)[4]

☐ White Non-Hispanic (36.97%)
☐ Black Non-Hispanic (5.47%)
☐ Native American Non-Hispanic (0.37%)
☐ Asian Non-Hispanic (14.37%)
☐ Pacific Islander Non-Hispanic (0.35%)
☐ Other Non-Hispanic (0.27%)
☐ Two or more races Non-Hispanic (3.05%)
☐ Hispanic Any Race (39.15%)

## See also

- Second Great Migration (African American)
- African Americans in San Francisco
- History of the African Americans in Los Angeles
- California locations by race
- Demographics of California
- Afro-Mexicans
- Hispanics and Latinos in California

## References

1. "Cities with the Highest Percentage of Blacks (African Americans) in California | Zip Atlas" (http://zipatlas.com/us/ca/city-comparison/percentage-black-population.htm).
2. "BLACK OR AFRICAN AMERICAN ALONE OR IN COMBINATION WITH ONE OR MORE OTHER RACES" (https://data.census.gov/cedsci/table?q=Black%20or%20African%20American&g=0100000US.04000.001&tid=ACSDT1Y2019.B02009&hidePreview=true). U.S. Census Bureau.
3. "U.S. Census Bureau, 2011-2015 American Community Survey 5-Year Estimates." *American FactFinder*. U.S. Census Bureau.

4. "B03002 HISPANIC OR LATINO ORIGIN BY RACE - California - 2017 American Community Survey 1-Year Estimates" (https://archive.today/20200213015820/https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_1YR/B03002/0400000US06). U.S. Census Bureau. July 1, 2017. Archived from the original (https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_1YR/B03002/0400000US06) on February 13, 2020. Retrieved October 11, 2018.

5. Taylor, Quintard (January 1, 2000). "African American Men in the American West, 1528-1990". *The Annals of the American Academy of Political and Social Science*. **569**: 102–119. doi:10.1177/000271620056900108 (https://doi.org/10.1177%2F000271620056900108). JSTOR 1048813 (https://www.jstor.org/stable/1048813). S2CID 145420060 (https://api.semanticscholar.org/CorpusID:145420060).

6. Bradford, Eric. "Free African American Population in the U.S. : 1790-1860." *NCpedia Home Page | NCpedia*. Ncpedia, 2008.

7. Moore, Shirley Ann Wilson (January 1, 1996). "African Americans in California: A Brief Historiography". *California History*. **75** (3): 194–197. doi:10.2307/25177592 (https://doi.org/10.2307%2F25177592). JSTOR 25177592 (https://www.jstor.org/stable/25177592).

8. Campbell, Marne L. (January 1, 2012). "African American Women, Wealth Accumulation, and Social Welfare Activism in 19Th-Century Los Angeles". *The Journal of African American History*. **97** (4): 376–400. doi:10.5323/jafriamerhist.97.4.0376 (https://doi.org/10.5323%2Fjafriamerhist.97.4.0376). JSTOR 10.5323/jafriamerhist.97.4.0376 (https://www.jstor.org/stable/10.5323/jafriamerhist.97.4.0376). S2CID 149013832 (https://api.semanticscholar.org/CorpusID:149013832).

9. "African Americans in Los Angeles - African American Studies - Oxford Bibliographies - obo" (https://www.oxfordbibliographies.com/view/document/obo-9780190280024/obo-9780190280024-0069.xml). *www.oxfordbibliographies.com*. Retrieved March 19, 2020.

10. Advocate, The. "Politics | News from The Advocate" (https://www.theadvocate.com/baton_rouge/news/politics/). *The Advocate*. Retrieved November 5, 2020.

11. Payton, Allen (February 5, 2019). "Antioch Council hires first African American as City Attorney" (http://antiochherald.com/2019/02/05ah01acc/). *The Antioch Herald*. Retrieved March 19, 2020.

12. "These Are The 10 California Cities With The Largest Black Population For 2019" (https://www.roadsnacks.net/most-african-american-cities-in-california/). *RoadSnacks*. December 9, 2018. Retrieved May 13, 2019.

13. Tramble, Thomas and Wilma (2007). *The Pullman Porters and West Oakland*. Charleston, SC: Arcadia Pub.

14. Franklin, V. P. (January 1, 2006). "Introduction: The African American Experience in the Western States". *The Journal of African American History*. **91** (1): 1–3. doi:10.1086/JAAHv91n1p1 (https://doi.org/10.1086%2FJAAHv91n1p1). JSTOR 20064043 (https://www.jstor.org/stable/20064043). S2CID 149288451 (https://api.semanticscholar.org/CorpusID:149288451).

15. "Serious Erosion of African-American Enrollment in California Higher Education". *The Journal of Blacks in Higher Education* (3): 11. January 1, 1994. doi:10.2307/2963084 (https://doi.org/10.2307%2F2963084). JSTOR 2963084 (https://www.jstor.org/stable/2963084).

# External links

- Hispanics: California's Next Majority (https://www.nytimes.com/interactive/2013/02/20/us/hispanics-californias-next-majority.html?_r=0), *The New York Times*
- https://www.nps.gov/juba/learn/historyculture/afro-latinos.htm (https://www.nps.gov/juba/learn/historyculture/afro-latinos.htm)
- https://hyperallergic.com/494309/california-bound-california-african-american-museum/
- https://theconversation.com/the-little-known-story-of-how-slavery-infiltrated-california-and-the-american-west-165705

Retrieved from "https://en.wikipedia.org/w/index.php?title=African_Americans_in_California&oldid=1081373505"

**This page was last edited on 7 April 2022, at 02:26 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License 3.0; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

**"Exhibit 4"**

## 2020 EMPLOYEE EXCELLENCE AWARDS

### CATEGORY: OUTSTANDING JOB PERFORMANCE

_Individual Nominees_

Capt. Elisabeth Albanese, Police

Sandra Skorkaite, Finance

Fausto Zagal, Public Works

Ben Smith, Public Works

Keith Sterling, Policy and Management

Aloe Barrios, Public Works

Karen Myron, Community Development

Shawnee Pickney, City Auditor

Steven Leungsikul, Community Services

Cindy Owens, Policy & Management

Timmi Tway, Community Development

Jonathan Herndon, Information Technology

Rochelle Hogue, Public Works

David Perusse, Fire

Sara Fernandez, Public Works

Sharon L'Heureux Dressel, Risk Management

Sara Scrimshaw, Community Services

Michelle Tse, Public Works

Mandana Motahari, Public Works

David Hillyer, Public Works

Robert Sahagun, Public Works

Elias Lemus, Public Works

Raymond Lara, Public Works

Emma Nica, Police

Michael Liang, Police

Meena Janmohamed, Policy & Management

Luis Salazar, Public Works

Narek Katabyan, Risk Management

Sergio Vasquez, Public Works

_Team Nominees_

EOC & Work from home support staff (Nicole McClinton, Joe Reis, Murugan Krishnan), Information Technology

WFH Mobilization Team (Alvin Collins, Joseph Reis, Roger Villafuerte, Ara Haroyan, Andrew Fernando, Art Ziyalov, Hal Bodkin, Chuck Merrill, Murugan Krishnan), Information Technology

PD Rodeo Drive Team (Sgt. Billy Fair, Sgt. Dale Drummond, Officer James Krug, Officer Billy Blair, Officer Jonathan De La Cruz, Officer Jerry Whittaker, Officer Jesse Lyga, Officer Jon Ilusorio), Police

Property Crime Detective Team (Aaron Goff, Dan Chilson), Police

Administrative Non-Sworn Detective Bureau Team (Barbara Varona, Karina Amaral, Michael Gonzalez, Connor Reeves), Police

BHPD Motor Unit (Sgt. Gregg Mader, Sgt. Jay Kim, Michael Yamada, Chris Bond, Sunday Arriaga, Joel Givens, Julian Reyes, Matt Thurman), Police

Fleet Services Center (Kevin Jones, Ken Aquilina, Charles Lapham, Greg Foerster, Steve Carrillo, Ryan Nelson, Zoran Lukic, Harry Kalindjian, Craig Crowder), Public Works

Camp Beverly Hills (Laura Briceno, Lisa Perry, Chris Reed, Lily Medrano, Ingrid Minera), Community Services

Paul Nguyen and Fausto Zagal, Public Works

**CATEGORY: EXEMPLARY CUSTOMER SERVICE**

| *Individual Nominees* | *Team Nominees* |
|---|---|
| Victor Vasquez, Finance | WFH Mobilization Team (Alvin Collins, Joseph Reis, Roger Villafuerte, Ara Haroyan, Andrew Fernando, Art Ziyalov, Hal Bodkin, Chuck Merrill, Murugan Krishnan, Information Technology |
| Alice Kuo, Community Services | |
| Ji Kim, Public Works | IT Go To Team (Alvin Collins, Murugan Krishnan), Information Technology |
| David Perusse, Fire | |
| Laura Briceno, Community Services | BHPD Cadets (Aaron Alberti, Jaquelyn Serrano, Larry Scaife, Jennifer Rocha, Nadia Martinez), Police |
| Raymond Lara, Public Works | |
| Capt. Elisabeth Albanese, Police | Fleet Services Center Team (Kevin Jones, Ken Aquilina, Charles Lapham, Greg Foerster, Steve Carrillo, Ryan Nelson, Zoran Lukic, Harry Kalindjian, Craig Crowder), Public Works |
| Michael Liang, Police | |
| Sara Fernandez, Public Works | |
| Magdalena Davis, Policy & Management | Cristian Novelo and Jairo Reyes, Public Works |
| Sean Stokes, Fire | |

**CATEGORY: BRIGHT IDEA**

*Individual Nominees*

Joe Evans, Human Resources

Jonathan Herndon, Information Technology

Ilene Knebel, Public Works

**LARGE GROUP NOMINATIONS**

We were excited to receive many large group nominations this year! While large groups, divisions, and departments are challenging to acknowledge within the format of the Employee Excellence Awards, we are actively working with City Management to identify a way to better recognize these nominees.

**"Exhibit 5"**



*City of Beverly Hills*

# EMPLOYEE EXCELLANCE AWARDS

2020

### For Outstanding Job Performance

*Jonathan Herndon*

*Sara Scrimshaw*

*Michelle Tse*

*Keith Sterling*

*Sharon L'Heureux Dressel*

*"Work From Home Mobilization Team" – Alvin Collins, Joseph Reis, Roger Villafuerte, Ara Haroyan, Andrew Fernando, Art Ziyalov, Hal Bodkin, Chuck Merrill, Murugan Krishnan*

*"Police Department's Rodeo Drive Team"*

### For Exemplary Customer Service

*Magdalena Davis*

*Mike Liang*

*"Water Superstars" – Cristian Novelo and Jairo Reyes*

*"Work From Home Mobilization Team" – Alvin Collins, Joseph Reis, Roger Villafuerte, Ara Haroyan, Andrew Fernando, Art Ziyalov, Hal Bodkin, Chuck Merrill, Murugan Krishnan*

### For Bright Idea

*Joe Evans*

*Jonathan Herndon*

*Ilene Knebel*

**"Exhibit 6"**

ADVERTISEMENT



# Charges of Police Racism Tear at Beverly Hills' Image : Law enforcement: Suit renews contention that officers regularly harass blacks. Chief, residents deny allegation.

BY DUKE HELFAND AND SUSAN STEINBERG

DEC. 27, 1995 12 AM PT



*Los Angeles Times*

TIMES STAFF WRITERS

The mayor helps minorities develop businesses in South-Central Los Angeles. Another city leader spends her free time promoting affirmative action programs. Other civic boosters proudly declare their allegiance to noble causes such as the American Civil Liberties Union.

In Beverly Hills, citizens like to tout their liberal credentials. The predominantly white enclave, they say, is a tolerant haven for people of all colors.

But many African Americans see the city in a different light: They go out of their way to avoid Beverly Hills for fear of being stopped by police.

The difference in perception could lie in the fact that residents have long demanded an aggressive style of law enforcement, one that has prompted allegations of racism by segments of the black community over the years.

The issue resurfaced last month when six African Americans filed a civil rights lawsuit in federal court alleging that police follow an unwritten policy of targeting black males and that city officials ignore the abuses.

ADVERTISING

Some African Americans say the case is just the latest example of the discrimination blacks have faced on the streets of the community, a sentiment shared by a former Beverly Hills mayor who is representing the plaintiffs in the new lawsuit.

Since 1990, blacks have filed five lawsuits and more than a dozen claims against Beverly Hills, alleging that police unjustifiably stop and harass minorities. In one case, a black motorist accused police of pointing a gun at his head during a traffic stop. Another man alleged that police ransacked his car in a vain search for drugs.

Police watchdog groups say that Beverly Hills is just one of many cities in Southern California where such misconduct occurs. But they say few other places have developed such an aggressive image.

"The reputation of Beverly Hills is that they keep minorities on the move," said Hugh Manes, a founder of Police Watch, a Los Angeles-based organization that tracks complaints about police. "That's been the sum and substance of their unspoken policy in the past."

Police Chief Marvin Iannone denied that the 132-member Police Department, which has six black officers, singles out African Americans or anybody else. Iannone noted that several white celebrities, including Zsa Zsa Gabor and Johnny Carson, are among those who have been arrested during traffic stops in recent years.

The chief defended his department's well-known proactive style of policing, in which officers scout for crime-- patrolling alleys, stopping pedestrians after dark and pulling over motorists for broken tail lights and other infractions that might be ignored elsewhere.

But Iannone said his force also is committed to protecting individual liberties.

"We're going to keep this community safe, but not at the expense of civil rights," said Iannone, a former assistant chief with the Los Angeles Police Department. "We're here to protect everybody."

City officials insist that police critics exaggerate the issue.

City Manager Mark Scott points out that Beverly Hills has paid out just $26,500 in police misconduct cases since 1990, a fraction of the $3.8 million Los Angeles paid Rodney G. King alone as a result of his 1991 videotaped police beating.

The officials also question the assertion that blacks get stopped more frequently than whites. A partial analysis of traffic citations issued in 1994 showed that 69% of tickets went to white motorists while 12% went to blacks, and the

rest to Hispanics and other groups.

Critics, however, maintain that the analysis fails to tell the whole story, since many traffic stops do not result in written citations.

Richard Hill, a black businessman from the Antelope Valley, is among those who say they have been stopped but never cited.

Hill, who recently joined the new lawsuit against the city, said in court papers that he was pulled over in July 1994 while heading to meet his wife for lunch at her office on Wilshire Boulevard. He alleges that police followed him into the parking garage beneath the office building, ordered him out of his car and frisked him, during which one officer "violently jerked" him by the groin.

"I said, 'What the hell reason do you have to do me this way?' " recalled Hill, 52. "And he said, 'That's procedure.' "

Police said they stopped Hill because he matched the description of a suspect in a bank robbery that had occurred just minutes before. Police investigated Hill's allegation that he was inappropriately grabbed and concluded in a letter to him that "there was no apparent misconduct on the part of the officer."

Hill says he now avoids Beverly Hills whenever possible, forgoing lunches he once enjoyed with his wife. "It makes me nervous just to be in that area," he said.

African American organizations say that stories such as Hill's are all too common.

The Beverly Hills-Hollywood chapter of the National Assn. for the Advancement of Colored People has received about 75 complaints about Beverly Hills police over the last two years, said Billie Green, the group's president.

She said that many African Americans, particularly young men, make a practice of skirting the city when they pass through the area.

"African Americans are not wanted in Beverly Hills," Green said. "It doesn't matter what kind of car you are driving. You're just not welcome there."

In the face of such criticism, community leaders have rallied behind their Police Department.

On the day the recent lawsuit was filed, more than a dozen of the city's most prominent citizens went before the City Council to say they did not believe the accusations.

"No one is more committed to civil rights and constitutional principles than we are in Beverly Hills," Ken Goldman, president of the city's largest homeowner group, told the council. "The city's record on human rights and human

values is one to be envied, not tarnished."

Some community members have suggested that the problem has more to do with African Americans who are pulled over and wrongly assume that police stopped them because of their race.

"I see white people stopped all the time and they're not complaining about racism," said Chuck Aronberg, a former mayor. "Blacks have a chip on their shoulder. [They] think bad things happen to them because they're black."

A strong and visible police presence has long been a priority in this city of nearly 33,000 people, which swells to more than 100,000 during business hours. Residents say they want a high-profile Police Department because the city's image as home to the rich and famous attracts criminals.

"You're talking about an affluent community that's a target," said Max Salter, a former mayor and an ACLU member. "You have to take all precautions."

Responding to such community sentiments, city officials traditionally have reserved large chunks of their budgets for public safety. Beverly Hills spends more per resident on policing--$571--than any city in the state. By comparison, Los Angeles and Santa Monica spend $158 and $278, respectively.

Consequently, Beverly Hills has four police officers for every 1,000 residents, nearly double the number in Los Angeles and Santa Monica. Such staffing in a city of just 5.6 square miles has led to an enviable three-minute response time for emergency calls.

"Most people don't realize we have the resources in Beverly Hills to stop and talk to a lot of people," said Lt. Frank Salcido, a department spokesman. "Our officers have a lot of time to go out and look for bad guys, to make traffic stops."

Longtime residents say they appreciate the heavy police presence even when it means they, too, are pulled over and questioned.

"The police should stop anybody if they have reasonable suspicion," said Donna Ellman Garber, a former mayor who recalled that she was stopped one night several years ago, before she joined the council. Garber said officers questioned her on a walk with her new dog because they did not recognize her as one of the area's nightly strollers. The officers asked her where she lived and where she was headed, she recalled.

"I was an unknown . . . person walking the street," Garber said. "I'm grateful for that level of attention. I don't find that offensive."

Jerry Lafayette, however, does find such stops offensive. Beverly Hills police have pulled him over more than 20 times in 18 months, he says.

One of the African Americans who recently sued the city, Lafayette says the frequent encounters with police have made him fearful in his own community.

"When I leave my house, I feel intimidated," said Lafayette, 17, a student at Beverly Hills High School and co-captain of the school's varsity football team. "I don't want to be a victim like Rodney King."

Lafayette and four other teen-age plaintiffs in the lawsuit live in Beverly Hills and attend local schools. They say friends from other cities often are reluctant to visit, fearing police stops.

For the families of the plaintiffs in the lawsuit filed last month, there is a twist of irony. They moved to Beverly Hills seeking better schools and an escape from the gang violence that plagues so many campuses in Los Angeles.

"We never thought we would have to worry about the police," said Ralph Jones, whose 15-year-old son, Moacir, accused officers earlier this year of detaining him and two friends for 45 minutes before releasing them. "We had heard about this happening to people who are not residents. But we were under the impression that, living here, you wouldn't be subject to that type of treatment."

In the suit, the African Americans have named as defendants the city, Mayor Allan Alexander, Councilwoman Vicki Reynolds, Chief Iannone and Police Capt. Robert Curtis.

The suit alleges that the police and officials have "engaged in a conscious policy of deliberate indifference" by allowing police harassment to go unchecked. It accuses Alexander and Reynolds, in particular, of disregarding appeals from residents on behalf of one alleged victim, Pat Earthly, a handyman at a local church.

Several members of the All Saints Episcopal Church wrote the city after an incident on Mother's Day of this year in which police allegedly followed Earthly for several blocks into the church parking lot. There, an officer ordered Earthly onto the ground as parishioners looked on, according to court documents.

The church members raised questions after hearing from Earthly that he had been stopped eight times since he began working at the church in August 1993. The incidents included one in which, he says, police put a gun to his head, an allegation police deny.

Alexander, Iannone and the other officials bristle at the suggestion that they ignored the Earthly incident, or any other allegations of police misconduct.

Alexander and Reynolds said they asked City Manager Scott to look into the Earthly case. Scott said he met with the church's rector, and he and Chief Iannone said they offered to speak to the All Saints congregation.

"The city of Beverly Hills takes great pride in its sensitivity to people's needs," Alexander said in a statement. "We . . . have worked hard to make Beverly Hills a great place to live, to work and to visit for all people."

Meanwhile, the city's attorney in the lawsuit, Skip Miller, insisted that the police had done nothing wrong in any of the cases, including the Earthly incident. He said that Internal Affairs investigators thoroughly probed each complaint and found that officers had "reasonable suspicion" to make the traffic stops.

Miller also said that investigators tried to meet with those families who requested further information but never heard back.

"The record is clear, there was intensive follow-up," Miller said. "It's not like the city and the Police Department put their heads in the sand. It was just the opposite of a whitewash."

Nevertheless, attorney Robert K. Tanenbaum, a former Beverly Hills mayor who is representing the plaintiffs, is pushing ahead with the lawsuit, contending that he sees a Police Department out of control.

"This case is about people's rights to walk the streets, to ride cars on public roadways without being terrorized, harassed or abused," he said. "All we're saying is, treat black folk like white folk."

Tanenbaum has himself become a center of controversy.

Critics in the community question why he never raised concerns about police conduct during his eight years on the council. Tanenbaum replies that the issue was never brought to his attention. The detractors also are skeptical about Tanenbaum's motivations, saying he has a personal vendetta against the department.

Indeed, police say Tanenbaum has been feuding with them for many years, partly because of an incident in 1992 involving actor Sylvester Stallone, who was accused of ramming his car into a photographer's vehicle. At the time, then-Councilman Tanenbaum served as attorney for Stallone in the assault case being investigated by the police.

Police accused Tanenbaum of a conflict of interest and objected to his involvement. Last year, the powerful police union, whose endorsement is considered key to winning City Council elections, struck back: It endorsed Tanenbaum's opponents, and he lost his reelection bid.

Tanenbaum, however, said he has no personal agenda and that he took the case because he has "zero tolerance for police corruption."

As the city and Tanenbaum prepare their cases, both sides are pressing hard to sway public opinion.

Tanenbaum, who held a news conference last month when he announced the lawsuit, has gone on television talk shows to hammer at the Police Department. City officials, meanwhile, have hired a public relations expert to spin their message to the news media.

But many citizens are not waiting for the outcome of the publicity or for a court to rule on the lawsuit. They've already made up their minds.

"This is a time when every one of us must demonstrate our support for our city and our Police Department," said Goldman of the homeowners association. "We believe in our police, and we as a community solidly support them."

---

**SUBSCRIBERS ARE READING**  ›

FOR SUBSCRIBERS

A transgender psychologist has helped hundreds of teens transition. But rising numbers have her concerned

---

17 L.A. gangs have sent out crews to follow and rob city's wealthiest, LAPD says  ▶

---

FOR SUBSCRIBERS

What's happening in Joshua Tree is a 'dream' — and possibly a curse

---

What $500,000 buys in five L.A. County communities

**"Exhibit 7"**

FIND YOUR Y.

ENROLL YOUR
KID IN DAY CAMP
TODAY

SANTA MONICA FAMILY YMCA   www.ymcasm.org

the Y

**westsidetoday.com**

# Civil rights activists respond to arrest of black TV/film producer, claim racial profiling in Beverly Hills



A group of civil rights activists is expected today to call on Beverly Hills to enact a "racial profiling prohibition" ordinance in response to the arrest of a black television and film producer.

"Civil rights organizations for years have gotten numerous complaints that Beverly Hills police target black males for unwarranted stops, frisks and harassment," said Earl Ofari Hutchinson, president of the Los Angeles Urban Policy Roundtable.

Beverly Hills was the target of two federal lawsuits in the 1990s byblacks claiming they were racially profiled.

A group of seven black males filed suit in 1995. They agreed to drop the suit in 2000, with the settlement including the city forming a human relations committee to hear complaints about treatment by city personnel and to promote tolerance and ethnic diversity.

Then-Assemblyman Kevin Murray filed suit in 1998 after his car was stopped by police on his way to celebrate a primary election victory. His case was dismissed.

Charles Belk, 51, said he had been working at a pre-Emmy Awards gifting suite at an area hotel last Friday when he was arrested after being positively identified by an eyewitness to a bank robbery, police said.



There have been complaints about Beverly Hills police regarding racial profiling for years. (Thinkstock)

Belk took to Facebook following his arrest, writing that he was walking away from a restaurant on Wilshire Boulevard when police grabbed him. He said he was handcuffed, forced to sit on a curb then taken to the police station, where he was held until about midnight, when detectives reviewed bank security video and realized he was not involved in the heist.

"I get that the Beverly Hills Police Department didn't know at the time that I was a law-abiding citizen of the community and that in my 51 years of existence, had never been handcuffed or arrested for any reason," Belk wrote.

"All they saw was someone fitting the description. Doesn't matter if he's a 'Taye Diggs BLACK,' a 'LL Cool J BLACK' or a 'Drake BLACK.'"

Belk also said he was never read his Miranda rights and could have been released sooner if police had simply reviewed surveillance video from the bank.

"We are taking these allegations very seriously," Beverly Hills police Chief David Snowden said. "We take pride in the professionalism of our department and the high-quality service that we provide to those who live, work and visit our community."

Police said Belk was detained because he matched the description of a man suspected of being an accomplice to Brianna Clemons Kloutse, 47, who was arrested last Friday following the robbery at a Citibank branch in the 8400
block of Wilshire Boulevard, between La Cienega and San Vicente boulevards.

Kloutse is suspected of being the "Purse Packing Bandit," who has been connected to a series of bank heists in Los Angeles, West Hollywood and Beverly Hills.

The Beverly Hills Police Department announced Thursday it is conducting an internal investigation into Belk's arrest.

"The arrest of Mr. Belk was lawful and proper based on the information known to the officers in the field at the time of the arrest," Snowden said. "However, we should have done a better job once Mr. Belk was taken into
custody."

Snowden said the department's Professional Standards Unit was reviewing Belk's allegations, but already, some initial "breakdowns" in the handling of Belk's case have "been identified and will be addressed."

Policies and training issues will be addressed in an attempt to prevent the recurrence of a similar incident, Snowden said.

"Ultimately, how we interact with the public we serve is what matters most," Snowden said.

---

By Staff Report  August 29, 2014
Tags: beverly hills, Beverly Hills police, police, racial profiling, racism  in  Crime, News

   



# RELATED POSTS

DINING, FOOD & DRINK, NEWS

### LA County Takes Steps Towards Banning Single-use Plastics

April 13, 2022  Staff Report

Board of Supervisors approve ordinance along 4-1 vote, final vote still needed By Dolores Quintana An ordinance that would ban...

NEWS, VIDEO, WELLNESS

### Mobile Dental Clinic Provides Free Care For Veterans

April 12, 2022  Juliet Lemar

"Exhibit 8"



CALIFORNIA



$$\mathfrak{Los\ Angeles\ Times}$$

BY JOSEPH SERNA

AUG. 29, 2014 4:12 PM PT

  

A movie producer is considering filing suit after he was held for six hours as a suspected bank robbery accomplice in Beverly Hills, his attorney said Friday.

Charles Belk, 51, was arrested Aug. 22 because police said he matched the description of an accomplice to a bank robbery that occurred moments earlier less than two blocks away.

Belk's attorney, Jaaye Person-Lynn, said Belk matched the general appearance of the suspect-- described as a tall, bald black man in a green shirt--but police erred in the six hours following his arrest.

Police did not ask Belk what he was doing in the area, delayed in allowing him a phone call and speaking with an attorney and did not check the bank's security cameras for hours – evidence that ultimately allowed him to go free.

On Thursday, police Chief David Snowden announced the department had launched an internal investigation into Belk's arrest and pledged to streamline arrestees' access to a phones and lawyers. He said detectives would review electronic evidence that could vindicate a suspect faster.

ADVERTISING



That does not go far enough, Person-Lynn said. Belk should be compensated for an infringment on his rights, and the department's officers should be retrained, he said.

"They didn't think his liberty was worth them asking where he was coming from...that his word was worth enough to even listen to," Person-Lynn said. "Any American citizen deserves to be heard before they're taken into custody...for them to come to that conclusion with all those resources available is unfortunate."

The way police treated Belk speaks to a larger pattern of racial profiling in the department's culture, said Earl Ofari Hutchinson, president of the Los Angeles Urban Policy Roundtable.

On his Friday radio show, Hutchinson called for Beverly Hills to adopt an ordinance that would explicitly prohibit racial and ethnic profiling. Any city employee guilty of it, he said, would be suspended or fired.

"We think it's a good opportunity to put Beverly Hills finally on record – 'We oppose, we condemn and punish racial profiling,'" Hutchinson said.

Beverly Hills police officials maintain Belk's detention was justified and that there were only "breakdowns" in how he was treated afterward.

Belk's attorney added that he thinks that if police were retrained and the arresting process was streamlined, it could serve as a model for smaller Los Angeles-area police agencies and eventually, the Los Angeles Police Department and L.A. County Sheriff's Department.

City leaders are scheduled to sit down with Belk and his attorney Wednesday in a closed-door meeting, Person-Lynn said.

**For breaking California news, follow [@JosephSerna](#).**

CALIFORNIA



### The stories shaping California

Get up to speed with our Essential California newsletter, sent six days a week.

**SIGN ME UP**

You may occasionally receive promotional content from the Los Angeles Times.

Joseph Serna

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Joseph Serna is the deputy editor of culture and talent at the Los Angeles Times and helps oversee its career training and recruitment efforts.

**"Exhibit 9"**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

```
MARK ROSEN,                      )
                                 )
              Plaintiff,         )
                                 )
         vs.                     )  CASE NO. BC654772
                                 )
CITY OF BEVERLY HILLS and        )
Does 1 - 100, inclusive,         )
                                 )
              Defendants.        )
_____)
```

VIDEOTAPED

DEPOSITION OF NANCY KRASNE

Tuesday, September 4, 2018

Beverly Hills, California

REPORTED BY:  GAIL T. BERARDINO, C.S.R. NO. 4045

Nancy Krasne                        Mark Rosen v. City of Beverly Hills                        1128693

| 10:43:17 | 1 | EXAMINATION |
|---|---|---|

10:43:17  2   BY MR. GAGE:

10:43:25  3        Q    Are you a racist?

10:43:27  4        A    No.

10:43:29  5        Q    Ever describe any African-Americans as

10:43:31  6   "scary-looking"?

10:43:36  7        A    Yes.

10:43:38  8        Q    How often?

10:43:42  9        A    Seldom.

10:43:43  10       Q    What's that mean?

10:43:44  11       A    Seldom.

10:43:48  12       Q    "Seldom," once every day, once every week?

10:43:49  13       A    Depends on my encounters.

10:43:56  14       Q    How many of the Beverly Hills Police

10:43:58  15   Department employees have you described as

10:44:00  16   "scary-looking"?

10:44:05  17       A    One.

10:44:07  18       Q    Who was that?

10:44:10  19       A    Officer Nutall.

10:44:14  20       Q    Why did you call him "scary-looking"?

10:44:17  21       A    Because if I saw him out of uniform, he would

10:44:18  22   be scary-looking.

10:44:20  23       Q    You talked about describing African-Americans

10:44:25  24   as "scary-looking," it depends on your encounters.

10:44:28  25   What kinds of encounters cause you to describe

9



Nancy Krasne                         Mark Rea vs. City of Beverly Hills                    1128693

10:44:31   1    African-Americans as "scary-looking"?

10:44:35   2        A    Well, I wouldn't say Officer Nutall was

10:44:38   3    scary-looking in his uniform, but --

10:44:41   4        Q    I'm asking a different question.  You --

10:44:41   5        A    Oh.

10:44:42   6        Q    I'm talking about African-Americans in

10:44:46   7    general.  You told us that you would describe them as

10:44:49   8    "scary-looking," depending on your encounters, so I

10:44:53   9    want to know what kind of encounters cause you to

10:44:55  10    describe them as "scary-looking"?

10:44:56  11        A    Threatening gestures.

10:44:57  12        Q    What are those?

10:44:58  13        A    Aggressive gestures.

10:44:59  14        Q    What are those?

10:45:04  15        A    I think aggressive gestures is res ipsa

10:45:06  16    loquitur.

10:45:08  17        Q    Well, I don't know what you mean, so I need

10:45:09  18    you to explain.

10:45:11  19        A    If somebody enters my space, that is

10:45:13  20    aggressive behavior.

10:45:15  21        Q    So if they're within three or four feet of

10:45:18  22    you, just walking, that would be aggressive behavior by

10:45:20  23    an African-American, right?

10:45:20  24        MR. WALTER:  Objection --

10:45:20  25        THE WITNESS:  No.



Kusar ® Keeping Your Word Is Our Business℠

Nancy Krasne                     Mark Reese v. City of Beverly Hills                     1128693

```
10:51:50  1   pinpoint down.  Do you know if you've referred to

10:51:54  2   African-Americans as, quote, "Negro," end quote, more

10:51:56  3   than a million times in your life?

10:51:57  4        A    I don't recall.

10:52:04  5        Q    Did you ever do a nursery rhyme, "Eenie,

10:52:08  6   meenie, minie, mo, catch a nigger by the toe"?

10:52:10  7        A    No.  I never liked that one.

10:52:13  8        Q    Well, sounds like you knew it, then, right?

10:52:15  9        A    I've heard it.

10:52:18 10        Q    But you've never repeated it, not even once?

10:52:20 11        A    Not even as a child.

10:52:23 12        Q    Where did you go to high school?

10:52:25 13        A    University High School in West L.A.

10:52:30 14        Q    When did you graduate from there?

10:52:37 15        A    The class of '62, the summer.

10:52:44 16        Q    Have you ever described African-Americans as

10:52:48 17   if you saw them in the hood, you would run the other

10:52:49 18   way?

10:52:57 19        A    Yes.

10:52:58 20        Q    How many times have you done that?

10:52:59 21        A    Once.

10:53:02 22        Q    Who was that regarding?

10:53:05 23        A    Nutall, out of uniform.

10:53:09 24        Q    And that is Lieutenant Terry Nutall of the

10:53:12 25   Beverly Hills Police Department, correct?
```

17



2/21/18

Nancy Krasne                    Mark Rego, City of Beverly Hills                    1128693

```
13:03:57  1    asking you at any time, from when you read the reports

13:03:59  2    until now, before the reports, after the reports, any

13:04:00  3    time.

13:04:03  4         THE WITNESS:  I didn't know him until I physically

13:04:07  5    saw him come into the council chambers just before I

13:04:11  6    left the City Council.  I didn't know he was even an

13:04:15  7    African-American until later on, after this credibility

13:04:18  8    stuff had occurred.

13:04:18  9    BY MR. GAGE:

13:04:22 10         Q    So you do know, then, that Nutall was

13:04:24 11    African-American, correct?

13:04:25 12         A    Now I do.

13:04:26 13         Q    When did you learn that?

13:04:29 14         A    I just told you, when he came into the City

13:04:30 15    Council chambers.

13:04:32 16         Q    What year?

13:04:34 17         A    Before I left the Council.  I don't know

13:04:35 18    when.

13:04:36 19         Q    Around 2016?

13:04:40 20         A    Could be.  2016 or 200- -- yeah, it would

13:04:42 21    have to be.  I left in 2017.

13:04:46 22         Q    Then after you saw Terry Nutall and you

13:04:49 23    learned that he was African-American, did you tell

13:04:53 24    anyone that "Nutall is a bully, he walks, he's

13:04:57 25    scary-looking, I watched him from a distance, you know.
```

126


Kusar® Keeping Your Word Is Our Business℠

```
13:05:00  1    He's just -- you wouldn't hang out with him.  This is

13:05:03  2    just -- he looks like if you saw him in the hood, you'd

13:05:06  3    run the other way.  He's a big guy."

13:05:08  4           Did you make that statement ever?

13:05:09  5       A    Part of it.

13:05:11  6       Q    Which part?

13:05:18  7       A    That if I saw him, he's scary, he's big, he

13:05:24  8    looks like a Marine, and he's built like a Mack truck.

13:05:26  9    And if he wasn't in uniform, I would want to hang out

13:05:30  10   with him?  I've never seen him smile the only times

13:05:44  11   I've seen him.  Even Mr. Rosen -- Captain Rosen smiles.
```

```
13:05:54  12      Q    So --

13:05:57  13          MR. WALTER:  Brad, it's been about 30 minutes.

13:05:59  14          MR. GAGE:  About 20 more minutes, ten more

13:05:59  15   minutes.

13:06:01  16          MR. WALTER:  We're not going 20 more minutes.

13:06:01  17   Maybe --

13:06:01  18          THE WITNESS:  Wait.

13:06:01  19          MR. WALTER:  Maybe five.

13:06:03  20          THE WITNESS:  Is it 20 more minutes, and then

13:06:03  21   we're done?

13:06:04  22          MR. WALTER:  No.

13:06:04  23   BY MR. GAGE:

13:06:05  24      Q    No.

13:06:06  25          MR. WALTER:  Whenever you're -- just let us know
```

127



Nancy Krasne                    Mark Reback/City of Beverly Hills                    1128693

1                          REPORTER'S CERTIFICATE

2

3          I, the undersigned Certified Shorthand Reporter

4    holding a valid and current license issued by the State

5    of California, do hereby certify:

6          That said proceedings were taken down by me in

7    shorthand at the time and place therein set forth and

8    thereafter transcribed under my direction and

9    supervision.

10         I further certify that I am neither counsel for

11   nor related to any party to said action, nor in any way

12   interested in the outcome thereof.

13         The dismantling, unsealing, or unbinding of the

14   original transcript will render the Reporter's

15   certificate null and void.

16         In WITNESS WHEREOF,  I have subscribed my name on

17   this date:  September 14, 2018.

18

19

20

21        _____

22             Certified Shorthand Reporter

23

24

25

323


Kusar®  Keeping Your Word Is Our Business℠

**"Exhibit 10"**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

MARK ROSEN,                          )
                                     )
            PLAINTIFF,               )
                                     )
         VS.                         )   CASE NO.  BC654772
                                     )
CITY OF BEVERLY HILLS AND            )
DOES 1 - 100, INCLUSIVE,             )
                                     )   VOLUME 1
            DEFENDANTS.              )   (PAGES 1 - 332)
                                     )
_____)


VIDEOTAPED DEPOSITION OF LIEUTENANT SCOTT DOWLING

MONDAY, AUGUST 28, 2017


JOB NO. 108510

REPORTED BY:  DAYNA HESTER, C.S.R. 9970

11:19 1          THE WITNESS:  The way you're asking, I

11:19 2   can't answer.

11:19 3          Can -- can visual stuff be harassing?  It

11:19 4   can.

11:19 5          But you're asking can visual harassment --

11:19 6   you're -- you're connecting the two as if it is

11:19 7   conclusive like...

11:19 8   BY MR. GAGE:

11:19 9       Q.   I'm just asking:  Was it your

11:19 10  understanding that a prohibitive type of visual

11:19 11  harassment at Beverly Hills PD, in the past four

11:19 12  years, included videotapes that would be harassing?

11:19 13      A.   Yes.

11:19 14      Q.   So, for example, if a male employee was

11:20 15  showing a female employee a videotape of

11:20 16  intercourse, that would violate the policy, correct?

11:20 17      A.   Yes.

11:20 18      Q.   Likewise, if that was then put onto

11:20 19  YouTube by the male officer to intimidate the female

11:20 20  officer or harass her, that would violate the

11:20 21  policy, correct?

11:20 22      A.   Yes.

11:20 23      Q.   So then you understood that if "Yellow

11:20 24  Fever" was put up on YouTube as part of a video, if

11:20 25  it was considered to be harassing, the fact it was

| | | |
|---|---|---|
| 11:20 | 1 | on YouTube would be a part of the prohibition of |
| 11:20 | 2 | Beverly Hills PD, correct? |
| 11:20 | 3 | MR. WALTER:  Objection.  Calls for |
| 11:20 | 4 | conclusion.  Calls for speculation. |
| 11:20 | 5 | THE WITNESS:  Yes. |
| 11:20 | 6 | MR. WALTER:  Go ahead. |
| 11:20 | 7 | BY MR. GAGE: |
| 11:20 | 8 | Q.   Did you ever have any conversation with |
| 11:21 | 9 | Chief Spagnoli about the "Yellow Fever" video? |
| 11:21 | 10 | A.   No. |
| 11:21 | 11 | Q.   Did you ever make any comments about an |
| 11:21 | 12 | African-American officer in the Detective Bureau |
| 11:21 | 13 | saying that he was lazy? |
| 11:21 | 14 | A.   That wasn't -- not that he's lazy, but |
| 11:21 | 15 | that's laziness. |
| 11:21 | 16 | Q.   What did you say specifically? |
| 11:21 | 17 | A.   I don't remember the specific content. |
| 11:21 | 18 | Q.   What's your best recollection of what you |
| 11:22 | 19 | did say? |
| 11:22 | 20 | A.   I'd be speculation, guessing. |
| 11:22 | 21 | Q.   Oh, no.  There's actually a difference, |
| 11:22 | 22 | and I'll explain. |
| 11:22 | 23 | A.   Okay. |
| 11:22 | 24 | Q.   If I was to ask you, "What did Sergeant |
| 11:22 | 25 | Smith say about an African-American at the Kalamazoo |

11:22  1    Police Department," that would be complete

11:22  2    speculation.  You weren't there, you don't know any

11:22  3    person.  You never heard it.

11:22  4              Instead, I'm asking you for something you

11:22  5    actually said, so it's not speculation.  It's just a

11:22  6    matter of what you can and cannot recall.

11:22  7              Do you understand that distinction?

11:22  8        A.   Yes.

11:22  9        Q.   All right.  So what did you say, to the

11:22 10    best of your recollection?

11:22 11        A.   I can't recall.

11:22 12        Q.   Anything at all - correct? - other than

11:22 13    referring to a black male as being lazy in some

11:22 14    manner, correct?

11:22 15        A.   Correct.

11:23 16        Q.   Have you ever called anyone a "nigger"?

11:23 17        A.   No.

11:23 18        Q.   Never, in your life?

11:23 19        A.   No.

11:23 20        Q.   Ever use the N-word?

11:23 21        A.   No.

11:23 22        Q.   Did you ever complain that a black female

11:23 23    detective was lazy and does not keep up with her

11:23 24    caseload?

11:23 25        A.   No.

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

11:23  1          Q.    Did you ever have discussions with Chief

11:23  2    Spagnoli about a lazy female detective not keeping

11:23  3    up with her caseload?

11:23  4          A.    No.

11:23  5          Q.    The black man that you referred to as

11:23  6    being lazy, who was that?

11:23  7          A.    Victor Short.

11:23  8          Q.    When did you refer to him as lazy?

11:24  9          A.    I think -- I'm not -- I don't remember

11:24 10    when, but it was probably in the last four or five

11:24 11    years.

11:24 12          Q.    Who did you say that he was lazy to?

11:24 13          A.    I don't recall.

11:24 14          Q.    Did you ever make any comments --

11:24 15    withdraw.

11:24 16                Do you know a person by the name of Dennis

11:24 17    Lynch?

11:24 18          A.    I do.

11:24 19          Q.    Who is he?

11:24 20          A.    He's the detective sergeant.

11:24 21          Q.    Is he African-American as well?

11:24 22          A.    He is.

11:24 23          Q.    And did you ever express any statements to

11:24 24    anyone that you felt he was lazy or worthless as

11:24 25    well?

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

| | | |
|---|---|---|
| 11:24 | 1 | A.   No. |
| 11:24 | 2 | Q.   What is your opinion of him? |
| 11:24 | 3 | A.   I like Dennis.  I like Victor.  They both |
| 11:24 | 4 | worked for me and with me. |
| 11:24 | 5 | Dennis is -- Dennis is a nice man that |
| 11:24 | 6 | doesn't have the skill sets to do the job he was |
| 11:25 | 7 | doing. |
| 11:25 | 8 | Q.   Did you ever tell anyone about Dennis |
| 11:25 | 9 | Lynch's deficiencies? |
| 11:25 | 10 | A.   I don't recall. |
| 11:25 | 11 | Q.   When you say you don't recall, it's |
| 11:25 | 12 | possible that you just can't recall one way or the |
| 11:25 | 13 | other, correct? |
| 11:25 | 14 | A.   I can't recall. |
| 11:25 | 15 | Q.   Did you have a conversation with an |
| 11:25 | 16 | Officer Williams about your naming various black |
| 11:25 | 17 | employees that were not doing anything? |
| 11:25 | 18 | A.   No. |
| 11:25 | 19 | Q.   Did you ever tell anyone that you felt |
| 11:25 | 20 | that Victor Short and Rachel Shannon were not |
| 11:26 | 21 | performing properly, or words to that effect? |
| 11:26 | 22 | A.   Yes. |
| 11:26 | 23 | Q.   What did you say about them? |
| 11:26 | 24 | MR. WALTER:  Well, objection.  Compound. |
| 11:26 | 25 | MR. GAGE:  I agree. |

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

| | | |
|---|---|---|
| 11:26 | 1 | BY MR. GAGE: |
| 11:26 | 2 | Q.   What did you say about Rachel Shore |
| 11:26 | 3 | [verbatim]? |
| 11:26 | 4 | A.   "Shannon"? |
| 11:26 | 5 | Q.   Shannon.   Excuse me. |
| 11:26 | 6 | A.   I don't remember the specific words, but |
| 11:26 | 7 | it would be a comment to her overall job |
| 11:26 | 8 | performance.   I think I've expressed it to the |
| 11:26 | 9 | captain. |
| 11:26 | 10 | Q.   Which captain? |
| 11:26 | 11 | A.   Every captain that supervised the |
| 11:26 | 12 | detectives. |
| 11:27 | 13 | Captain Rosen. |
| 11:27 | 14 | Q.   You referred to her as being lazy as well, |
| 11:27 | 15 | true? |
| 11:27 | 16 | A.   No. |
| 11:27 | 17 | Q.   Ever tell anyone you felt she was |
| 11:27 | 18 | incompetent? |
| 11:27 | 19 | A.   I don't think she should be detective. |
| 11:27 | 20 | Q.   Did you ever tell anyone she is |
| 11:27 | 21 | incompetent is my question. |
| 11:27 | 22 | A.   No, I don't think so. |
| 11:27 | 23 | Q.   Did you ever tell anyone why you did not |
| 11:27 | 24 | think she should be a detective? |
| 11:27 | 25 | A.   Yes. |

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

11:27  1          Q.    Who?

11:27  2          A.    I think I shared it with the captain,

11:27  3     Rosen, that she doesn't have the skill sets to do

11:27  4     the job.

11:27  5          Q.    What did he say in response, if anything?

11:27  6          A.    I don't recall.

11:27  7          Q.    Did you have a conversation with Captain

11:27  8     Spagnoli [verbatim] about the performance of various

11:27  9     African-Americans working in the Detective Bureau?

11:28 10          A.    Chief Spagnoli.

11:28 11                No.

11:28 12          Q.    Did you ever have any conversations with

11:28 13     Terry Nutall regarding the African-American

11:28 14     detectives?

11:28 15          A.    I've only had conversations with Terry

11:28 16     about Terry.

11:28 17          Q.    Not with anyone else?

11:28 18          A.    No.

11:28 19          Q.    Did you have any conversations with Chief

11:28 20     Spagnoli regarding claims that Nutall made against

11:28 21     you for being a racist?

11:28 22          A.    I don't recall Terry doing that, and I

11:28 23     don't recall a conversation with the chief.

11:28 24          Q.    Did you ever learn that Terry Nutall told

11:28 25     Chief Spagnoli that he felt you were being

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

15:55  1   available to her, as you understand it, to demote

15:55  2   you from a sergeant back to -- from a lieutenant

15:55  3   back to a sergeant?

15:55  4        A.   If I fail to perform my duties as a

15:55  5   lieutenant.

15:55  6        Q.   If you give negative information about the

15:55  7   Chief, do you believe that that would be failing to

15:55  8   be performing your duties?

15:55  9             MR. WALTER:   Objection.   Vague.   Calls for

15:56 10   speculation.

15:56 11             THE WITNESS:   If I gave negative

15:56 12   information to you about the Chief?

15:56 13   BY MR. GAGE:

15:56 14        Q.   Or anybody.

15:56 15        A.   No.

15:56 16        Q.   So it's okay for a probationary lieutenant

15:56 17   to criticize the Chief, let's say, and go to a bar

15:56 18   and say, "Gee, that Chief Spagnoli, she's a terrible

15:56 19   person.   I am a lieutenant, and here's what she's

15:56 20   done wrong, for example"?   That's -- would that be a

15:56 21   problem?

15:56 22             MR. WALTER:   Objection.   Sorry.

15:56 23   Objection.   Calls for speculation.

15:56 24             THE WITNESS:   You can't -- you can't speak

15:56 25   disparagingly about the department in that setting.

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

15:56  1    BY MR. GAGE:

15:56  2        Q.   All right.   Did you ever say that two

15:56  3    different African-American officers were lazy, they

15:56  4    don't do their work, and they get behind in the

15:56  5    caseload?

15:56  6        A.   So -- the way you're asking it, no.

15:57  7        Q.   When you say the way I'm asking it, it

15:57  8    makes me think that something similar to that

15:57  9    occurred.

15:57 10        A.   Yes.

15:57 11        Q.   Tell me what did occur, then.

15:57 12        A.   There are -- there are two detectives that

15:57 13    are not keeping up with their caseload;

15:57 14    Coincidentally, they are African-American.   But

15:57 15    they're not keeping up with their caseload.

15:57 16             One of them is an auto theft detective and

15:57 17    one is a court liaison detective.

15:57 18        Q.   What are their names?

15:57 19        A.   Victor Short and Rachel Shannon.

15:57 20        Q.   Who did you make these comments to about

15:57 21    Short and Shannon?

15:57 22        A.   Every supervisor they've had.

15:57 23        Q.   Any discussions with Spagnoli about them?

15:57 24        A.   No.

15:57 25        Q.   Has anyone said anything in response to

15:57  1    your comments about inadequacies of these two

15:57  2    African-American detectives?

15:57  3        A.    No.

15:58  4        Q.    Did you have any conversation with Terry

15:58  5    Nutall about the two detectives?

15:58  6        A.    Terry and I didn't have that relationship.

15:58  7    No.

15:58  8        Q.    Who were the supervisors that you did

15:58  9    discuss it with, then?

15:58 10        A.    I discussed it with Captain Rosen.  I've

15:58 11    discussed it with Mike Publicker.  I discussed it

15:58 12    with the lieutenant before Terry Nutall.  Joe

15:58 13    Trujillo.  Mitch McCann.

15:58 14        Q.    What did you and Rosen discuss regarding

15:58 15    Shannon and Short?

15:58 16        A.    Detective Short, I think, neglects his

15:59 17    responsibilities almost at every level.  He has

15:59 18    somebody in custody, he calls in sick so he doesn't

15:59 19    have to deal with the in-custody when he comes in on

15:59 20    Monday.

15:59 21             If he has a case that has any nexus to

15:59 22    L.A., he'll turn it over to LAPD to investigate; he

15:59 23    won't do it.

15:59 24             He won't Prop 115 an officer, so he

15:59 25    subpoenas all officers to court so he doesn't have

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

16:47  1        A.    I may have discussed it with Captain

16:47  2    Rosen.

16:47  3        Q.    What did you say?

16:47  4        A.    Essentially that, that he doesn't have --

16:47  5    he doesn't have the skill sets to run that unit.

16:47  6        Q.    Were you ever counselled in connection

16:47  7    with negative statements you made about Dennis

16:48  8    Lynch, Terry Nutall, Victor Short or Rachel Shannon?

16:48  9        A.    No.

16:48 10        Q.    Did you ever make statements to the effect

16:48 11    that some or all of those four African-Americans

16:48 12    were "lazy" or "worthless"?

16:48 13        A.    No.

16:48 14        Q.    How about words to that effect?

16:48 15        A.    No.

16:48 16        Q.    Did you ever make the comment or statement

16:48 17    that Terry Nutall protects the black employees who

16:48 18    work for him?

16:48 19        A.    No.

16:48 20            MR. WALTER:  You already asked him that.

16:48 21    BY MR. GAGE:

16:48 22        Q.    Did you ever make the statement Terry

16:48 23    Nutall only associates at work with the black

16:48 24    officers?

16:48 25        A.    No.

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

16:48 1      Q.    You hesitated on that.   Is there something

16:48 2   you said similar to that?

16:48 3      A.    He only eats with the black officers.

16:48 4      Q.    That's what you said?

16:48 5      A.    Yeah.

16:48 6      Q.    When did you make that comment?

16:49 7      A.    I don't remember when.

16:49 8      Q.    Who did you make the comment to that Terry

16:49 9   Nutall only eats with the black officers?

16:49 10      A.    I think Captain Rosen.

16:49 11      Q.    Why did you make that comment?

16:49 12      A.    It seemed to me like it wasn't a proper

16:49 13   way to behave when you have several subordinate

16:49 14   employees.

16:49 15      Q.    Who were --

16:49 16      A.    You would treat -- you only treat the

16:49 17   black detectives or officers different than the

16:49 18   white or Hispanic officers or Asians.

16:49 19      Q.    Who were the officers that you saw Terry

16:49 20   Nutall eating with?

16:49 21      A.    Routinely or...?

16:49 22      Q.    [Attorney gestures affirmative].

16:49 23      A.    Routinely it's Dennis Lynch, Victor Short,

16:49 24   Dave Williams.

16:49 25      Q.    And then did he sometimes also eat -- eat

LIEUTENANT SCOTT DOWLING, VOLUME 1 - 08/28/2017

```
 1    STATE OF CALIFORNIA                          )

 2    COUNTY OF LOS ANGELES                        )   SS.

 3

 4           I, Dayna Hester, C.S.R. No. 9970, in

 5    and for the State of California, do hereby certify:

 6           That, prior to being examined, the witness

 7    named in the foregoing deposition was by me duly

 8    sworn to testify to the truth, the whole truth, and

 9    nothing but the truth;

10           That said deposition was taken down by me

11    in shorthand at the time and place therein named and

12    thereafter reduced to typewriting under my

13    direction, and the same is a true, correct, and

14    complete transcript of said proceedings;

15           That if the foregoing pertains to the

16    original transcript of a deposition in a Federal

17    Case, before completion of the proceedings, review

18    of the transcript {  } was {  } was not required;

19           I further certify that I am not interested

20    in the event of the action.

21     Witness my hand this 18th day of September, 2017.

22

23    _____

24           Certified Shorthand Reporter

25           for the State of California
```

**"Exhibit 11"**

Anne Marie Lunsman vs. City of Beverly Hills                    Scot Dowling

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES


ANNE MARIE LUNSMAN,                    )
                                       )
                  Plaintiff,           )
                                       )
        vs.                            )   No. BC719517
                                       )
CITY OF BEVERLY HILLS and DOES         )
1-100, inclusive,                      )
                                       )
                  Defendants.          )
_____)
                                       )
RENATO MORENO, MICHAEL FOXEN &         )
DONA NORRIS,                           )
                                       )
                  Plaintiffs,          )
                                       )
        vs.                            )  No. BC687003
                                       )
CITY OF BEVERLY HILLS and DOES         )
1-100, inclusive,                      )
                                       )
                  Defendants.          )
_____)



VIDEOTAPED DEPOSITION OF SCOTT DOWLING

Tuesday, January 8, 2019

Woodland Hills, California



REPORTED BY:  Lyn Corrin Aaker, CSR No. 6228

Anne Marie Lunsman vs. City of Beverly Hills                          Scot Dowling

|  | 1 | BY MR. GAGE: |
|---|---|---|
| 12:34:39 | 2 | Q.   Well, that's your own situation.  What was |
| 12:34:43 | 3 | that that you signed off on that you thought was not |
| 12:34:46 | 4 | true? |
| 12:34:47 | 5 | A.   It was one of the two times I was written |
| 12:34:49 | 6 | up by my boss in Traffic. |
| 12:34:52 | 7 | Q.   Mike Foxen? |
| 12:34:54 | 8 | A.   Yes. |
| 12:34:54 | 9 | Q.   What were the two times you were written |
| 12:34:57 | 10 | up?  What did they involve? |
| 12:34:58 | 11 | A.   One is I -- it's been a while.  But one is |
| 12:35:02 | 12 | I spoke out about the quality of detective work |
| 12:35:08 | 13 | because of the manpower shortages and that in the |
| 12:35:12 | 14 | past when we had more officers, this would not have |
| 12:35:15 | 15 | happened.  They interpreted that to be me talking |
| 12:35:19 | 16 | disparagingly about a particular detective. |
| 12:35:22 | 17 | Q.   Which detective? |
| 12:35:23 | 18 | A.   I think that one had to do with George |
| 12:35:26 | 19 | Elwell.  And that wasn't why it was said.  It was |
| 12:35:31 | 20 | just a reality of the conditions we were working in, |
| 12:35:37 | 21 | severely understaffed, and that's just the outcome. |
| 12:35:42 | 22 | And I think the other one had something to |
| 12:35:45 | 23 | do with Snowden, and I don't know what the words |
| 12:35:47 | 24 | were, but they said I was talking disparagingly |
| 12:35:51 | 25 | about the organization.  I kind of think that's what |

Kusar Legal Services, Inc.                                                    87

| | | |
|---|---|---|
| 12:35:53 | 1 | it was.   Those are the only two times in my career. |
| 12:35:56 | 2 | Q.   That you have been written up? |
| 12:35:58 | 3 | A.   That I have been in trouble. |
| 12:36:01 | 4 | Q.   Was there ever a time when anyone accused |
| 12:36:04 | 5 | you of making derogatory racial comments against |
| 12:36:09 | 6 | African-Americans? |
| 12:36:10 | 7 | A.   Only in this lawsuit. |
| 12:36:12 | 8 | Q.   Did you ever refer to any African-American |
| 12:36:15 | 9 | employees as lazy? |
| 12:36:18 | 10 | A.   As a race, no.   A detective being lazy, |
| 12:36:22 | 11 | yes. |
| 12:36:23 | 12 | Q.   Who? |
| 12:36:23 | 13 | A.   Rachel Shannon and Victor Short. |
| 12:36:33 | 14 | Q.   So two different African-Americans, one |
| 12:36:35 | 15 | being Shannon, one being Short? |
| 12:36:38 | 16 | A.   Two different detectives, yeah. |
| 12:36:41 | 17 | Q.   What specifically did you say about these |
| 12:36:43 | 18 | two, quote, "lazy," end quote, African-American |
| 12:36:49 | 19 | detectives? |
| 12:36:50 | 20 | A.   Detective Short was an auto theft |
| 12:36:53 | 21 | investigator.   I was an auto theft investigator, so |
| 12:36:58 | 22 | I know what the job entails.   And he neglected most |
| 12:37:03 | 23 | all of his duties and responsibilities.   He went and |
| 12:37:07 | 24 | interviewed victims.   He would call in sick if there |
| 12:37:11 | 25 | was an arrest during the night so he wouldn't have |

Anne Marie Lunsman vs. City of Beverly Hills                    Scot Dowling

| | | |
|---|---|---|
| 12:37:13 | 1 | to deal with it the next day.  He would not 115 |
| 12:37:17 | 2 | witnesses for trial.  He wouldn't write warrants or |
| 12:37:21 | 3 | arrest warrants.  He wouldn't adopt cases that were |
| 12:37:27 | 4 | mutually held by LAPD and us where we both had |
| 12:37:31 | 5 | victims, same suspect.  He would just give his case |
| 12:37:35 | 6 | away to LAPD.  And all they did was clear the case. |
| 12:37:40 | 7 | They wouldn't prosecute typically. |
| 12:37:42 | 8 | And then any time he could, he would give |
| 12:37:43 | 9 | his work to a retired officer, even if those cases |
| 12:37:46 | 10 | were to be investigated and prosecuted.  We are not |
| 12:37:49 | 11 | supposed to give those to retired policemen to do |
| 12:37:52 | 12 | because they have court obligations that may be |
| 12:37:55 | 13 | years down the road.  And that was the standard SOP |
| 12:37:58 | 14 | for him. |
| 12:37:59 | 15 | Rachel -- and I am talking about Rachel in |
| 12:38:02 | 16 | the past, not Rachel currently, Shannon. |
| 12:38:05 | 17 | Q.   Before her, just so I don't forget it, the |
| 12:38:08 | 18 | 115 which you are talking about is Prop 115 where |
| 12:38:11 | 19 | the officer can testify for the witness? |
| 12:38:13 | 20 | A.   Where the officer can testify for the |
| 12:38:15 | 21 | witness, or he can testify for the officer. |
| 12:38:17 | 22 | Q.   And then with respect to the retired |
| 12:38:21 | 23 | officers, they would be called 960s, I believe.  Is |
| 12:38:25 | 24 | that correct? |
| 12:38:25 | 25 | A.   Yes. |

Kusar Legal Services, Inc.                                              89

Anne Marie Lunsman vs. City of Beverly Hills                    Scot Dowling

| | | |
|---|---|---|
| 15:07:10 | 1 | Q.   Also soul food with Black people in the |
| 15:07:14 | 2 | beginning? |
| 15:07:17 | 3 | A.   I saw Louisiana soul food, but I don't know |
| 15:07:21 | 4 | if that's -- what's your question about that? |
| 15:07:23 | 5 | Q.   Are you aware of any stereotypes that |
| 15:07:27 | 6 | African-Americans eat soul food? |
| 15:07:31 | 7 | A.   I lived in the city.  I eat soul food, so I |
| 15:07:36 | 8 | don't consider that a stereotype. |
| 15:07:40 | 9 | Q.   Do you know if the "Yellow Fever" video was |
| 15:07:44 | 10 | ever shown in the police department?  I know it was |
| 15:07:48 | 11 | on the news. |
| 15:07:50 | 12 | A.   Yes, I do. |
| 15:07:51 | 13 | Q.   How, where, when was it shown? |
| 15:07:53 | 14 | A.   I think Sergeant Lynch showed it to a bunch |
| 15:07:57 | 15 | of officers to see if they were offended by it. |
| 15:08:00 | 16 | MR. WALTER:  I'm sorry.  Sergeant who? |
| 15:08:03 | 17 | THE WITNESS:  Lynch, Dennis Lynch. |
| | 18 | MR. WALTER:  Okay. |
| | 19 | BY MR. GAGE: |
| 15:08:04 | 20 | Q.   When did he do that? |
| 15:08:05 | 21 | A.   Sometime after it was pulled from YouTube, |
| 15:08:10 | 22 | sometime after the second day or first day. |
| 15:08:12 | 23 | Q.   Were you present when he showed it to |
| 15:08:14 | 24 | folks? |
| 15:08:14 | 25 | A.   No. |

Anne Marie Lunsman vs. City of Beverly Hills                    Scot Dowling

| | | |
|---|---|---|
| 15:08:16 | 1 | Q.    Who did Sergeant Lynch show it to?  Do you |
| 15:08:20 | 2 | know? |
| 15:08:20 | 3 | A.    To my understanding, he showed it to Black |
| 15:08:24 | 4 | officers on the department to see if they were |
| 15:08:26 | 5 | offended by it. |
| 15:08:27 | 6 | Q.    Do you know if any of the Black officers |
| 15:08:30 | 7 | including Sergeant Lynch were offended by it? |
| 15:08:32 | 8 | A.    I don't know. |
| 15:08:34 | 9 | Q.    After Sergeant Lynch showed that video to |
| 15:08:38 | 10 | various African-American officers, did any of them |
| 15:08:43 | 11 | make a complaint that you are aware of about that? |
| 15:08:46 | 12 | A.    I am not aware. |
| 15:08:50 | 13 | Q.    You indicated before our break that you had |
| 15:08:55 | 14 | referred to a couple of the African-American |
| 15:08:57 | 15 | officers as lazy.  Remember that? |
| 15:09:00 | 16 | A.    Detectives, yes. |
| 15:09:01 | 17 | Q.    When did you call them lazy? |
| 15:09:05 | 18 | MR. WALTER:  Objection; vague. |
| 15:09:07 | 19 | MR. GAGE:  The year. |
| 15:09:09 | 20 | MR. WALTER:  Same objection. |
| 15:09:13 | 21 | THE WITNESS:  When did I describe them as being |
| 15:09:14 | 22 | lazy, or when did I call them lazy? |
| | 23 | BY MR. GAGE: |
| 15:09:18 | 24 | Q.    Whatever is accurate. |
| 15:09:23 | 25 | A.    Probably several times over years. |

Anne Marie Lunsman vs. City of Beverly Hills                    Scot Dowling

| 15:09:26 | 1 | Q. During what years? |
| 15:09:28 | 2 | A. The years that they were detectives. I |
| 15:09:31 | 3 | don't know the years those were. |
| 15:09:33 | 4 | Q. Did that continue until 2018? |
| 15:09:40 | 5 | A. No. |
| 15:09:41 | 6 | Q. Did they leave Detectives in 2017? |
| 15:09:45 | 7 | A. No. I left the area, and so the Detective |
| 15:09:51 | 8 | folks would stop complaining to me because I wasn't |
| 15:09:53 | 9 | in Traffic any more. |
| 15:09:54 | 10 | Q. When did you leave Traffic? |
| 15:09:55 | 11 | A. When I promoted to lieutenant. |
| 15:09:57 | 12 | Q. So sometime in mid 2017. Correct? |
| 15:10:00 | 13 | A. April. |
| 15:10:11 | 14 | Q. When did Detective Shannon become a great |
| 15:10:14 | 15 | detective? |
| 15:10:17 | 16 | A. Probably in the last year and a half to two |
| 15:10:20 | 17 | years of her time in Detectives until she retired. |
| 15:10:26 | 18 | Q. So sometime around mid 2017 or before then? |
| 15:10:35 | 19 | Two years, I guess, would go back to January of |
| 15:10:39 | 20 | 2017. Correct? |
| 15:10:41 | 21 | A. I would say towards the end of 2017. |
| 15:10:49 | 22 | Q. Did you ever talk about Terry Nutall being |
| 15:10:52 | 23 | lazy? |
| 15:10:54 | 24 | A. I told Terry he was lazy. |
| 15:10:56 | 25 | Q. When did you do that? |

Anne Marie Lunsman vs. City of Beverly Hills                    Scot Dowling

| | | |
|---|---|---|
| 15:10:58 | 1 | A.   I had several arguments in his office with |
| 15:11:01 | 2 | him, several discussions. |
| 15:11:02 | 3 | Q.   Over what time frame? |
| 15:11:04 | 4 | A.   I don't know how long he was in there as a |
| 15:11:06 | 5 | detective lieutenant, but a few times while I was |
| 15:11:13 | 6 | there.  So if he was there for six months, it was |
| 15:11:16 | 7 | six months.  If he was a year, it was a year.  I |
| 15:11:19 | 8 | just don't know how long he was in there.  Not long. |
| 15:11:21 | 9 | Q.   Do you know how far it was before he became |
| 15:11:24 | 10 | the lieutenant when you last spoke with him about |
| 15:11:27 | 11 | being lazy? |
| 15:11:28 | 12 | A.   Probably several months to a half a year |
| 15:11:31 | 13 | before I was promoted. |
| 15:11:32 | 14 | Q.   Several months to a half year.  So sometime |
| 15:11:37 | 15 | between November 2016 and February of 2017, |
| 15:11:43 | 16 | approximately? |
| 15:11:45 | 17 | A.   Very vague approximate, yeah.  I mean I am |
| 15:11:48 | 18 | not sure of the exact times. |
| 15:11:51 | 19 | Q.   It could have been March of 2017.  It could |
| 15:11:55 | 20 | have been October 2016.  Sometime in that kind of |
| 15:11:57 | 21 | time frame, though.  Correct? |
| 15:11:59 | 22 | A.   I don't know. |
| 15:12:02 | 23 | Q.   Is Terry Nutall African-American as well? |
| 15:12:05 | 24 | A.   He is. |
| 15:12:06 | 25 | Q.   Are you aware of any racial stereotypes of |

Anne Marie Lunsman vs. City of Beverly Hills                          Scot Dowling

| | | |
|---|---|---|
| 15:12:11 | 1 | African-Americans being referred to as lazy? |
| 15:12:14 | 2 | A.   No. |
| 15:12:58 | 3 | Q.   Sorry.  I am just having a computer thing |
| 15:13:01 | 4 | here.  Was there a time when you were with Brian |
| 15:14:02 | 5 | Withers and other officers including Alex Duncan |
| 15:14:09 | 6 | where you made a comment after Alex said that his |
| 15:14:13 | 7 | dad had lost his hair, that he had a big patch |
| 15:14:16 | 8 | growing on the back of his head? |
| 15:14:20 | 9 | A.   So Brian Withers doesn't exist. |
| 15:14:26 | 10 | MR. WALTER:  Todd Withers. |
| | 11 | BY MR. GAGE: |
| 15:14:28 | 12 | Q.   Todd Withers.  Thank you.  Was there a time |
| 15:14:30 | 13 | when you were with Todd Withers, and Alex Duncan |
| 15:14:37 | 14 | said that his dad had lost his hair, that he had a |
| 15:14:40 | 15 | big patch growing on the back of his head, where you |
| 15:14:43 | 16 | told him he could cover it up with one of those |
| 15:14:45 | 17 | Jewish hats? |
| 15:14:46 | 18 | A.   No. |
| 15:14:49 | 19 | Q.   Do you have any understanding why Alex |
| 15:14:52 | 20 | Duncan would say that he heard you saying that? |
| 15:14:57 | 21 | A.   None at all. |
| 15:14:59 | 22 | Q.   Did you ever make a comment in front of |
| 15:15:02 | 23 | Ryan Lawrence after Alex Duncan said that his dad |
| 15:15:07 | 24 | had a big patch growing on the back of his head, |
| 15:15:10 | 25 | telling him that he could cover it up with one of |

Anne Marie Lunsman vs. City of Beverly Hills                    Scot Dowling

| 15:15:14 | 1 | those funny Jewish hats? |
|---|---|---|
| 15:15:18 | 2 | A.   I have never said that. |
| 15:15:25 | 3 | Q.   Was there a time when you were with any |
| 15:15:29 | 4 | officers, and there was a buffet of food, and |
| 15:15:34 | 5 | officers were getting it recently, that you are |
| 15:15:37 | 6 | aware of? |
| 15:15:40 | 7 | A.   Two days ago. |
| 15:15:41 | 8 | Q.   And how about earlier, around November of |
| 15:15:45 | 9 | 2018? |
| 15:15:49 | 10 | A.   It happens continuously. |
| 15:15:51 | 11 | Q.   Did you say to a group of officers when |
| 15:15:58 | 12 | they were getting food words to the effect of "Why |
| 15:16:06 | 13 | are you kiking that food?" or "Stop kiking that |
| 15:16:08 | 14 | food"? |
| 15:16:08 | 15 | A.   Absolutely not. |
| 15:16:12 | 16 | Q.   Do you know any reason why Ryan Lawrence |
| 15:16:15 | 17 | would say that you heard you making that comment? |
| 15:16:17 | 18 | A.   None at all. |
| 15:16:18 | 19 | Q.   Do you know any reason why Alex Duncan |
| 15:16:22 | 20 | would say that he heard you making that comment? |
| 15:16:24 | 21 | A.   None at all. |
| 15:16:25 | 22 | Q.   Do you know any reason why Billy Fair would |
| 15:16:28 | 23 | say that he heard you making that comment? |
| 15:16:30 | 24 | A.   Not at all. |
| 15:16:32 | 25 | Q.   If you made such comments about the Jewish |

Anne Marie Lunsman vs. City of Beverly Hills                    Scot Dowling

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, Lyn Corrin Aaker, a Certified Shorthand

 4   Reporter, holding a valid and current license issued

 5   by the State of California, CSR No. 6228, do hereby

 6   certify:

 7

 8        That said proceedings were taken down by me in

     shorthand at the time and place therein set forth

 9   and thereafter transcribed under my direction and

10   supervision.

11

12        I further certify that I am neither counsel for

13   nor related to any party to said action, nor in any

14   way interested in the outcome thereof.

15

16        The dismantling, unsealing, or unbinding of the
     original transcript will render the Reporter's

17   Certificate null and void.

18

19        IN WITNESS WHEREOF, I have hereunto subscribed

20   my name on this date: January 15, 2019.

21

22

23

24        _____

                Certified Shorthand Reporter
25
```