**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JASMINE WILLIAMS, et al., in Their Individual and Representative Capacities on Behalf of a Class of All Persons similarly situated,

Plaintiffs,

v.

CITY OF BEVERLY HILLS, et al.,

Defendants.

Case No. CV 21-8698 FMO (RAOx)

**ORDER RE: MOTION TO DISMISS**

Having reviewed and considered all the briefing filed with respect to defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint (Dkt. 188, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b); Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

## BACKGROUND[1]

Plaintiffs allege that "[t]he City of Beverly Hills has a widespread, policy, practice and custom of racial profiling against Black Americans resulting in unconstitutional detentions, arrests, and, illegal searches and seizure." (Dkt. 179, Third Amended Complaint ("TAC") at ¶ 47). According to plaintiffs, the City of Beverly Hills ("the City") and the Beverly Hills Police Department

[1] Because the parties are familiar with the facts and allegations of this case, the court will discuss them only as necessary. Capitalization, quotation and alteration marks, and emphasis in record citations may be altered without notation.

("BHPD") "formed the Rodeo Drive Team ('RDT') to eliminate the presence of Black Americans, referred to as the 'criminal element['] out of the Rodeo Drive district." (Id. at ¶ 5). Plaintiffs allege that the BHPD also formed the overlapping EDD Task Force for the same purpose.[2] (See id. at ¶ 49). These two task forces were collectively known as "Operation Safe Streets." (Id. at ¶ 85).

Plaintiffs allege that as part of its task forces, "[t]he BHPD directed, taught and instructed its officers to use pretext stops to target African Americans for minor infractions." (Dkt. 179, TAC at ¶ 13). Plaintiffs allege that BHPD had a "policy, practice and widespread custom to demand identification of Black People, search them for weapons, detain them and falsely arrest them with excessive force and false charges[.]" (Id. at ¶ 101). According to plaintiffs, "the arrests lacked probable cause" and "[n]one of the Black people arrested by the RDT and EDD task forces were convicted." (Id. at ¶ 88). BHPD "target[ed] Black Americans for selective enforcement," (id. at ¶ 16), and implemented this "policy to intimidate and deter Black Americans from coming to the City." (Id. at ¶ 184).

Plaintiffs seek to represent a class of "[a]ll Black people who were detained or arrested" by BHPD "from August 30, 2019 through August 30, 2021 without being convicted of any crime." (Dkt. 179, TAC at ¶ 2). The class "is comprised of approximately 1,086 Black Americans." (Id. at ¶ 12). Plaintiffs also identify two subclasses based on the task forces: (1) "[t]he 80 Black Americans arrested by the City of Beverly Hills Police Department's Rodeo Drive Task Force, ('RDT') between August 29, 2020 and October 25, 2020"; and (2) "[t]he 99 Black Americans arrested by the City of Beverly Hills Police Department's EDD Task Force ('EDD') between August 29, 2020 and October 25, 2020." (Id. at ¶ 4). Plaintiffs allege that over 90% of people arrested during the RDT and EDD subclass periods, and 34% of people arrested during the entire class period were Black, despite the fact that "the City itself is only 1.9% Black." (Id. at ¶ 47).

The TAC identifies six named plaintiffs as proposed class representatives: Jasmine Williams ("Williams"), Khalil White ("White"), Joseph Nett ("Nett"), Lakisha Swift ("Swift"), Cameron

---

[2] The TAC does not define "EDD" but given the references to "EDD fraud," (see e.g., Dkt. 179, TAC at ¶ 5), EDD presumably refers to California's Employment Development Department.

Rogers ("Rogers"), and Shepherd York ("York") (collectively, "named plaintiffs").[3] (See Dkt. 179, TAC at ¶¶ 25-31). The named plaintiffs – all of whom are Black – allege they were stopped by BHPD "[b]ecause of Defendants' common operation plan, top down widespread policies, practices and customs" and were subjected to some form of detention or arrest. (Id. at ¶ 25); (see id. at ¶¶ 26-30, 93 & 99). Plaintiffs were ultimately released without charges. (See id. at ¶¶ 25-30). Williams, White, Nett, and Swift allege that the charges against them were dropped, and Rogers alleges that he was never prosecuted.[4] (See id.).

In response to these incidents, plaintiffs filed the instant action, asserting four causes of action under 42 U.S.C. § 1983 for violations of: (1) the Fourteenth Amendment Due Process Clause as a result of false imprisonment and malicious prosecution without probable cause, against various BHPD officers in their official and personal capacities; (2) the Fourth Amendment right to be free from unreasonable searches and seizures, against various BHPD officers in their official and personal capacities; (3) the Fourth and Fourteenth Amendments, against the City under a theory of municipal liability; and (4) the Fourteenth Amendment Equal Protection Clause, against the City, based on discriminatory treatment. (See Dkt. 179, TAC at ¶¶ 106-189). Plaintiffs assert their first and second causes of action – their due process and search and seizure claims – against BHPD law enforcement officials: former Police Chief Sandra Spagnoli ("Spagnoli"), former Interim Police Chief Dominick Rivetti ("Rivetti"), Captain Scott Dowling ("Dowling"), Sergeant Dale Drummond ("Drummond"), Sergeant Billy Fair ("Fair"), Officer Jon Ilusorio ("Ilusorio"), Officer Jonathan de la Cruz ("Cruz"), Officer James Krug ("Krug"), Officer Billy Blair ("Blair"), Officer Jerry Whittaker ("Whittaker"), and Officer Jesse Lyga ("Lyga") (collectively, "individual defendants"). (See id. at ¶¶ 35-44, 41 n. 7 & 106-139). These claims are brought

---

[3] Plaintiffs' counsel appear to misspell the names of two named plaintiffs throughout the TAC – they refer to Khalil White as both "Khalil" and "Kahlil" and Cameron Rogers as both "Rogers" and "Rodgers[.]" (See, generally, Dkt. 179, TAC). Plaintiffs' counsel are admonished that they should spell their clients' names correctly and consistently out of respect for their clients and to avoid further confusion.

[4] It is unclear whether York was ever charged, as the TAC merely states that "[h]e was never convicted of any crime." (Dkt. 179, TAC at ¶ 30).

against the individual defendants in both their individual and official capacities. (Id. at 1). Plaintiffs assert their third and fourth causes of action – their municipal liability and Equal Protection Clause claims – against the City. (See id. at ¶¶ 140-189). Plaintiffs seek compensatory damages, civil penalties, punitive damages, injunctive relief, and attorney's fees and costs. (See id. at Prayer for Relief).

In the instant Motion, defendants seek to strike or dismiss all claims against all defendants. (See Dkt. 188, Motion at 1).

## LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure[5] should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010). Although the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; see also Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted), "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93,

[5] All further "Rule" references are to the Federal Rules of Civil Procedure unless otherwise indicated.

127 S.Ct. 2197, 2200 (2007) (per curiam) (internal quotation marks omitted); Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, Erickson, 551 U.S. at 94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266, 268, 114 S.Ct. 807, 810 (1994), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor. Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005). Dismissal for failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory. See Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). A complaint may also be dismissed for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim. Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984).

## DISCUSSION

The court first addresses defendants' motion to strike plaintiffs' class allegations under Rule 12(f), and then turns to defendants' motion to dismiss under Rule 12(b)(6).

### I. DEFENDANTS' MOTION TO STRIKE CLASS ALLEGATIONS.

Defendants move to strike plaintiffs' class allegations under Rule 12(f).[6] (See Dkt. 188, Motion at 5-6). Defendants argue that plaintiffs' class allegations should be stricken because they are "overbroad, include uninjured members," have a "fail safe" problem, and are not well-pled. (See id.).

Pursuant to Rule 12(f), a party may move to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Although class allegations may be stricken at the pleading stage, see, e.g., Kamm v. California City Dev. Co., 509 F.2d 205, 212 (9th Cir.1975), "[m]otions to strike class allegations are disfavored because

---

[6] Defendants do not specifically identify Rule 12(f) in their argument seeking to strike plaintiffs' class allegations, (see, generally, Dkt. 188, Motion at 4-6), but because defendants invoke Rule 12(f) at the outset of their Motion and request that the TAC's class allegations "be stricken," (see id. at 2 & 6), the court analyzes their arguments under Rule 12(f).

a motion for class certification is a more appropriate vehicle[.]" Thorpe v. Abbott Lab., Inc., 534 F.Supp.2d 1120, 1125 (N.D. Cal. 2008) (denying motion to strike class certification allegations); Baesel v. Mut. of Omaha Mortg., Inc., 2020 WL 12675283, *1 (S.D. Cal. 2020) (same). "[C]ourts will generally grant a motion to strike only when the moving party has proved that the matter to be stricken could have no possible bearing on the subject matter of the litigation." Carranza v. Terminix Int'l Co. Ltd. P'ship, 529 F.Supp.3d 1139, 1142 (S.D. Cal. 2021); Erceg v. LendingClub Corp., 475 F.Supp.3d 1071, 1075 (N.D. Cal. 2020) ("Before a motion to strike is granted . . . the court must be convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed."). "Given their disfavored status, courts often require a showing of prejudice by the moving party before granting the requested relief." Claiborne v. Water of Life Cmty. Church, 2017 WL 9565337, *13 (C.D. Cal. 2017) (internal quotation marks omitted). "In exercising its discretion over whether to grant a motion to strike, the court views the pleadings in the light most favorable to the non-moving party." Carranza, 529 F.Supp.3d at 1142 (internal quotation marks omitted).

As an initial matter, the court notes that defendants' arguments are not truly made under Rule 12(f). In challenging plaintiffs' class allegations, defendants do not explain how any allegation is "redundant, immaterial, impertinent, or scandalous" within the meaning of Rule 12(f). (See, generally, Dkt. 188, Motion at 5-8). Instead, defendants appear to challenge the viability of plaintiffs' class allegations. (See, generally, id.). Although the court has some reservations about the viability of plaintiffs' class claims given that plaintiffs seek individual damages for civil rights violations, not just injunctive relief, the court is persuaded that it would be premature to strike these claims under Rule 12(f), as any challenges to the viability of the class are best considered at the class certification stage.[7] See, e.g., Baesel, 2020 WL 12675283, at *1 (Although "Defendant raises some interesting arguments as to why the proposed classes should not be certified . . . it has not shown that the proposed classes are not certifiable as a matter of law."); Knuttel v.

---

[7] To the extent defendants intended to advance these arguments under Rule 12(b)(6), the court is convinced that plaintiffs have plausibly stated claims for relief and that defendants' arguments are more appropriate for the class certification stage.

Omaze, Inc., 2022 WL 1843138, *14 (C.D. Cal. 2022) (denying motion to strike class allegations as premature); Claiborne, 2017 WL 9565337, at *14 (same).

## II. DEFENDANTS' MOTION TO DISMISS.

### A. Timeliness of Claims and Relation Back.

#### 1. **Addition of Individual Defendants.**

The court first considers defendants' argument that plaintiffs' class claims against individual defendants Spagnoli, Rivetti, Drummond, Ilusorio, De La Cruz, Fair, Krug, Blair, Whittaker, and Lyga are time-barred. (See Dkt. 188, Motion at 7-8). Defendants argue that because plaintiffs added these defendants on April 21, 2022, the two-year statute of limitations for personal injury actions precludes plaintiffs from raising claims that accrued before April 21, 2020 – which is after the proposed class period start date of August 2019. (See id. at 7-8); Jackson v. Barnes, 749 F.3d 755, 761 (9th Cir. 2014) (For § 1983 actions, "the applicable statute of limitations under California law is two years.").

"[A] plaintiff may sue unnamed defendants when the identity of the alleged defendants is not known before filing the complaint." Bolton v. Steve's Towing, 2024 WL 3064038, *2 (C.D. Cal. 2024) (citing Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980)). In § 1983 actions, federal courts apply the forum state's law with respect to the statute of limitations, tolling, and relation back. See Butler v. Nat'l Cmty. Renaissance of California, 766 F.3d 1191, 1198, 1200 (9th Cir. 2014). "Under California law, a plaintiff who names a Doe defendant in his complaint and alleges that the defendant's true name is unknown has three years from the commencement of the action in which to discover the identity of the Doe defendant, to amend the complaint accordingly, and to effect service of the complaint." Lindley v. Gen. Elec. Co., 780 F.2d 797, 799 (9th Cir. 1986); see also Rojas by & through Rojas v. Sea World Parks & Ent., Inc., 538 F.Supp.3d 1008, 1015 (S.D. Cal. 2021). Cal. Civ. Proc. Code § 474 "allows DOE defendants to be added within three years of the filing date of the original complaint if: (1) the complaint states a cause of action against each DOE defendant; (2) the complaint alleges that the plaintiff is ignorant of the true name of each DOE defendant; (3) the plaintiff is actually ignorant of the true name at the time of filing; and (4) the plaintiff amends once the true name of the defendant is discovered." McCloud

v. Farrow, 2014 WL 6390288, *3 (E.D. Cal. 2014) (internal quotation marks omitted); see also Fed. R. Civ. P. 15(c); Cal. Civ. Proc. Code § 583.210 (providing three year deadline for service of process).

Although defendants frame their argument regarding the addition of the specified individual defendants as a statute of limitations issue, (see Dkt. 188, Motion at 7-8), the relevant question is whether plaintiffs' April 2022 amendment naming these individual defendants relates back to the initial Complaint filed on August 30, 2021, which named several Doe defendants. (See Dkt. 1-1, Complaint at ¶¶ 13-24). Plaintiffs identified these individual defendants, using their initials, in the First Amended Complaint ("FAC"), filed on January 19, 2022. (See Dkt. 25, FAC at ¶¶ 31-39) (identifying individual defendants using initials); (see also Dkt. 35, Court's Order of March 25, 2022) (ordering plaintiffs to file "either (1) an amended complaint that names these Defendants by their proper names or (2) a statement establishing that it is proper for Plaintiffs to maintain suit and to serve these individuals by pseudonyms"). Plaintiffs then named these individual defendants, using their full names, in the Second Amended Complaint filed on April 21, 2022. (See Dkt. 43, "SAC" at ¶¶ 27-47).

Under California law, plaintiffs' April 2022, amendment naming these individual defendants relates back to the original filing date of August 30, 2021, because it meets the three-year deadline and the other statutory requirements. See McCloud, 2014 WL 6390288, at *3 (describing requirements); Klamut v. California Highway Patrol, 2015 WL 9024479, *5 (N.D. Cal. 2015) (finding that plaintiff's amendment to include the true names of officers related back). Defendants make no argument to the contrary. (See, generally, Dkt. 188, Motion). Accordingly, the court finds no basis to conclude that plaintiffs' claims against Spagnoli, Rivetti, Drummond, Ilusorio, De La Cruz, Fair, Krug, Blair, Whittaker, or Lyga are time-barred.

**2. Timeliness of White, York, and Rogers's Claims.**

Next, defendants contend that White, York, and Rogers's representative claims are time-barred because their claims accrued more than two years ago. (See Dkt. 188, Motion at 8-10). Defendants' contentions are unpersuasive.

First, with respect to White, (see Dkt. 179, TAC at ¶ 1), plaintiffs state that he was

mistakenly named as "Juwan White" in the first and second amended complaints, but correctly named in the initial Complaint. (See Dkt. 190, Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp.") at 20). Plaintiffs explain that "Kahlil White was named a plaintiff in the Original Complaint and has been a plaintiff in the action since it was filed. However, the First, Second and proposed Third Amended Complaints mistakenly changed his name from Kahlil White to Juwan White. The mistake in the pleadings was due to the fact the arrest records pertaining to Kahlil White used the name Juwan White rather than his correct name. The allegations in all of the Complaints pertained to Kahlil White even though due to a clerical error he was mistakenly named as Juwan." (Dkt. 190-1, Declaration of Jeffrey Spencer at ¶ 2). Defendants do not claim that they were, in any way, prejudiced by this error. (See, generally, Dkt. 188, Motion at 10). Nor have defendants provided any authority for the proposition that such an error requires dismissing White's claims. (See, generally, id.).

Although defendants are correct that plaintiffs' TAC did not comply with the requirements of Local Rule 15-1, which requires that a party granted leave to amend file the amended pleading approved by the court, the court finds, under the circumstances here, that plaintiffs' explanation evidences good cause and does not require the court to dismiss or strike any part of it. See L.R. 83-7 (noting that the court has discretion over whether or not to sanction a party for failure to comply with the Local Rules). In other words, White's claim is timely, as he was named in the original Complaint, (see Dkt. 1-1, Complaint), and the fact that he was erroneously named in the First, Second and proposed Third Amended Complaints does not mean his claim is time-barred. Further, even if the court were to accept defendants' argument that the naming mistake means that White did not assert his class claim until June 2023, he remained a putative class member during the pendency of the litigation, and thus his claims would not be time-barred because, as discussed below, they would be equitably tolled like York and Rogers's class-capacity claims.[8]

---

[8] As noted below, defendants offer no argument as to why White, York, and Rogers's claims do not relate back to the original Complaint pursuant to Rule 15. (See, generally, Dkt. 188, Motion at 8-10); see, e.g., Bos. Ret. Sys. v. Uber Techs., Inc., 2021 WL 4503137, at *3 (N.D. Cal. 2021) (finding that new class representatives' claims relate back).

Second, defendants argue that York and Rogers's class-capacity claims are time-barred because their claims accrued more than two years before they were added as named plaintiffs in the TAC filed in June 2023.[9] (See Dkt. 188, Motion at 8-9); (Dkt. 179, TAC at ¶ 1). This argument rests on a misunderstanding of equitable tolling in the class action context. York and Rogers's class-capacity claims are timely, and even if they were not, they relate back to the original Complaint.

In American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756 (1974), the Supreme Court established that "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Id. at 554, 94 S.Ct. at 766. "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 354, 103 S.Ct. 2392, 2397-98 (1983). "At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." Id. at 354, 103 S.Ct. at 2398; see also DeFries v. Union Pac. R.R. Co., 104 F.4th 1091, 1096-97 (9th Cir. 2024) (explaining equitable tolling doctrine in the class action context); Charles Alan Wright & Arthur R. Miller, 7B Fed. Prac. & Proc. Civ. § 1800 (3d ed.) (discussing intervention in class actions and the rule that filing a class action tolls the applicable statute of limitations for all class members).

In support of their position, defendants cite China Agritech, Inc. v. Resh, 584 U.S. 732, 138 S.Ct. 1800 (2018) in which the Supreme Court held that "American Pipe does not permit the maintenance of a follow-on class action past expiration of the statute of limitations." Id. at 736, 138 S.Ct. at 1084. Taking an expansive reading of China Agritech, defendants argue that equitable tolling does not apply to named plaintiffs who are added in the course of a single class

[9] Defendants' only other argument on this point is somewhat difficult to follow. Defendants point out that "the year of York's incident . . . post-dates the start of the class period" and suggest that this fact may make it untimely. (See Dkt. 188, Motion at 8-9). But if the alleged harm that York suffered occurred after the inception of the class period – i.e., it "post-dated" the inception of the class period – that is exactly what is required for a class member's claim to be timely. Cf., e.g., In re Clearly Canadian Sec. Litig., 875 F.Supp. 1410, 1420 (N.D. Cal. 1995) (striking alleged conduct that pre-dated the start of the class period or post-dated the end of the class period).

action prior to class certification. (See Dkt. 188, Motion at 8-9); (Dkt. 196, Reply at 5-6). Plaintiffs argue that defendants misread China Agritech, (see Dkt. 190, Opp. at 19), and the court agrees.

China Agritech held that after denial of class certification, a putative class member may not file a new class action beyond the time allowed by the relevant statute of limitations. See 584 U.S. at 736, 138 S.Ct. at 1804. Thus, while American Pipe tolling permits individuals to move to intervene or file their individual claims separately after class certification has been denied irrespective of the statute of limitations, China Agritech limits the ability of such class members to file a new class action after the statute of limitations has passed. See, e.g., Bos. Ret. Sys., 2021 WL 4503137, at *3 (distinguishing American Pipe from China Agritech). In other words, under American Pipe and China Agritech, the filing of a class action tolls the statute of limitations for putative class members' individual claims until the denial of class certification, but does not toll the statute of limitations for the filing of a successive class action.[10]

In this case, the question is whether adding York and Rogers as named plaintiffs in the existing putative class action – prior to class certification – runs afoul of the statute of limitations. China Agritech is thus inapposite here. It neither addresses nor applies to the addition of new named plaintiffs in the same class action. The Northern District of California, faced with a similar request to add named plaintiffs, recently addressed the question of equitable tolling in this context, and concluded that China Agritech "does not pose a barrier to the addition of new proposed class representatives" to an existing class action because "the existing class action is not an 'untimely successive class action[.]'" Bos. Ret. Sys., 2021 WL 4503137, at *3-*4 (internal quotation marks omitted). And although the Ninth Circuit has not yet addressed this question, other circuit courts

[10] It is also worth noting that China Agritech was motivated by a concern regarding successive filings. The Supreme Court feared that permitting successive filings of class actions "would allow the statute of limitations to be extended time and again; as each class is denied certification, a new named plaintiff could file a class complaint that resuscitates the litigation." China Agritech, 584 U.S. at 743, 138 S.Ct. at 1808. No similar concern exists where, as here, a new potential class representative is added in the course of a single action prior to class certification. Indeed, China Agritech expressly contemplates the resolution of competing class representative claims during the same litigation. See 584 U.S. at 740 n. 2, 138 S.Ct. at 1807 n. 2 ("[A]s class discovery proceeds and weaknesses in the class theory or adequacy of representation come to light, the lead complaint might be amended or a new plaintiff might intervene.").

have agreed with this interpretation. See, e.g., In re Allstate Corp. Sec. Litig., 966 F.3d 595, 615 (7th Cir. 2020) (holding that American Pipe tolling may permit the addition of new class representatives to the original class action); Fund Liquidation Holdings LLC v. Bank of Am. Corp., 991 F.3d 370, 393 (2d Cir. 2021) (holding that the addition of new representative plaintiffs was subject to equitable tolling under American Pipe and that amendment should be granted as long as it satisfies Rule 15(c)).[11] For instance, the Seventh Circuit determined that a new putative class representative who is joined within the same class action prior to class certification benefits from equitable tolling of their class-capacity claims, as well as their individual claims. See In re Allstate Corp. Sec. Litig., 966 F.3d at 615 ("Allstate would read China Agritech much more broadly to prohibit any addition or substitution of a new class representative within the original class action after the statute of limitations period would have run. . . . We see no hint in the China Agritech opinion or its reasoning that would support this proposed extension.").

This court agrees with the reasoning in Boston Retirement, as well as that of the Second and Seventh Circuits – China Agritech poses no barrier to putative class members seeking to become named plaintiffs prior to class certification, as their claims are subject to equitable tolling under American Pipe. Thus, when plaintiffs filed this action in November 2021, the statute of limitations for York and Rogers, then putative class members, was tolled under American Pipe. Because their statute of limitations has been tolled since then, there was no statute of limitations issue when York and Rogers were added as named plaintiffs in June 2023.

Furthermore, even if York and Rogers's class-capacity claims were untimely,[12] their claims

---

[11] In support of their interpretation, defendants rely on Dennis v. JPMorgan Chase & Co., 439 F.Supp.3d 256 (S.D.N.Y. 2020), in which the Southern District of New York found that a plaintiff's class-capacity claim was time-barred because it was raised after the statute of limitations had expired. See id. at 264-66. But Dennis involved a putative class representative seeking to join the action after the denial of class certification. Id. at 265. Moreover, the Second Circuit, in a decision issued after Dennis, appears to have resolved the issue. See Fund Liquidation Holdings LLC, 991 F.3d at 393 (stating that "[n]othing in China Agritech purports to say that equitable tolling does not apply to new class representatives joined within the same class action.") (emphasis omitted).

[12] In other words, if American Pipe were read to only toll individual claims (not class-capacity claims) and equitable tolling did not otherwise apply to the class-capacity claims, these claims

would relate back to the initial Complaint. "When a limitations period derives from state law, as it does here, courts must 'consider both federal and state law and employ whichever affords the more permissive relation back standard.'" Yablonsky v. California Dep't of Corr. & Rehab., 2021 WL 2952934, *2 (S.D. Cal. 2021) (quoting Butler, 766 F.3d at 1201). Plaintiffs' amendment to add York and Rogers relates back to the original Complaint under either law.

Under California law, "an amendment relates back to the original complaint if the amendment: (1) rests on the same general set of facts; (2) involves the same injury; and (3) refers to the same instrumentality." Estrada v. Royalty Carpet Mills, Inc., 76 Cal.App.5th 685, 714-15 (2022), aff'd, 15 Cal.5th 582 (2024) (internal quotation marks omitted). Here, the amendment naming York and Rogers as plaintiffs relates back to the original Complaint because it: (1) rests on the same general set of facts involving alleged racial profiling; (2) involves the same injury of being unlawfully detained; and (3) refers to the same instrumentality or cause, i.e., allegedly racist policing. See Pointe San Diego Residential Cmty., L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP, 195 Cal.App.4th 265, 277, 283 (2011) (describing requirements for relation back under California law); Dhuyvetter v. City of Fresno, 110 Cal.App.3d 659, 666 (1980) (holding that addition of new named plaintiffs in class action related back).

Plaintiffs also meet the federal standard for relation back. Under federal law, "[a]n amendment adding a plaintiff relates back to the date of the original pleading when (1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; (2) the relation back does not unfairly prejudice the defendant; and (3) there is an identity of interests between the original and newly proposed plaintiff." Allen v. Similasan Corp., 96 F.Supp.3d 1063, 1068 (S.D. Cal. 2015) (internal citations omitted); see also Immigrant Assistance Project of Los Angeles Cnty. Fed'n of Lab. (AFL-CIO) v. I.N.S., 306 F.3d 842, 857 (9th Cir. 2002) (discussing requirements for relation back).

Here, the original Complaint provided clear notice of its intent to allege and certify a class, thereby giving defendants adequate notice of York and Rogers's claims. See Allen, 96 F.Supp.3d

---

would still relate back.

at 1069 ("Where the new plaintiffs had always been a part of the putative class, notice is satisfied because Defendants had always known that all putative class members were potential plaintiffs.") (internal quotation marks omitted); Immigrant Assistance, 306 F.3d at 857-58. Also, defendants are not prejudiced by the addition of these named plaintiffs. See Allen, 96 F.Supp.3d at 1069 ("The substitution of new plaintiffs forwarding the same theories . . . does not prejudice Defendant."); Immigrant Assistance, 306 F.3d at 858 ("The addition of new plaintiffs who are similarly situated to the original plaintiffs therefore did not cause the [defendant] any prejudice in the present case."). Finally, there is an identity of interests between the existing and newly added named plaintiffs because their claims "arise out of the same circumstances giving rise to [the] original claim[.]" Allen, 96 F.Supp.3d at 1069. In sum, the court concludes that York, Rogers, and White's claims are timely and otherwise relate back under Rule 15(c).

B. Shotgun Pleading.

Next, defendants argue that plaintiffs' TAC is an impermissible "shotgun pleading" because plaintiffs "lump Defendants, and often themselves, together as one 'group' and make no effort to specify the roles each Individual Defendant played as to each Plaintiff's claim." (Dkt. 188, Motion at 10-11).

An improper "shotgun" pleading is one that "overwhelm[s] defendants with an unclear mass of allegations and make[s] it difficult or impossible for defendants to make informed responses to the plaintiff's allegations." Morris v. Sun Pharma Glob. Inc., 2021 WL 3913191, *3 (C.D. Cal. 2021) (internal quotation marks omitted). For instance, "[s]hotgun pleading occurs when one party pleads that multiple parties did an act, without identifying which party did what specifically; or when one party pleads multiple claims, and does not identify which specific facts are allocated to which claim." Hughey v. Drummond, 2014 WL 5797365, *5 (E.D. Cal. 2014). "At the pleading stage, a complaint need not be abundantly detailed, but it must at least provide fair notice about which defendants allegedly engaged in what wrongful conduct." Conta v. City of Huntington Beach, 2022 WL 3574439, *4 (C.D. Cal. 2022); see, e.g., Destfino v. Reiswig, 630 F.3d 952, 958 (9th Cir. 2011) ("The second amended complaint was properly dismissed because it failed to" "state[] clearly how each and every defendant is alleged to have violated plaintiffs' legal rights[,]" "continuing to make

'everyone did everything' allegations.") (internal quotation marks omitted); Ong v. Cnty. of Amador, 2021 WL 4132406, *5 (E.D. Cal. 2021) (Plaintiff must "allege facts describing the conduct of each of those Defendants to establish their individual liability based on more than 'merely being present' during the alleged constitutional violation.").

"[A]ctions brought under § 1983 must allege how each named defendant personally participated to cause the deprivation of the plaintiff's rights[,]" and "the allegations of the complaint must be sufficient to apprise each defendant of the acts the plaintiff claims the defendant took." Apothio, LLC v. Kern Cnty., 599 F.Supp.3d 983, 1000 (E.D. Cal. 2022). Similarly, in a class action, "[t]o meet the threshold pleading requirements, a complaint must contain some specific facts regarding each Defendant." Jaime v. Parts Auth. LLC, 2021 WL 3055041, *8 (D. Ariz. 2021) (emphasis omitted). "Even though heightened pleading is not required in discrimination cases, the complaint must still give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Williams v. Boeing Co., 517 F.3d 1120, 1130 (9th Cir. 2008) (internal quotation marks omitted). However, the court may deny a motion to dismiss where the plaintiff's allegations are largely sufficient and discovery would clear up any remaining lack of specificity. See, e.g., White v. Sacramento Police Dep't, 2022 WL 2052596,*3 (E.D. Cal. 2022) ("Nor do Defendants explain why they cannot get the details and specificity they claim they need through discovery."); Apothio, 599 F.Supp.3d at 1002 ("Any remaining lack of clarity can be ascertained through the discovery process.").

The court largely disagrees with defendants' characterization of plaintiff's TAC as a shotgun pleading. Indeed, the detail with which defendants respond to plaintiffs' causes of action indicates that defendants have had little trouble understanding what plaintiffs allege. (See, generally, Dkt. 188, Motion at 1-24). If defendants truly desired a clearer complaint, defendants' "recourse . . . [was] to move for a more definite statement under Rule 12(e), not a motion to dismiss under Rule 12(b)." Cai v. CMB Exp. LLC, 2022 WL 17080172, *8 (C.D. Cal. 2022). Further, in the context of a class action, plaintiffs need not allege details regarding each specific incident in order to provide defendants fair notice of the conduct alleged – it is sufficient if plaintiffs set out generally applicable claims and identify the defendants involved and their alleged conduct. See Wright &

Miller, 5 Fed. Prac. & Proc. Civ. § 1216 (4th ed.) (noting that Rule 8 inquiry can be contextual); id. at § 1230 (In the civil rights context, "the pleader must reach a level of specificity sufficient to give the defendant notice regarding what rights are claimed to have been violated and the conduct that is claimed to be unlawful.").

However, plaintiffs' TAC does not allege which specific defendants were involved in detaining the named plaintiffs. (See, generally, Dkt. 179, TAC). Setting aside the fact that the information regarding which BHPD officers conducted the challenged stops and arrests is in defendants' possession, plaintiffs had over a year to conduct discovery before they filed their TAC and could have amended to allege this information. Given the breadth of plaintiffs' claims, the numerous defendants allegedly involved, and the fact that plaintiffs seek class-wide damages, the court will require more specific allegations as to each defendant officer's conduct towards the named plaintiffs. Thus, while the court declines to dismiss the TAC based on defendants' contention that it is a shotgun pleading, the court will grant plaintiffs leave to amend with respect to the named plaintiffs' claims.[13]

C. Official Capacity Claims.

Next, defendants challenge plaintiffs' claims against the individual defendants in their official capacity because none were "office holders" and some were merely "subordinates." (See Dkt. 188, Motion at 12).

Official capacity suits represent "'another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105 (1985) (quoting Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55 (1978)); see Lewis v. Clarke, 581 U.S. 155, 162, 137 S.Ct. 1285, 1291 (2017) ("In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself."). "Local governing bodies . . . can [also] be sued directly under § 1983 for monetary, declaratory, or injunctive relief" under a theory

[13] The court is persuaded that the TAC adequately provides notice to defendants of the substance of plaintiffs' claims; the court dismisses the named plaintiffs' claims solely to require plaintiffs to identify the particular defendants and their conduct.

of municipal liability. Monell, 436 U.S. at 690, 98 S.Ct. at 2035 (footnote omitted). Because "a suit against an individual in [their] official capacity is the same as a suit against that official's local government entity[,] . . . when a plaintiff asserts claims against a local government entity and an official of that entity in their official capacity, courts routinely dismiss the official capacity claim as duplicative and redundant." Poe v. Cnty. of Ventura, 2017 WL 5125748, *2 (C.D. Cal. 2017); see, e.g., Contreras ex rel. Contreras v. Cnty. of Glenn, 725 F.Supp.2d 1157, 1160 (E.D. Cal. 2010) (dismissing redundant official-capacity claims); Watkins v. Cnty. of Los Angeles, 2022 WL 18278620, *4 (C.D. Cal. 2022) (same).

Here, plaintiffs assert the same Fourth and Fourteenth Amendment claims against the individual defendants in their official capacity and against the City directly.[14] (See Dkt. 179, TAC at ¶¶ 140-189). The court thus dismisses plaintiffs' claims against the individual defendants in their official capacity as duplicative. See Poe, 2017 WL 5125748, at *2. Plaintiffs' municipal liability claims are addressed below. See infra at § II.G.

D. Supervisory Liability Claims Against Spagnoli, Rivetti, and Dowling.

Defendants argue that "[t]he 'individual capacity' claims against Spagnoli, Rivetti, and Dowling are not supported by sufficient facts, as none are alleged to be personally involved in any of the alleged detentions, arrests, charges, or court proceedings of any of the Plaintiffs." (Dkt. 188, Motion at 13). Plaintiffs respond that they are proceeding on a theory of "[s]upervisor liability" as to Spagnoli, Rivetti, and Dowling. (Dkt. 190, Opp. at 21).

"[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Graham, 473 U.S. at 166, 105 S.Ct. at 3105 (emphasis omitted). Each government official "is only liable for his or her own misconduct." Iqbal, 556 U.S. at 677, 129 S.Ct. at 1949. "Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013) (internal quotation marks omitted).

---

[14] As discussed below, see infra at § II.D, plaintiffs also assert claims against the individual defendants in their individual capacity.

However, "[a] defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted). "The requisite causal connection can be established . . . by setting in motion a series of acts by others[] . . . or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury[.]" Id. at 1207-08 (cleaned up). Thus, "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." Id. at 1208 (internal quotation marks omitted). A supervisor may also be liable in his individual capacity for failure to train if the official "was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." Flores v. County of Los Angeles, 758 F.3d 1154, 1158-59 (9th Cir. 2014).

Here, Spagnoli "was the main policy maker and Chief of the Beverly Hills Police Department from March 2016 to May 2020." (Dkt. 179, TAC at ¶ 36). Rivetti was "the Interim Chief of the Beverly Hills Police Department and its main policy maker from May 2020 to November 2021." (Id. at ¶ 37). Plaintiffs allege that during their respective terms as BHPD Chief, Spagnoli and Rivetti "promulgated policies wherein police officers were ordered and encouraged to stop, detain, arrest, forcefully seize, and/or prosecute Black Americans who visited the City of Beverly Hills." (Id. at ¶ 146). Spagnoli and Rivetti also "ratified and approved of the decisions of . . . all employees from the RDT and EDD Task Forces." (Id. at ¶ 41). Plaintiffs also allege that the task forces were developed as a result from "direction" that "stemmed from the chief." (Id. at ¶ 49). Additionally, as "the third highest [ranking] employee[,]" Dowling "was a Captain and worked in conjunction with the chiefs to set policy during the entire class period[,]" and "was specifically in charge of managing the RDT[.]" (Id. at ¶¶ 8, 14 & 38). According to plaintiffs, Dowling "implemented the EDD, RDT and other practices to target Black Americans with illegal stops, arrests, jailings' [sic] and prosecutions." (Id. at ¶ 73). Plaintiffs thus allege that Spagnoli, Rivetti,

and Dowling set in motion a series of acts by their subordinates. See Starr, 652 F.3d at 1207-08.

Plaintiffs also supply allegations to suggest that Spagnoli, Rivetti, and Dowling knowingly refused to terminate the subject series of acts by their subordinates, which they knew or reasonably should have known would inflict a constitutional injury. See Starr, 652 F.3d at 1207-08. For example, plaintiffs allege that Spagnoli, Rivetti, and Dowling knew "of the unconstitutional conduct by BHPD officers," yet "failed to act to prevent their subordinates from engaging in such conduct." (Dkt. 179, TAC at ¶ 94). Spagnoli and Rivetti "were aware of the racial profiling and constitutional violations of Black Americans because of complaints received from citizens, various lawsuits and newspaper articles[,]" and "continuous prosecutorial rejections for charges against Black Americans improperly arrested and charged by BHPD." (Id. at ¶ 149). Rivetti and Dowling both knew "that 90% of the people arrested by the RDT were Black," but were not "concerned" by this fact. (Id. at ¶ 47). Indeed, Dowling was "worried that an attorney would look at the numbers and file a lawsuit." (Id.). Plaintiffs also allege that Dowling "referred to Black people as lazy[,]" "used the N word[,]" and "stated [that] 'these people' were causing problems on Rodeo drive spending marijuana money." (Id. at ¶ 14). He "referred to the Black American individuals arrested by the RDT, as 'terrorists and animals.'" (Id. at ¶ 73). Spagnoli also allegedly made "derogatory comments." (Id. at ¶ 85).

Plaintiffs also allege that Rivetti knew that RDT arrested Black people at disproportionate rates and "approved awards for [RDT,]" (Dkt. 179, TAC at ¶ 47), and that Spagnoli promoted Dowling even though he had been reported for making racist comments. (See id. at ¶ 91-92). Rivetti was aware of the claims against Dowling, e.g., his use of racial stereotypes such as "lazy" in referring to Black people, but nevertheless "allowed him to remain a Captain and thus in charge of both the EDD and RDT task forces." (See id. at ¶ 91-92). Plaintiffs also provide allegations showing Spagnoli, Rivetti, and Dowling's knowledge of repeated incidents of racial profiling, their ratification of racist statements, and their awareness of a troubling racist culture at BHPD. (See, e.g., id. at ¶¶ 57-68, 70-73, 80-81, 83-92 & 97-99).

Contrary to defendants' argument, (see Dkt. 188, Motion at 13), a "supervisor need not be directly and personally involved in the same way as are the individual officers who are on the

scene inflicting constitutional injury." Starr, 652 F.2d at 1205 (internal quotation marks omitted). Here, plaintiffs have adequately alleged that "Spagnoli, Dowling and Rivetti set in motion a series of acts by their subordinates, or knowingly refused to terminate a series of acts by their subordinates, that each knew or reasonably should have known would cause the subordinates to deprive Black Americans of their rights under law." (Dkt. 179, TAC at ¶ 94); see Starr, 652 F.3d at 1207-08. Under the circumstances, the court is persuaded that plaintiffs have adequately alleged supervisory liability under § 1983 against Spagnoli, Rivetti, and Dowling.

E. Due Process Claims.

Defendants also argue that plaintiffs' due process claims against the individual defendants should be dismissed as factually deficient. (Dkt. 188, Motion at 14). Confusingly, defendants list the elements of a § 1983 claim based on deliberate fabrication of evidence, and argue that "[p]laintiffs have failed to properly allege the basic elements" of such a claim, and that "alleging the elements of common law malicious prosecution and/or false imprisonment claims" is insufficient to plead a due process claim. (Id.). Perhaps the reason defendants do not believe plaintiffs adequately alleged a § 1983 claim for deliberate fabrication of evidence is because no such claim is asserted in the TAC. (See, generally, Dkt. 179, TAC at ¶¶ 106-123). That said, the court understands some of defendants' confusion, because plaintiffs' "first cause of action[,]" (id. at 34), includes two distinct claims for relief: (1) a § 1983 claim for false imprisonment and (2) a § 1983 claim for malicious prosecution. (See id. at ¶¶ 106-123); (see also Dkt. 190, Opp. at 22-23).

**1. False Imprisonment.**

"False imprisonment is the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." George v. City of Long Beach, 973 F.2d 706, 710 (9th Cir. 1992) (internal quotation marks omitted). "To prevail on [a] § 1983 claim for false arrest and imprisonment, [a plaintiff] would have to demonstrate that there was no probable cause to arrest [them]." Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998). Here, the court is persuaded that plaintiffs have plausibly alleged a claim for false imprisonment, as the TAC alleges that each named plaintiff was arrested without probable cause.

(See Dkt. 179, TAC at ¶¶ 106-123); see also Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1988) ("[A]n arrest without probable cause . . . gives rise to a claim for damages under § 1983.").

**2. Malicious Prosecution.**

A claim of malicious prosecution is cognizable under § 1983 "when a malicious prosecution is conducted with the intent to . . . subject a person to a denial of constitutional rights." Lacey v. Maricopa Cnty., 693 F.3d 896, 919 (9th Cir. 2012) (internal quotation marks omitted); Bretz v. Kelman, 773 F.2d 1026, 1031 (9th Cir. 1985) (en banc). To maintain a § 1983 claim for malicious prosecution, a plaintiff must allege "that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right." Lacey, 693 F.3d at 919 (internal quotation marks omitted); Awabdy v. City of Adelanto, 368 F.3d 1062, 1066 (9th Cir. 2004). Additionally, "[i]t requires 'the institution of criminal proceedings against another who is not guilty of the offense charged' and that 'the proceedings have terminated in favor of the accused.'" Lacey, 693 F.3d at 919 (quoting Restatement (Second) of Torts § 653 (1977)); see also Awabdy, 368 F.3d at 1068. "To constitute a favorable termination, 'a dismissal in the interests of justice [must] reflect[ ] the opinion of the prosecuting party or the court that the action lacked merit or would result in a decision in favor of the defendant.'" Williams v. Cnty. of Alameda, 26 F.Supp.3d 925, 944 (N.D. Cal. 2014) (quoting Awabdy, 368 F.3d at 1068).

"Although being lawfully arrested on a criminal charge may be considered the institution of a criminal proceeding, where the arrest is not a valid one, an action for malicious prosecution will not lie unless some further step is taken, such as bringing the accused before a magistrate for determination whether he is to be held[.]" Lacey, 693 F.3d at 919-20 (citations and internal quotation marks omitted). In other words, "[i]f there is nothing more than the false arrest and the accused is released without any further proceeding, the remedy is limited to damages for the false arrest." Id. at 920 (internal quotation marks omitted); see also Blaxland v. Commonwealth Dir. of Pub. Prosecutions, 323 F.3d 1198, 1204-05 (9th Cir. 2003) (describing difference between malicious prosecution – "the wrongful use of legal process" – and false imprisonment – "imprisoning someone [] without the authority of legal process").

Here, defendants argue that plaintiffs have failed to state a claim for malicious prosecution because there were no court proceedings against the named plaintiffs. (See Dkt. 188, Motion at 14-15). For instance, defendants argue that Nett, Swift, and Rogers were not "prosecuted" because no criminal charges were filed against them. (See id.; Dkt. 196, Reply at 8). The court agrees as to Swift and Rogers, as there are no allegations that they were subjected to further proceedings. (See, generally, Dkt. 179, TAC). Indeed, the TAC states that no court proceedings of any kind occurred as to Rogers. (See id. at ¶ 29). However, Nett was detained for 72 hours in jail, (see id. at ¶ 97), which would have required an appearance before a judicial officer. See Cal. Penal Code § 825; Rose v. Daimler Trucks N. Am. LLC, 2010 WL 11651593, *2 (C.D. Cal. 2010) (courts may take judicial notice of state statutes). Thus, it appears that plaintiffs have plausibly alleged a claim of malicious prosecution as against Nett. As for the other named plaintiffs, plaintiffs "have not alleged that any process resulting in the initiation of criminal proceedings followed [their] arrest" – they have "simply recast the false arrest claim as a claim for malicious prosecution" and dismissal is therefore appropriate. Lacey, 693 F.3d at 920 (affirming dismissal of malicious prosecution claims). Accordingly, Williams, White, Swift, Rogers and York's malicious prosecution claims are dismissed with leave to amend.

F. Unreasonable Seizure Claims.

"[A]n arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983." Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1076 (9th Cir. 2011) (internal quotation marks omitted). Here, plaintiffs have "alleged that [defendants] violated their Fourth Amendment right to be free from false arrest by ordering their arrests without probable cause to do so." Lacey, 693 F.3d at 919; (see e.g., Dkt. 179, TAC at ¶¶ 6, 7, 59, 88, 99, 100, 103 & 110-11).

Defendants concede that plaintiffs "arguably allege an unreasonable seizure claim generally" but contend that plaintiffs have not "adequately alleged such claim [sic] against each Individual Defendants [sic]." (Dkt. 188, Motion at 16). In support of their contention, defendants largely repeat the same arguments, (see id.), that the court has already addressed regarding plaintiffs' failure to identify the specific officers involved in each incident. See supra at § II.B. In

short, plaintiffs have adequately alleged their unreasonable seizure claims, but because plaintiffs have not specified the individual officers' conduct against the named plaintiffs, the court will dismiss the claims against the individual officers with leave to amend. See supra at § II.B.

G. Municipal Liability Claims.

A local government may be liable under 42 U.S.C. § 1983 if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury[.]" Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38. "Under Monell, a local government body can be held liable under § 1983 for policies of inaction as well as policies of action." Jackson, 749 F.3d at 763. "A policy of action is one in which the governmental body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a governmental body's failure to implement procedural safeguards to prevent constitutional violations." Id. (internal quotation marks omitted); see Waggy v. Spokane Cty., 594 F.3d 707, 713 (9th Cir. 2010) (noting that in order to state a claim based on inaction, "a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees") (internal quotation marks omitted); Connick v. Thompson, 563 U.S. 51, 61, 131 S.Ct. 1350, 1359 (2011) ("[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.").

Here, plaintiffs allege the existence of a policy, practice, and custom – a policy of action. (See, e.g., Dkt. 179, TAC at ¶ 47) ("The City of Beverly Hills has a widespread, policy, practice and custom of racial profiling against Black Americans resulting in unconstitutional detentions, arrests, and, illegal searches and seizure."). They also allege a policy of inaction – that is, a failure to train. (See e.g., id. at ¶¶ 58-60, 155 & 157-64). Defendants argue that plaintiffs do not adequately allege either an affirmative policy or one that amounts to deliberate indifference or that any such policy was the moving force behind the constitutional violation. (See Dkt. 188, Motion at 16-20).

To challenge a policy of action, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388 (1997). The policy must be an "official policy" – i.e., an "act[] which the

municipality has officially sanctioned or ordered" – in other words, a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. Cincinnati, 475 U.S. 469, 480 & 483, 106 S.Ct. 1292, 1298 & 1300 (1986); see Castro v. County of Los Angeles, 833 F.3d 1060, 1075 (9th Cir. 2016) (same).

The gravamen of defendants' argument is that plaintiffs' allegations regarding the existence of such a policy are conclusory. (See Dkt. 188, Motion at 17-18). However, the factual allegations underlying a Monell claim need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" Twombly, 550 U.S. at 555, 127 S.Ct. at 1964 (internal quotation marks omitted). Here, plaintiffs allege the existence of a policy or practice pursuant to which "officers were ordered and encouraged to stop, detain, arrest, forcefully seize, and/or prosecute Black Americans who visited the City of Beverly Hills." (Dkt. 179, TAC at ¶ 146). Plaintiffs provide specific examples of how the policy was developed and implemented. (See, e.g., id. at ¶¶ 146-154). Indeed, plaintiffs allege that "over 90% of all arrests reported during the RDT and EDD subclass [periods] and 34% over the entire class period are of Black Americans while the City itself is only 1.9% Black." (Id. at ¶ 47). Such allegations, viewed in conjunction with the other allegations in the TAC, are more than sufficient to allege an affirmative policy. See Estate of Osuna v. County of Stanislaus, 392 F.Supp.3d 1162, 1174-75 (E.D. Cal. 2019) (finding that allegations which, among other things, identified "multiple prior instances of alleged misconduct" were sufficient to allege a policy or custom).

Plaintiffs have also adequately alleged a failure to train. In inaction cases, "the plaintiff must show, first, that the policy amounts to deliberate indifference to the plaintiff's constitutional right. This requires showing that the defendant was on actual or constructive notice that its omission would likely result in a constitutional violation." Jackson, 749 F.3d at 763 (internal quotation marks, citation, and alterations omitted); Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1145 (9th Cir. 2012) (same). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train[.]" Flores, 758 F.3d at 1159 (internal quotation marks omitted). "Second, the plaintiff must show that

the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." Jackson, 749 F.3d at 763 (internal quotation marks omitted); Tsao, 698 F.3d at 1143 (same).

Here, plaintiffs allege that defendants' "grossly inadequate training" amounts to "deliberate indifference to the civil rights of victims of the BHPD's unlawful arrests[.]" (See Dkt. 179, TAC at ¶¶ 58-60, 155 & 157-64). Plaintiffs allege, among other things, that defendants purposefully implemented a policy of stopping Black people based solely on their race, (see id. at ¶ 146), that defendants were aware of the policy, and that such a policy caused civil rights violations. (See id. at ¶¶ 153-160 & 162-163). Plaintiffs provide examples to support their claim of deliberate indifference, including "ignoring the history and pattern of prior civil lawsuits alleging civil rights violations," the failure "to identify and investigate instances of false and unlawful arrests," the "preparation of untrue police reports," and "an absence of or by maintenance of an inadequate system of tort claims tracking and by maintaining an inadequate system of officer discipline." (See, e.g., id. at ¶¶ 158-59 & 161). In short, the court is persuaded that such allegations are sufficient to state a Monell claim based on deliberate indifference. See Flores, 758 F.3d at 1159; Plumeau v. School District No. 40 County of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997).

Finally, the court is unpersuaded by defendants' argument that plaintiffs have not adequately alleged that the policy was the moving force behind the constitutional deprivations. (See Dkt. 188, Motion at 19-20). In a single paragraph, defendants assert that the TAC "offer[s] no specific factual detail showing how the alleged [policies] . . . were the 'moving force' behind any alleged constitutional violations." (See id.). But plaintiffs allege that the City implemented two task forces whose underlying purpose was to eliminate the presence of Black Americans in the City, (see e.g., Dkt. 179, TAC at ¶ 49), and that defendants knowingly allowed a racist captain to remain in charge of the task forces. (See id. at ¶¶ 72 & 91-92). Plaintiffs further allege that the policy of racially profiling Black Americans – by, among other things, pretextually stopping and detaining them, without probable cause – directly resulted in the alleged constitutional violations. (See id. at ¶¶ 25-30, 93, 151-152, 164 & 167). Plaintiffs need not provide factual details regarding each stop; they have provided allegations to support their claim that the policy was the moving force

behind the violations. In sum, the court concludes that plaintiffs have adequately alleged their Monell claim. See Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

H. Equal Protection Claims.

To state a claim under § 1983 for a violation of the Equal Protection Clause, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class," Thornton v. St. Helens, 425 F.3d 1158, 1166-67 (9th Cir. 2005) (internal quotation marks omitted), and that plaintiff was treated differently from those similarly situated. See Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir.2001); Lacey, 693 F.3d at 920 ("To prevail on an equal protection claim under the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose. . . . In order to prove a discriminatory effect, the claimant must show that similarly situated individuals . . . were not prosecuted.") (internal quotation marks omitted).

Here, plaintiffs' equal protection claims are based on allegations that BHPD officers were assigned to participate in a law enforcement operation that racially profiled Black people in Beverly Hills. As noted, plaintiffs allege that over 90% of all arrests conducted by the RDT and EDD task forces and 34% of arrests during the entire class period were of Black Americans, even though "the City itself is only 1.9% Black." (Dkt. 179, TAC at ¶ 47). According to plaintiffs: (1) they were racially profiled and treated differently from similarly situated non-Black people, (see id. at ¶¶ 47 & 93); (2) this unequal treatment was based on plaintiffs' race, (see id. at ¶¶ 49, 74, 77 & 93); (3) defendants intended to discriminate based on plaintiffs' race, (see id. at ¶¶ 91-92 & 94-105), and (4) plaintiffs were unlawfully detained – that is, injured as a result. (See id. at ¶¶ 188-189). Plaintiffs' TAC "is replete with references to acts of intentional discrimination by Defendants against Plaintiffs on the basis of race." Melendres v. Arpaio, 598 F.Supp.2d 1025, 1037 (D. Ariz. 2009). The court finds that the allegations in the TAC are sufficient to state a claim for violation of the Equal Protection Clause. See, e.g., id. (finding plaintiff adequately stated an equal protection claim for selective enforcement); Lacey, 693 F.3d at 920-22 (same); Sykes v. City of Henderson, 738 F.Supp.3d 1344, 1352-53 (D. Nev. 2024) (finding plaintiff adequately stated an equal protection claim for racial profiling).

Defendants argue that plaintiffs' equal protection claims should be dismissed because "more likely explanations' exist" as to why the task forces had the incidental effect of targeting Black Americans. (See Dkt. 188, Motion at 21-22). Defendants analogize the instant case to Iqbal, stating that "[i]n Iqbal, the Court noted that the September 11 attacks were perpetrated by Arab Muslims at the direction of an Arab Muslim whose followers were largely other Arab Muslims . . . [so] a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims[.]" (Id. at 21-22) (citing Iqbal, 556 U.S. at 682, 129 S.Ct. at 1951-52). According to defendants, "here, the officers' alleged conduct was just as plausibly an attempt to legally enforce the law in making stops and effectuating arrests." (Id. at 22).

The obvious and disturbing implication of defendants' argument is that it is "just as plausibl[e]" that defendants arrested Black people at a vastly disproportionate rate because Black people are simply more likely than non-Black people to commit crimes in Beverly Hills. (See Dkt. 188, Motion at 21-22). Setting aside whether defendants have accurately characterized Iqbal, defendants' attempt to analogize that decision to the situation here is unpersuasive because in that case, the FBI was investigating a discrete group – al Qaeda. See 556 U.S. at 682, 129 S.Ct. at 1951-52. Here, there is no suggestion that defendants were investigating such a group – only that defendants targeted Black people and sought to "eliminate" their presence from the City. (See Dkt. 179, TAC at ¶¶ 5 & 46-50). Given that the crux of plaintiffs' action is that defendants targeted Black people because defendants believed them to be a "criminal element," (see id. at ¶¶ 5 & 47-50), defendants' implicit claim that Black people are more likely to commit crimes in Beverly Hills, (see Dkt. 188, Motion at 21-22), is extremely troubling. In short, "[t]here is no 'obvious alternative explanation,' within the meaning of Iqbal, for why [defendants] took no action to stop [their alleged] repeated violations of [plaintiffs'] constitutional rights despite being repeatedly confronted with those violations, such that the alternative explanation requires us to conclude that [plaintiffs'] explanation 'is not a plausible conclusion.'" Starr, 652 F.3d at 1216 (quoting Iqbal, 129 S.Ct. at 1951, 1952).

Defendants also argue that plaintiffs assert an Equal Protection Clause claim under a "class

of one" theory and that this "should eviscerate class-wide treatment of their claims." (Dkt. 188, Motion at 8); (see id. at 23) ("Plaintiffs' alternative pleading of a "class of one" is contrary to their factual allegations and of a putative class, and thus, fails."). However, it is not clear from the TAC that plaintiffs are asserting their equal protection claims under a class of one theory. (See Dkt. 179, TAC at ¶ 170); see also Gerhart v. Lake Cnty., Mont., 637 F.3d 1013, 1021 (9th Cir. 2011) ("The Supreme Court has recognized that an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'") (some internal quotation marks omitted). The full sentence from the TAC which defendants quote reads as follows: "Illustratively, courts even recognize 'class of one' claims." (Id.). But one sentence later, plaintiffs allege that the fact that such claims have been recognized supports their position that "1,086 members of the class and 179 members of the subclass were singled out for irrational or differential treatment by Defendants in the same way, making their claims typical of one another." (Id.). Plaintiffs are correct, (see Dkt. 190, Opp. at 32-33), that they are permitted to allege alternative or inconsistent claims. See Fed. R. Civ. P. 8(d); Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC, 149 F.Supp.3d 1188, 1205 (E.D. Cal. 2015), although it is not clear why plaintiffs would attempt to assert a class of one theory given that their alleged injuries revolve around class-based discrimination, not the unique mistreatment of a singular plaintiff. Even so, the court is unpersuaded by defendants' argument that the mere mention of class of one claims warrants dismissal of plaintiffs' class claims. Plaintiffs have alleged a viable theory to support their Equal Protection Clause claims – that is, class based discrimination. In short, the court finds that plaintiffs' TAC adequately pleads a claim under § 1983 for violation of the Equal Protection Clause.

I. Injunctive Relief.

Finally, defendants argue that plaintiffs' claim for injunctive relief should be dismissed because the TAC's "allegations of possible future harm are conclusory." (Dkt. 188, Motion at 24). The court disagrees. Plaintiffs allege that "unless restrained and enjoined by this court, defendant City will continue to treat Black Americans worse," (Dkt. 179, TAC at ¶ 187), that "there has been no change to the defendants['] policies . . . and they are continuing to engage in the deprivation

of the civil rights of Black Americans[,]" (id. at ¶ 62), and that "Beverly Hills plans on setting up further task forces in the future that will continue to perpetuate racial stereotypes and racial profiling if not enjoined." (Id. at ¶ 137).

Moreover, Rule 12(b)(6) "only sanctions dismissal for failure to state a claim." Commerce Point Capital, Inc. v. First Data Corp., 2019 WL 7020057, *10 (S.D. Cal. 2019). Injunctive relief is a remedy, not a cause of action. See Ajetunmobi v. Clarion Mortg. Capital, Inc., 595 F.Appx. 680, 684 (9th Cir. 2014) ("Declaratory and injunctive relief are remedies, not causes of action."); Huynh v. NorthBay Med. Ctr., 2018 WL 4583393, *4 (E.D. Cal. 2018) ("Injunctive relief is a remedy derived from the underlying claims and not an independent claim in itself."). Thus, plaintiffs' request for injunctive relief is not subject to dismissal under Rule 12(b)(6). See, e.g., Commerce, 2019 WL 7020057, at *10 ("Because a 12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings, not the appropriateness of the relief sought, a motion to dismiss is not the proper mechanism to challenge a prayer for relief."); Casey v. City of Santa Rosa, 2019 WL 2548140, *6 (N.D. Cal. 2019) ("[A] motion to dismiss pursuant to Rule 12(b)(6) is not the proper vehicle for challenging a prayer for relief."); Minkley v. Eureka City Sch., 2017 WL 4355049, *16 (N.D. Cal. 2017) (noting that a request for injunctive relief is "not subject to dismissal under Rule 12(b)(6)").

## CONCLUSION

Based on the foregoing, IT IS ORDERED that:

1. Defendants' Motion **(Document No. 188)** is **denied in part** and **granted in part** as set forth herein. Plaintiffs' claims against the individual defendants are dismissed with leave to amend. Williams, White, Swift, Rogers, and York's § 1983 malicious prosecution claims are dismissed with leave to amend. To the extent plaintiffs wish to amend their malicious prosecution claims, plaintiffs shall plead their false imprisonment and malicious prosecution claims as separate, distinct causes of action. Plaintiffs' official-capacity claims against the individual defendants are dismissed without leave to amend.

2. Plaintiffs shall file a Fourth Amended Complaint no later than **March 6, 2025**. The Fourth Amended Complaint must be labeled "Fourth Amended Complaint," filed in compliance with Local Rule 3-2 and contain the case number assigned to the case. In addition, plaintiffs are

informed that the court cannot refer to a prior pleading in order to make their Fourth Amended Complaint complete. Local Rule 15-2 requires that an amended pleading be complete in and of itself without reference to any prior pleading. This is because, as a general rule, an amended pleading supersedes the original pleading. See Ramirez v. Cnty. of San Bernardino, 806 F.3d 1002, 1008 (9th Cir. 2015) ("It is well-established in our circuit that an amended complaint supersedes the original, the latter being treated thereafter as non-existent. In other words, 'the original pleading no longer performs any function[.]'") (citations and internal quotation marks omitted).

3. Plaintiffs are cautioned that failure to timely file a Fourth Amended Complaint may result in this action being dismissed without prejudice for failure to prosecute and/or failure to comply with a court order. See Fed. R. Civ. P. 41(b); Link v. Wabash R.R. Co., 370 U.S. 626, 629-30, 82 S.Ct. 1386, 1388 (1962).

4. Defendants shall file their Answer to the Fourth Amended Complaint or a motion pursuant to Fed. R. Civ. P. 12 no later than **March 27, 2025.** *In the event defendants decide to file another Rule 12 motion, the motion shall be limited to addressing the sufficiency of plaintiffs' claims against the individual defendants – that is, whether plaintiffs have adequately identified the specific defendants and their conduct – and/or the sufficiency of plaintiffs' malicious prosecution claims.*

5. In the event defendants wish to file another motion to dismiss, then counsel for the parties shall, on **March 20, 2025, at 10:00 a.m.**[15] meet and confer in person at an agreed upon location within the Central District of California to discuss defendants' motion to dismiss. Defendants' motion must include copies of all meet and confer letters as well as a declaration that sets forth, in detail, the entire meet and confer process (i.e., when and where it took place, how long it lasted and the position of each attorney with respect to each disputed issue that will be the subject of the motion). Failure to include such a declaration will result in the motion being denied.

6. Plaintiffs' Motion for Class Certification and related motions **(Document Nos. 262, 263**

---

[15] Counsel may agree to meet and confer at another time and place without seeking court approval for such an agreement.

**& 265)** are **denied without prejudice**. Renewed motions that take into account this Order and any subsequent orders issued in connection with the Fourth Amended Complaint may be filed at a later time.

Dated this 8th day of February, 2025.

/s/
Fernando M. Olguin
United States District Judge