Bradley C. Gage, Esq., S.B. No. 117808
(bgage@goldbergandgage.com)
Milad Sadr, Esq., S.B. No. 245080
(msadr@goldbergandgage.com)
BRAD GAGE LAW, APC
23002 Victory Boulevard
Woodland Hills, California 91367
(818) 340-9252 Fax: (818) 340-9088

Benjamin Crump, Esq. - admitted pro hac vice
(Court@BenCrump.com)
BEN CRUMP LAW FIRM
122 South Calhoun Street, Tallahassee, Fla. 32301
Florida Bar Number 0072583

Jeffrey Spencer, Esq., S.B. No. 182440
Email; jps@spencerlaw.net
THE SPENCER LAW FIRM
2 Venture, Suite 420. Irvine, CA 92618
(949) 240-8595

Attorneys for Plaintiffs,
JASMINE WILLIAMS, KHALIL WHITE, JOSEPH NETT, LAKISHA SWIFT, CAMERON ROGERS, SHEPHARD YORK and the PUTATIVE CLASS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JASMINE WILLIAMS, KHALIL WHITE, JOSEPH NETT, LAKISHA SWIFT, CAMERON ROGERS and SHEPHARD YORK in Their Individual and Representative Capacities on Behalf of a Class of All Persons similarly situated,<br><br>Plaintiffs,<br><br>v. | CASE NO.: 2:21-cv-08698-FMO-(RAOx)<br><br>BEFORE THE HONORABLE FERNANDO M. OGUIN, UNITED STATES DISTRICT JUDGE. COURTROOM 6D<br><br>CLASS ACTION<br><br>**FIFTH AMENDED COMPLAINT FOR MONETARY DAMAGES** |

CITY OF BEVERLY HILLS, SANDRA SPAGNOLI, DOMINICK RIVETTI, CAPTAIN SCOTT DOWLING, SERGEANT DALE DRUMMOND, OFFICER JON ILUSORIO, inclusive, all sued in their individual capacities,

Defendants

**AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL**

1. **VIOLATION OF CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE SEIZURES**
2. **SUPERVISORIAL LIABILITY**
3. **MUNICIPAL LIABILITY FOR VIOLATION OF EQUAL PROTECTION CLAUSE**

**FIFTH AMENDED COMPLAINT FOR MONETARY DAMAGES, INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL**

Plaintiffs assert the following claims and hereby demand a jury trial for themselves and all members of the Class.

## I. VENUE AND JURISDICTION

1. Plaintiffs JASMINE WILLIAMS, KHALIL WHITE, JOSEPH NETT, LAKISHA SWIFT, CAMERON ROGERS and SHEPHARD YORK[1] (hereinafter, collectively "Plaintiff," or "Plaintiffs") bring this action on their own behalf and on behalf of all persons within the class defined herein. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs assert claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district. The class representatives will not pursue any claims that are inconsistent with the class.

[1] York and Williams have been withdrawn as class representatives and only bring their claims individually.

## II. CLASS ALLEGATIONS

2. The Class consists of the following: All Black people who were detained, or arrested by the City of Beverly Hills Police Department ("BHPD") from August 30, 2019 through August 30, 2021 without being convicted of any crime.

3. The BHPD is a subdivision of the Defendant City of Beverly Hills.

4. There are two sub classes:

   a. The 80 Black Americans arrested by the City of Beverly Hills Police Department's Rodeo Drive Task Force, ("RDT") between August 29, 2020 and October 25, 2020. According to Depositions taken May 8, 2023, and May 10, 2023 of Former Captain Dowling and Former Interim Police Chief Rivetti respectively, none of these 80 Black Americans was convicted after being arrested. None of them pleaded guilty or no contest.

   b. The 99 Black Americans arrested by the City of Beverly Hills Police Department between August 29, 2020 and October 25, 2020. According to Depositions taken May 8, 2023, and May 10, 2023 of Former Captain Dowling and Former Interim Police Chief Rivetti respectively, none of these 89 Black Americans was convicted after being arrested. None of them plead guilty or no contest. Thus, their arrests were part of a widespread custom and practice of deliberate indifference to constitutional violations.

5. On or about August 2020, the City of Beverly Hills and the BHPD formed the Rodeo Drive Team ("RDT") to eliminate the presence of Black Americans, referred to as the "criminal element out of the Rodeo Drive district. The RDT was further established to target Black American's because they were making the city look too Ghetto. Officers were told to get rid of the "thugs" referring to Black people. When the RDT was formed the BHPD invited the officers to bring their friends and "come out and play" to target Black Americans for

minor infractions to get the "criminal element" out of the Rodeo Drive district. One of the managing officers over the RDT referred to Black persons arrested as animals. The BHPD directed the RDT to look for minor infractions by Black Americans and treat all Black Americans stopped the same way and provided them with a cut and paste template for the arrests and EDD fraud because of the common modus operandi. The BHPD characterized the arrests of Black Americans as "a dime a dozen."

6. Between August 20, 2020 through October 25, 2020, there were a total of 197 people arrested by the BHPD. Of those 179 (90%) were Black Americans. Not a single one of these Black Americans arrested was convicted. None of them plead guilty or no contest. There was no known probable cause for any of those arrests. This was confirmed in Depositions taken May 8, 2023 and May 10, 2023 of Former Captain Dowling and Former Interim Police Chief Rivetti respectively.

7. Between August 31, 2020 through August 30, 2021 there were a total of 3,213 persons arrested and 1,088 of those persons were Black Americans which amounts to 34% of the persons arrested during the full class period. Captain Dowling was not aware of a single one of those African Americans arrested that were convicted. None of them pled guilty or no contest. There was no known probable cause for any of those arrests. However, Chief Rivetti claims there was probable cause and convictions for two or the 1, 088 African Americans arrested during this time period. This was also confirmed in depositions taken May 8, 2023 and May 10, 2023 of Former Captain Dowling and Former Interim Police Chief Rivetti, respectively. Training Officers instructed new BHPD officers that anyone who they saw in Beverly Hills who was Black could not be

living in Beverly Hills, so the BHPD should find a reason to stop and cite that Black person.

8. Following a common operational plan and top down polices from August 29, 2020, through October 24, 2020, the RDT arrested 90 people. The RDT arrests by race were listed as: “African American 80; Caucasian 3; Hispanic 4; Vietnamese 2; Other 1.” None of the arrested black individuals was convicted of any crime as admitted by the policy maker, Chief Rivetti and the third highest BHPD employee, Captain Dowling. The RDT concentrated in the business district which included Rodeo Drive and Wilshire Blvd.

9. Following a common operational plan and top-down policies from August 29, 2020 through October 24, 2020, the EDD arrested 107 people of which 99 were African American; 2 were Caucasian; 4 were Hispanic and 2 were Vietnamese.

10. During the nearly two-month period of August 29, 2020, through October 24. 2020, the RDT arrested a total of 197 people. Of the total number of people arrested by these task forces, 179 were Black Americans. Accordingly, more than 90% of the total number of individuals arrested were Black. However, the City of Beverly Hills is only 1.96% Black and the State of California is a mere 5.8% Black. Black Americans are members of a recognized protected class. Since the top management at BHPD admits there were no convictions, this astounding disparity can only be attributed to racial profiling, illegal searches and seizures, violation of due process and violation of equal protection.

11. The disparate impact of arresting such a disproportionate percentage of Black Americans compared with other races is because of Defendants’ top-down policies, practices, common operational plan to target Black Americans for stops, searches and arrests. Once the RDT’s targeting of Black Americans became known, fewer Black Americans came to Beverly Hills which pleased

Decision Makers for the City of Beverly Hills who exalted the elimination of Black visitors, proclaiming, “its beginning to look more normal again.”

12. There are exact numbers for the sub-classes because the City of Beverly Hills provided information to the media in response to its probing inquiries about its racial profiling during the RDT task force. In Discovery to date the City has admitted 3,213 persons were arrested and 1,088 of those persons were Black Americans which amounts to 34% of the persons arrested during the full class period. Three of those 1,088 African Americans were convicted. Accordingly, the ascertainable class is comprised of approximately 1,085 Black Americans. These numbers are so numerous that the joinder of all such persons is impracticable and the disposition of their claims as a Class will benefit the parties and the Court. The incredibly low conviction rate is unfathomable and can only be explained by a policy, practice and custom of long-standing racial profiling and targeting Black Americans for selective enforcement and deliberate indifference to constitutional violations.

13. The BHPD directed, taught and instructed its officers to use pretext stops to target African Americans for minor infractions. The typical practice was for BHPD officers to use their police powers, to stop, detain and search Black Americans for minor infractions such as roller skating on the sidewalk, illegal U-turns, failing to stop behind the limit line, smoking, playing music or making loud noise, to name a few examples and then handcuff them, humiliate them by making them stand handcuffed on the sidewalk, then arresting them. In contrast when White people engaged in the same conduct the BHPD offices either ignored them, gave them a warning or gave them a ticket. They were not handcuffed, searched and arrested. White people were allowed to stay in their cars while engaging in violations, or they were not even stopped at all as shown

by the video tape of officers allowing a white driver to pass the limit line without even being pulled over. Black people are required to exit their vehicles. White people are not handcuffed for minor infractions. Black people are handcuffed. White people are not searched for minor infraction. Black people are searched personally under the pretext of looking for weapons and being pressured to “consent” to a vehicle search. An excellent example is the detention at gun point of a black Versace Vice President (Mr. Bembury) after “jay walking.”

14. Under the policy, practice and training of BHPD between August 2019 and August 2021 (as well as before and after the class period), white people were not searched. If a Black motorist had no contraband, they would be set free, frequently with no documentation provided to allow for tracking the race of individuals stopped and searched. If contraband was found, the Black person was then arrested. Since the numbers of Black people subjected to searches was so much higher than white people, the number of arrests of Black people was also disproportionately high. This was a common practice of the BHPD for the past several years (over 31 years). Thus, during the full two-year class period, approximately one third (1/3) of the people arrested were African American, but the City of Beverly Hills, has a population of only around 1.9% African American. The reason for this disparity is that the defendants erroneously and stereo typically regarded Black people as inherently more suspicious. The policy makers in charge of these arrests were Chiefs Spagnoli and Rivetti, though they delegated some duties to Captain Dowling (who was specifically in charge of managing the RDT). Dowling in discussing the formation of the RDT stated "these people" were causing problems on Rodeo drive spending marijuana money.” These people referred to Black Americans. Dowling also

used the N word according to his co-defendant's testimony. The RDT had an operation plan which was approved by Dowling and Rivetti. Dowling also referred to black people as "lazy." The RDT was supposed to be responsible for all arrests on Rodeo Drive each day to provide for "consistency" also known as "commonality and typicality."

15. The RDT accomplished its goals of targeting Black Americans for arrest for minor infractions. Over 90% of the persons it arrested were Black Americans. The arrests were improper and baseless as evidenced by the fact that none of the arrests by the RDT resulted in a single conviction. All the RDT accomplished was to successfully target Black Americans and scare them out of the Rodeo Drive district. Since the RDT's arrests of 80 Black Americans did not result in a single conviction it should have been considered a failure and a waste of resources. However, even though the RDT arrests of Black Americans didn't result in a single conviction, the City of Beverly Hills and the BHPD was so pleased with the way the RDT targeted Black Americans they gave the RDT an award for excellence.

## III. COMPLIANCE WITH FEDERAL RULE 23

16. The conduct of the RDT in targeting Black Americans for selective enforcement was directed, ratified and approved by the City of Beverly Hills and the BHPD. No BHPD officers were reprimanded or subjected to discipline for their work on the RDT racial profiling and targeting Black Americans and the City of Beverly Hills and the BHPD gave the RDT an award of excellence. The same police, directives and practices employed by the RDT toward Black Americans continued for the entire class period, yet no BHPD officers were reprimanded or subjected for discipline for racial profiling and targeting Black Americans during the entire class period. Indeed, officers were given awards as

Supervisors Rivetti and Dowling ratified and approved the actions of subordinates who engaged in racial profiling in violation of the civil rights of Black Americans.

17. Federal Rule of Civil Procedure 23(a) provides the following requirements for class actions:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that the joinder of all members is impracticable. Here, the class has at least 1,085 members and, the sub classes have 179 total members making joinder impracticable.

(2) there are questions of law or fact common to the class. Here, the claims for all class members involve civil rights violations subject to the same law and facts.

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class. Here, because the claims all involved civil rights violations with the same law, the defenses and claims are all typical of those of the class.

(4) the representative parties will fairly and adequately protect the interests of the class. They will not take an interest contrary to the class.

18. The attorneys for the class are experienced lawyers in civil rights cases, and in class actions.

19. Local Rule 23-2.2 sets forth similar requirements for class allegations. It provides that the Class Allegations section of a complaint "shall contain appropriate allegations thought to justify the action's proceeding as a class action, including, but not limited to:

"(a) The definition of the proposed class (the class and subclasses are defined above);

"(b) The size of the proposed class: 1,085 Black Americans with sub classes totaling 179 Black Americans;

"( c) The adequacy of representation by the representative(s) of the class. Here, the plaintiffs are adequate class representatives because they were arrested or detained during the class period, and they were not convicted of any crimes and did not plea to anything, just as the class members they represent;

(d) The commonality of the questions of law and fact (see above);

(e) The typicality of the claims or defenses of the representative(s) of the class are typical of all class members (see above);

(f) If proceeding under F.R.Civ.P. 23(b)(3), allegations to support the findings required by that subdivision are provided herein; and

(g) The nature of notice to the proposed class required and/or contemplated. Here, we propose notice via CPT Group, Inc. as Claims Administrator, or such other administrator as the Court approves. The defendants are in possession of the names and addresses of all individuals in the class and thus can provide that information in order to give the class notice.)

20. Plaintiffs and the Class will not be able to obtain effective and economic legal redress unless the action is maintained as a class action. Here, Plaintiffs and the Class will not recover economically from defendants for the class claims without filing as a class. The numerous Plaintiffs makes individual recovery unlikely. Additionally, Plaintiffs are alleging widespread discrimination to a protected class of persons.

21. There is a community of interest in obtaining appropriate legal and equitable relief for the common law and statutory violations and other improprieties, and

in obtaining adequate compensation for the damages and injuries which Defendant City of Beverly Hills' (herein after "CITY") actions have inflicted upon each Plaintiff and the Class as a whole. Here, identifying and remedying racist and discriminatory practice and treatment is of interest both economically and equitably as its both unconscionable and illegal in our Country under the United States Constitution.

22. There is a community of interest in ensuring that the combined assets and available insurance of Defendant CITY are sufficient to adequately compensate the members of the Class for the injuries sustained, especially as to the individually named defendants. Here, the United States Constitution provides constitutional rights and equal protection of all its citizens. As such, there's a community interest in economically rectifying racist and discriminatory injuries the members of this protected class experienced.

23. Without class certification, the prosecution of separate actions by individual members of the Class would create a risk of:

a. Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants; and/or

b. Adjudications with respect to the individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests, including but not limited to the potential for exhausting the funds available from those parties who are, or may be, responsible Defendants; and

c. Defendant CITY has acted or refused to act on grounds generally applicable to the Class, thereby making monetary and injunctive relief appropriate with respect to the Class as a whole.

24. Questions of law and fact common to all potential Class Members predominate over any questions affecting only individual Class Members. Among the common questions of law and fact to the Class Members are:

a.. Whether Defendants engaged in a common operational plan and implemented top-down policies that violated the Class Members' constitutional rights.

b. Whether Defendant CITY engaged in a common operational plan and implemented top-down policies and procedures that violated the Class Members' constitutional rights to Equal Protection.

c. Municipal liability.

## IV. PARTIES

25. At all times relevant hereto, Plaintiff JASMINE WILLIAMS (hereafter also "Plaintiff" or "WILLIAMS"), was and is a Black American. Because of Defendant CITY'S common operational plan, top-down widespread policies, practices and customs, she was racially profiled, arrested, detained and handcuffed by Defendants DRUMMOND and ILLISORIO because of her identifiably protected characteristic-Black. She was not convicted of any crime. She did not enter any plea agreement after her arrest. All charges against her were dropped. WILLIAMS is a resident of Pennsylvania.

26. At all times relevant hereto, Plaintiff KHALIL WHITE (hereafter also "Plaintiff" or "WHITE" or collectively part of "Plaintiffs"), was and is a Black American. Because of Defendant CITY'S common operational plan, top-down widespread policies, practices and customs, he was racially profiled, stopped

and arrested by the defendants DRUMMOND and ILLISORIO because of his identifiably protected characteristic-Black. He was racially profiled, handcuffed, jailed and maliciously prosecuted because of his identifiably protected characteristic-Black. He was not convicted of any crime. He did not enter any plea agreement after his arrest. All charges against him were dropped. WHITE is a resident of Texas.

27. At all times relevant hereto, Plaintiff JOSEPH NETT (hereafter also “Plaintiff” or “NETT” or collectively part of “Plaintiffs”), was a resident of Los Angeles County. NETT is a Black American. Because of Defendant CITY’S common operational plan, top-down widespread policies, practices and customs, he was racially profiled, stopped and arrested because of his identifiably protected characteristic-Black. He was handcuffed, and jailed because of his identifiably protected characteristic-Black. He was not convicted of any crime. He did not enter any plea agreement after his arrest. All charges against him were dropped.

28. At all times relevant hereto, Plaintiff LAKISHA SWIFT (hereafter also “Plaintiff” or “SWIFT” or collectively part of “Plaintiffs”), was a resident of Los Angeles County. SWIFT is a Black American. Because of Defendant CITY’S common operational plan, widespread policies, practices and customs, she was racially profiled, arrested or detained. because of her identifiably protected characteristic-Black. She was handcuffed because of her identifiably protected characteristic-Black. She was not convicted of any crime. She did not enter any plea agreement after her arrest. All charges against her were dropped or not pursued.

29. At all times relevant hereto, Plaintiff CAMERON ROGERS (hereinafter, "Plaintiff" or "ROGERS" or collectively part of "Plaintiffs") is a resident of Arkansas who came to Beverly Hills in August 2020 to celebrate his birthday.

ROGERS is African American. As part of the BHPD common operational plan, he was driving a rental car when BHPD racially profiled him for being Black and pulled him over. The police made him exit his vehicle, placed him in handcuffs and humiliated him, making him sit in public while handcuffed. Passersby said that he was being racially profiled. He was arrested on a claim of felony EDD fraud. He went to jail. Because of being jailed, he lost his job. There was no court proceedings after he was released from jail. He was not convicted of any crime. He did not plea to any crime. He was not even prosecuted.

30. At all times relevant hereto, Plaintiff SHEPHERD YORK (hereinafter, "Plaintiff" or "YORK" or collectively part of "Plaintiffs") is a resident of Los Angeles, California and African American. He was employed by a law firm in Beverly Hills and was stopped by the BHPD while driving to work. He had his hair in dreadlocks and was Black but did nothing wrong. As part of BHPD's common operational plan he was racially profiled and the BHPD pulled him over. When he asked why he was pulled over, the officers refused to tell him and were very aggressive. They finally told him it was because his license plates were expired. However, they were not expired. He was required to exit his vehicle. He was subjected to a nonconsensual pat down search of his person, and non-consensual search of his belongings and vehicle and was jailed for one night and his vehicle was impounded. He was arrested for allegedly violating two warrants, but he was not convicted of any warrant violations. Instead he plead no contest to a minor traffic violation.

**A. CLASS REPRESENTATIVES**

31. The class action claims of class representatives, WHITE, NETT, SWIFT, and ROGERS are typical of the claims of the Class they seek to represent.

32. WHITE, NETT, SWIFT, and ROGERS will fairly and adequately protect the interests of the Class and Plaintiffs do not have any interests that are antagonistic to the Class.

33. The claims or defenses of the representative parties are typical of the claims or defenses of the class.

**B. DEFENDANTS**

34. At all times mentioned herein, Defendant CITY OF BEVERLY HILLS (hereafter also "CITY" or part of Defendants) was a public entity duly organized and existing under and by virtue of the laws of the State of California. The Beverly Hills Police Department ("BHPD") is a part of the city.

35. The policy makers in charge of implementing the common top-down discriminatory policies and practices were Police Chief SANDRA SPAGNOLI, her replacement, Interim Police Chief DOMINICK RIVETTI, and Captain SCOTT DOWLING, (Hereinafter also collectively referred to as "Defendants.")

36. SANDRA SPAGNOLI was the main policy maker and Chief of the Beverly Hills Police Department from March 2016 to May 2020.

37. DOMINICK RIVETTI was the Interim Chief of the Beverly Hills Police Department and its main policy maker from May 2020 to November 2021.

38. DOWLING was a Captain and worked in conjunction with the chiefs to set policy during the entire class period. DOWLING'S actions were also ratified by both SPAGNOLI and RIVETTI.

39. SPAGNOLI and RIVETTI as the Chiefs of Police are individuals who acted under color of law. Their actions deprived all of the plaintiffs of their rights under the laws of the United States and the United States Constitution. SPAGNOLI and RIVETTI had final policy making authority from Defendant

CITY OF BEVERLY HILLS concerning these acts and when engaged in these acts, SPAGNOLI and RIVETTI were acting as the final policymakers for Defendant CITY OF BEVERLY HILLS and its Police Department.

40. SPAGNOLI and RIVETTI both also delegated some of their final policy making authority to their subordinates and ratified the decisions of their subordinates. That is, SPAGNOLI and RIVETTI both ratified the actions of DOWLING and other subordinate employees and specifically approved of the employee's acts. One example of how the actions of subordinates was ratified is found in the 2020 Employee Excellence Awards for the category of "Outstanding Job Performance" given to all of the members of the RDT. Another example, Billy Fair was promoted from sergeant to lieutenant for his involvement with the RDT and after making derogatory comments of Black people including but not limited to calling them "animals."

41. Defendant SCOTT DOWLING, was a managerial level or supervisory level employees of the BHPD. As Captain, DOWLING was the third highest ranking employee of the police department during the entire class period. DOWLING, was an official with final policymaking authority whose edicts or acts could fairly be said to represent official policy, and was an official with final policy-making authority that was delegated to him by RIVETTI and SPAGNOLI. Moreover, RIVETTI and SPAGNOLI ratified and approved of the decisions of DOWLING, BHPD officers and all employees from the RDT and EDD Task Forces. DOWLING made derogatory comments about Black people including calling them racial slurs, after which SPAGNOLI promoted him from sergeant to lieutenant and then RIVETTI promoted him to captain.

42. At all relevant times herein, SPAGNOLI, DOWLING, and RIVETTI were residents of the County of Los Angeles. At all times relevant hereto, said

defendants were acting within the course and scope of their employment as captains, chiefs, and policy makers of defendant City.

43. At all times relevant herein, defendant Sgt. DALE DRUMMOND (hereafter also “DRUMMOND”), was a resident of the County of Los Angeles and a supervisor at BHPD. At all times relevant herein, defendant JON ILUSORIO was a resident of the County of Los Angeles and a BHPD officer.

46. At all times relevant herein, all of the defendants engaged in the conduct alleged herein under color of law, and through the auspices of the City of Beverly Hills and BHPD. Plaintiffs allege that the conduct and actions of defendants as alleged herein occurred during defendants normal working hours as Beverly Hills Police Officers, Supervisors, Managers, Captains or Chief or occurred under the pretense that either was acting as a BHPD employee or was made possible solely because of his/her/their position as a BHPD Officers, Supervisors, Managers, Captains or Chiefs.

## V. FACTUAL ALLEGATIONS

47. The City of Beverly Hills has a widespread, policy, practice and custom of racial profiling against Black Americans resulting in unconstitutional detentions, arrests, and, racial profiling. These are violations of the Due Process rights and Equal Protection rights afforded in the U.S. Constitution. In the City of Beverly Hills Non-Black Americans are not subject to such profiling. This is demonstrated by the fact that over 90% of all arrests reported during the RDT and EDD subclass and 34% over the entire class period are of Black Americans while the city itself is only 1.9% Black. Chief Rivetti was told by Assistant Chief Coopwood that 90% of the people arrested by the RDT were Black. He was not concerned. Indeed, he believed that the RDT accomplished his objective. He approved awards for them. Captain Dowling testified that he was not

concerned about 90% of the arrests being black, but he was worried that an attorney would look at the numbers and file a lawsuit. Captain Dowling admitted that BHPD officers were taught they could use minor infractions like illegal U turns, or jay walking to justify detentions and searches of Black Americans that could lead to an arrest. This is known as pretext stops. Something that unbelievably, Chief Rivetti testified he had never heard of despite 40 years in law enforcement.

48. The constitutional violations of the civil rights of Black Americans were based on instructions from officials with final policy-making authority, whose edicts represented official policy. Additionally, the actions of officers targeting Black Americans was ratified by the policy makers of the BHPD and CITY. Illustratively, the RDT members were nominated for, and then received the "Employee Excellence Award" in 2020, demonstrating that the common custom, policy and practice of authorizing racial profiling was ratified and authorized by the CITY. The awards from the BHPD was for the outstanding work by the RDT of racial profiling Black Americans. The accolades were only one of many examples of CITY'S ratification and widespread policies, practices and customs of racial profiling and selective enforcement of Black Americans.

49. Indeed, the targets of the RDT were Black Americans repeatedly described as the "criminal element," "thugs", "terrorists" "animals" and making the city look too "ghetto." The Rodeo Drive Team formed because of the "criminal element" "thugs", "terrorists" and "animals" (all code for African Americans) coming to Beverly Hills. Yet, that philosophy perpetuates the racial stereotype that all Black people are "criminals." Lieutenant Nance and/or Captain Dowling emailed police officials about establishing a "core group of officers and supervisors assigned to Rodeo Drive to allow for consistency......" That is the

RDT Task Force. The direction "has stemmed from the chief." The Department based on information and belief claimed that Rap songs bragged and educated listeners to come to Beverly Hills and commit fraud. Apparently, Defendants believed that music frequently associated with African Americans was enticing criminal acts in their city by the class of Black Americans.

50. Once many Black American's were arrested there was a decrease in Black Americans visiting the City. Assistant Chief Coopwood in an email dated October 1, 2020 sent to the City Manger (George) stated under "Rodeo Drive Enforcement Review and EDD Fraud Review) Hi George - ¶ "The quality of life issues along Rodeo Drive are beginning to diminish. It is beginning to look more normal again. Our EDD arrest and seizures are decreasing as a result; which is a very good thing...." The fact the city was starting to look normal again, was a reference to a reduction in Black American visitors.

51. Denying Black Americans equal protection has existed in Beverly Hills for over 31years demonstrating a governmental policy and longstanding custom or practice of violating the Civil Rights of Black Americans and also supports the need for an injunction.

52. As noted in the *Los Angeles Times*, between 1990 and 1995, Black Americans filed five lawsuits and more than a dozen claims against Beverly Hills, alleging that police unjustifiably stop and harass minorities. In one case, a Black motorist accused BHPD officers of pointing a gun at his head during a traffic stop. Another man alleged that his car was ransacked in a vain search for drugs. Such lawsuits demonstrate Defendants' knowledge of the practice of profiling Black people that has existed for decades in Beverly Hills. (The defendants knew of this lack of proper accountability, but were deliberately indifferent to the repeated violations of rights of Black Americans.)

53. As part of this long-standing policy, practice and custom, Defendants used minor infractions like broken tail lights to justify its practice of targeting Black people for unconstitutional detentions and arrests.

54. Between 1993 and 1995 the Beverly Hills-Hollywood chapter of the NAACP received 75 complaints about Beverly Hills police officers targeting Black Americans.

55. In defending the City's targeting of Black Americans, former mayor Chuck Aronberg said, "Blacks have a chip on their shoulder. [They] think bad things happen to them because they're Black." And Mr. Aronberg was exactly right, in Beverly Hills - bad things do happen to Black people.

56. Illustratively, Jerry Lafayette, a Black American in Beverly Hills, was pulled over more than 20 times in 18 months for simply being Black.

57. In 1995 the City, its Mayor, Council member, Chief and Captain were sued for having "engaged in a conscious policy of deliberate indifference" by allowing police harassment of African Americans to go unchecked. There Defendants were made aware of constitutional violations, and with deliberate indifference ratified the wrongdoing. Defendants failed to provide adequate training to safeguard the constitutional rights of Black Americans and provide them equal protection. Instead, the City continued and ramped up its' targeting and discrimination against Black Americans in Beverly Hills.

58. The training policies of Defendant CITY OF BEVERLY HILLS were not adequate to train its police officers to handle the usual and recurring situations with which they must deal. Defendant CITY OF BEVERLY HILLS was deliberately indifferent to the obvious consequences of its failure to train its police officers adequately.

59. The failure of Defendant CITY OF BEVERLY HILLS to provide adequate training caused the deprivation of the rights of all plaintiffs by the actions of Defendant CITY OF BEVERLY HILLS' police officer employees. That is, the Defendants failure to train is so closely related to the depravation of the plaintiffs' rights as to be the moving force that caused each of them the ultimate injuries such as detentions and arrests without reasonable suspicion and probable cause. False arrest, false imprisonment, fabrication of evidence, and malicious prosecution of Black people for alleged criminal acts they were never found guilty of.

60. In 1995, a civil rights lawsuit was filed by six Black Americans. Five of the Black Americans suing were teenagers who lived in Beverly Hills and attended local schools, and the sixth was a maintenance man at a Beverly Hills church. The BHPD stopped and harassed Black Americans without "reasonable suspicion," often pulling over Black-American motorists for violations such as broken taillights or detaining minors who were out past the City's 10 p.m. curfew. In 2000, a settlement was reached, which included the City of Beverly Hills setting up a Human Relations Commission to deal with issues of racial profiling. But then the commission was not implemented as part of the City's deliberate indifference to racial profiling.

61. Indeed, a former Beverly Hills Mayor, Robert Tanenbaum, sued the City for racial profiling, claiming that his "case is about people's rights to walk the street, to ride cars on public roadways without being terrorized, harassed or abused." "All we are saying is, treat Black folk like White folk."

62. Although Captain Dowling spent 37 years employed by the BHPD, only retiring after the RDT fiasco became public, he testified on May 8, 2023 that he was not aware of a single meeting by the Human Relations Commission from 2002 to the

present. He was not aware of a single person on that commission, or any papers, policies or suggestions implemented by that commission. In short, it was simply a farce designed to deflect the history of racial profiling that has plagued the city. It does explain why an injunction to deter future racial profiling is so vital in this case. Indeed, Captain Dowling testified despite the disproportionate profiling of African Americans by the RDT there has been no change to the defendants' policies since the RDT and they are continuing to engage in the deprivation of the civil rights of Black Americans. Thus, the CITY and BHPD continues its policy and practice to racially profile Black Americans. An injunction is required to stop the practices because racial profiling should NOT be business as usual.

63. Captain Dowling testified that no officer was disciplined for the actions of the RDT. Neither he nor Rivetti testified about any officer who has been disciplined for racial profiling, ever. The same applies to Chief Spagnoli despite her receiving numerous complaints of racial profiling[2] Thus, without damages and an injunction the denial of equal protection to Black Americans will continue into the future. None of the officers were engaged in these racial profiling arrests outside of their duties. In other words, all of the arrests by the RDT that resulted in 90% of the arrests being Black (and no convictions) were performed according to BHPD common directives, policies, practices and training. because the arrests by the RDT officers were performed in accordance with their training, and the policies, all of their arrests were approved of and ratified. But they should not have been. What kind of police department approves of racial targeting? It is unconstitutional. In light of the CITY'S long standing and continuing bias

[2] In her deposition at pages 157-158 despite the fact that there was less than 500 times (in four years) that she received emails complaining about racial profiling, plus a smaller number of in person complaints of racial profiling. At p. 164 she admitted that not a single officer was disciplined by her for racial profiling.

against Black Americans and policies, customs and practices promoting the racial profiling and selective enforcement of Black Americans it is no wonder why BHPD Mangers called the black people arrested during the class period, "Domestic terrorists."

64. In 1998, then-Assemblyman Kevin Murray, a Black American, filed suit after his car was stopped by police on his way to celebrate a primary election victory.

65. In August 2014, there was a potentially dangerous wrongful arrest of noted Black American film maker and producer Charles Belk. In stereotypical fashion, the BHPD thought the film maker "fit the description" of a bank robbery suspect because Belk was "tall, bald, Black and male." Objectively, thousands of Black men would fit such a vague description. When stopped, Belk behaved in exemplary fashion. He stated why he was in the city. He related his impressive academic, business and artistic credentials that could have been easily and quickly checked. The BHPD officers did not care. Mr. Belk had to suffer the indignity of being handcuffed and forced to sit on the curb in public. Then the PD successfully imposed an exorbitant amount of bail, forcing Mr. Belk to sit in jail for hours before he could even speak to an attorney. Belk was never even given his Miranda Rights. At the time, Belk (51 years old) was working at a pre-Emmy Awards gifting suite before going to dinner. He was arrested when he walked away from a restaurant on Wilshire Blvd.

66. In approximately June 2015, a video entitled "Yellow Fever with Soul" was prepared by Officers Charles Yang and Stanley Shen and posted on "You Tube." It made fun of Black Americans and Asian Americans. The "Yellow Fever with Soul" video used a racial stereotype of a Black American man holding a chicken leg in his hand. The video referenced racial stereotypes of the sizes of Black men's penis' Officer Yang was shown holding a woman's buttocks in the video.

Stanley Shen made comments about slavery and "master" derogatory towards Black Americans. Yang was not punished for this at all. Shen had been fired for a different act of misconduct, but after the Yellow Fever video was publicized, he was reinstated by SPAGNOLI. He has since been promoted to Detective by chief Spagnoli and to sergeant by RIVETTI who apparently saw nothing wrong with the video. However, Chief Rivetti testified on May 10, 2023 that the video was improper. Sgt. Shen, along with a Lieutenant (Andrew Myers) authored a police report about a peaceful protest about the killing of George Floyd, comparing a protest by mostly black people as the same as the Holocaust where 6,000,000 Jews were killed by the Nazi's and to the Iranian Revolution where Persians were slaughtered in the streets. 25 people were arrested in that protest for "curfew violations." All of those arrests were thrown out of court as being unconstitutional DOWLING laughed about the "Yellow Fever with Soul" video when he saw it in the BHPD. That video perpetuated racial stereotypes of Black men and Asian men.

67. In March 2016, Sandra SPAGNOLI became the chief of police. There were three finalists for the position. The top candidate was a Black American police chief with Oxnard PD, but she was passed over for promotion because city council members did not want the Black woman to be "the face of Beverly Hills." SPAGNOLI was hired instead. Before she was hired, defendants knew that SPAGNOLI was sued repeatedly while she was the chief at San Leandro, including for various civil rights violations and discrimination. RIVETTI was part of the investigation and selection process of SPAGNOLI.

68. As the Chief of Police, not only was SPAGNOLI the final policy maker at the time, but she implemented common policies, customs and practices designed to deprive Black Americans of their constitutional rights and with deliberate

indifference to the rights of Black Americans which was a moving force behind the constitutional violations suffered by the class as a whole.

69. SPAGNOLI also created customs and practices to violate the constitutional rights of Black Americans by ratifying discriminatory treatment of Black Americans by BHPD police officers. Illustratively, SPAGNOLI set the tone of treating Black Americans unconstitutionally by ratifying the "Yellow Fever with Soul" video displayed by members of the BHPD. The "Yellow Fever with Soul" video was put on the Internet. Portions of it were later played on television because the media saw how racist and improper the video was. That video promulgated racial stereotypes of the size of Black men's penis' and stereo types of foods that Black Americans supposedly eat like fried chicken.

70. Instead of taking corrective action, by her conduct, SPAGNOLI sent a message to the troops that she approved of the video, setting an example for others to follow - that treating Black Americans differently is acceptable, and condoned. Those who shared SPAGNOLI's racist views, were promoted. Accordingly, the "Yellow Fever" creator, Stanley Shen was re-hired after having been fired, and then promoted to Detective by SPAGNOLI. This gave him a raise in pay. Shen was assigned to a specialized unit (CIT) by SPAGNOLI. SPAGNOLI knew that the female officer that Shen was promoted over (Officer Lunsman) is married to a Black American. Lunsman is herself bi-racial. RIVETTI then promoted Shen to a supervisor and provided him an additional pay raise.

71. Yet, Yellow Fever was not the only way that SPAGNOLI created a custom and practice of encouraging racism and rewarding those officers who treated Black Americans differently. SPAGNOLI received complaints about DOWLING's racist attitudes from Lt. Foxen and Lt. Nutal. They both advised SPAGNOLI that DOWLING referred to Black Americans as "lazy" and used other

derogatory stereotypes towards Black Americans. Within days of being told about DOWLING's racist comments which were well known in the BHPD, SPAGNOLI promoted DOWLING to Lieutenant and later, RIVETTI promoted him to captain. This ratification of racist comments and statements by DOWLING help to show the common widespread custom and practice of targeting Black Americans for illegal treatment and is relevant to the class action claims because DOWLING was in charge of the RDT task force.

72. Thus, DOWLING implemented RDT and other practices to target Black Americans with illegal stops, arrests, jailings' and prosecutions. Demonstrating how t defendant CITY had widespread policies, practices and customs to violate the civil rights of Black Americans, and the deliberate indifference towards those civil rights violations as well as the discriminatory moving force targeting Black Americans. DOWLING the head of the RDT task force and a supervisor at the BHPD specifically referred to the Black American individuals arrested in the RDT , as "terrorists and animals."

73. Black Americans are NOT terrorists or animals, and they should not be treated as such. Black Americans are a recognized protected class. The discriminatory animus and prejudice by CITY against Black Americans explains why over 90% of the people arrested were during the subclass periods and 34% over the total class period were Black, while only 1.9% of the residents of Beverly Hills are Black. CITY'S common operational plan, top down policies and treatment affects a discrete and identifiable group of citizens differently from other groups - Black Americans who were and are stopped, arrested, imprisoned and maliciously prosecuted because of their protected characteristic - Black. The widespread top down policy of violating the constitutional rights of Black Americans is shown by the CITY giving an award of excellence to the RDT

arrests, which targeted Black Americans which were 90% of all persons they arrested. The task forces only resulted in two convictions via Nolo pleas for minor quality of life infractions and accomplished nothing other than successfully targeting Black Americans to scare them into staying out of Beverly Hills.

74. The unconstitutionality of the actions of the CITY towards the class as a whole was done with discriminatory intent had discriminatory impact as is demonstrated by the fact (based on information and belief) of the 1,088 Black American's arrested, only two or three of them were ever convicted of anything. Prosecutors repeatedly refused to pursue charges, or after investigating further, dismissed the claims in the interests of justice.

75. CITY and BHPD's ratification of employees with racist views against Black Americans created a discriminatory effect. The Task Forces and arrests of Black Americans were motivated by a discriminatory purpose and intent. The disparate impact of the arrests of Black Americans demonstrates CITY'S discriminatory motivation because it is strong circumstantial evidence of the CITY'S racist views.

76. Black Americans were unquestionably treated differently than similarly situated members of other classes because of their race - Black and membership in the protected class of Black Americans. How else can one explain how 1.9% of the City is Black, but more than 90% of the people arrested by the task forces and 34% over the whole class period were Black? Black people were treated differently than members of other races because of their race - Black.

77. When the CITY ratifies Dowling's reference to Black People as "animals" "terrorists," "lazy" and other racial stereotypes, a deliberate indifference to the constitutional rights of Black American's is clearly demonstrated, as is the

Defendants' discriminatory purpose and discriminatory motive. Violating the constitutional rights of Black Americans was part of CITY'S ' policy, widespread custom or practice that was ratified, encouraged and promoted by the police Chiefs.

78. Former Beverly Hills Mayor, Nancy Krasne described Terry Nutall, the highest ranking Black American BHPD officer as "scary looking", "if you saw him in the hood you would run the other way." He is a big guy. He looks like an ex-Marine. He's huge and he's a bad influence." As the Mayor, Krasne was a policy maker for the CITY.

79. In approximately August, 2019, there were a series of emails between SPAGNOLI and residents of Beverly Hills regarding the racial profiling of a dark complected individual Defendants believed was Black (and later learned to be Latin American.) The young man was repeatedly pulled over by members of the BHPD when they believed him to be a Black American. Once the officers learned the man was Latin and not Black, the unconstitutional s actions stopped.

80. But, the profiling of Black Americans did not stop. Accordingly, on February 9, 2020, Ashley Blackmon, a Black-American female, was driving in a Toyota Rav-4 through Beverly Hills around 9:30 a.m. on her way to a Sunday morning yoga class. Blackmon was thirty years old and had recently moved from New York City to Marina Del Rey for a job at Red Bull corporate headquarters as a brand manager. BHPD officers ordered her to pull over. Blackmon immediately complied with all instructions. Yet, five BHPD officers pointed their guns at Blackmon or her car during that stop. All of these BHPD officers had either seen her driving the car alone or had been made aware that the lone driver was Black. Prior to pulling Blackmon over at gunpoint, BHPD officers noted her race on the radio to dispatch and requested air support. Moreover, BHPD officers admitted

before the stop that Blackmon and/or her car did not materially match any suspects they were looking out for. Blackmon was released. No reasonable suspicion or probable cause existed to ever stop her. She was not convicted of any crime. She did not plea to any crime.

81. For 25 years the CITY has continued to treat Black people differently than White people because of a widespread policy, custom and practice. It is time to put such conduct to an end.

**A. THE VIOLATION OF CONSTITUTIONAL RIGHTS IN THE RDT SUBCLASSES.**

82. Two of the plaintiffs in this case (WHITE and WILLIAMS) were racially profiled and arrested for allegedly riding a scooter on the sidewalk. Ironically, during a press conference on this very case, in front of City Hall and right next to the Police Department where police officers were present, a white person rode by on a scooter on the sidewalk. Not only was he not arrested by the BHPD, the White man was not stopped, detained, or even asked to ride on the street.

83. Two of the plaintiffs in this case (NETT and SWIFT) were racially profiled and detained when their car stopped less than one inch over the limit line. Once again, during a press conference on this very case in front of City Hall and next to BHPD headquarters, several White motorists did not stop vehicles behind limit lines. The White motorists were not stopped, handcuffed or arrested, but Black Americans were. White motorists in Beverly Hills are not required to exit their cars when stopped for minor traffic infractions like two inches over the limit line, but Black motorists are. White motorists are not jailed in Beverly Hills after stopping inches over the limit line, but Black motorists are. As a class Black Americans had their constitutional rights violated while non-Black Americans did not because of the CITY'S widespread practices and customs that

had a discriminatory effect in deliberate indifference to the constitutional rights of Black Americans. The recent racial profiling of NBA Allstar Jaylen Brown in March, 2026 demonstrates the CITY'S common practice of targeting Black Americans continues to present.

84. On May 15, 2020, SPAGNOLI was forced to retire due to over a dozen lawsuits alleging misconduct by her including her making derogatory comments against, and discrimination of various "minorities" including Black Americans, resulting in over $8,000,000.00 in judgments, verdicts and settlements against the city of Beverly Hills. After SPAGNOLI was forced out, RIVETTI became the Interim Police Chief. RIVETTI then ratified and approved of the creation of the RDT.

85. Between August 29, 2020 and October 24, 2020, the RDT focused on detaining and arresting Black American's for violations of "crimes" that White people were not detained or arrested for, such as: CVC 21955 (jaywalking); CVC 21456 (crossing against red hand/signal at cross walk); HSC 113.62 (smoking marijuana, and possessing cannabis products); smoking tobacco in a public right of way (including on the sidewalk or alleyway); smoking in a city park; CVC 23111 throwing out even an unlit cigarette; California Penal Code § 415 (playing loud music); CVC 27150(a) (having a loud exhaust); CV 22102 (illegal U-turn in business district); BHMC 5-6-801 (Riding a bicycle, skateboard, or roller skates on sidewalks in the business district (not specifically included in the statute is riding of a scooter, so Black Americans on scooters were arrested with the false charge of riding roller skates on the sidewalk)).

86. Other statutes that were enforced against Black Americans because of their race included: solicitation for charitable purposes without a permit; filming without a permit which includes still photography on private or public property without a permit. However, as demonstrated by the defendants' own statistics, non-Black

Americans were not stopped, detained, handcuffed, jailed or maliciously prosecuted. Each of these detentions and arrests of Black people in Beverly Hills was part of a widespread custom and practice or policy of the defendants.

87. None of the Black people arrested by the RDT task force was convicted. Most of those cases were not even prosecuted because the arrests lacked probable cause and/or were otherwise unconstitutional and maliciously prosecuted.

88. On or about October 1, 2020, the RDT participated in a traffic stop of a Black driver and passenger near Rodeo Drive. The stop involved at least four officers and three police vehicles; two of the officers repeatedly refused to give their names when asked by a bystander, who was attempting to film them, and treated the would-be videographer with obvious hostility. Ultimately, the officers let the Black driver and passenger go without even a citation because there was not a reasonable suspicion to stop the motorists other than their race. There was no probable cause to arrest them. Nevertheless, the Beverly Hills officers asked the passenger for his identification as well as the driver. This is part of the wide spread custom and practice in Beverly Hills to try and find any little thing they can on Black Americans while not doing the same to non-Black Americans. Thus, Black Americans are subjected to more intrusive policing and entanglement with the criminal justice system than white people. White people do not have a swarm of BHPD officers arrive for minor infractions, but they swarm for Black people. White people are not searched for weapons when jaywalking or other minor infractions, but Black people are.

89. On or about October 2, 2020, BHPD Officers stopped and searched Versace’s Vice President of Men’s Footwear, Salehe Bembury. At the time, he was holding a Versace shopping bag near Rodeo Drive. Allegedly, he had jaywalked by going less than one foot out of the crosswalk. BHPD officers surrounded him and

searched him. They then asked for his ID and ran his name for warrants. Defendants believed that Bembury was suspicious because he was Black and shopping in Beverly Hills. In actuality, Bembury was and is a Vice President of Versace and works in Beverly Hills. While it is common for defendants to stop, surround, question, and search Black Americans for jaywalking near Rodeo Drive, non-Black Americans do not undergo the same treatment. When black people are stopped for minor offenses such as jaywalking they are consistently asked for ID and a warrant check is done, this does not happen for non-black people. Clearly, Black Americans are treated differently and unequally in deliberate indifference to their constitutional rights because of widespread customs and practices with discriminatory effect on Black Americans.

90. Because racism is so rampant at BHPD, over 12 employees of the police department filed lawsuits. DOWLING was deposed. In his deposition, he admitted to calling two Black American employees "lazy" and other racial stereotypes, "probably several times over the years." Further, DOWLING referred to the highest ranking Black American in the BHPD at the time, Terry Nutal as "lazy." At the time, Nutal was a lieutenant and a superior to DOWLING.

91. Chief SPAGNOLI was advised by two different Lieutenants (Foxen and Nutal) that they were concerned about DOWLING being racist, but SPAGNOLI promoted him from Sergeant (a supervisor position) to Lieutenant (a manager position) despite their concerns. Subsequently, SPAGNOLI promoted DOWLING to lieutenant and RIVETTI promoted him to captain. Accordingly, SPAGNOLI and RIVETTI as the heads of the agency, ratified and condoned the statements and actions of DOWLING. RIVETTI was aware of the claims

against DOWLING, yet allowed him to remain a Captain and thus in charge of RDT task forces.

92. Thus, from August 29, 2020, to October 24, 2020, the RDT targeted Black Americans. Over 90% of the arrests were of Black Americans. Defendants authorized and ratified the constitutional violations of the rights of Black Americans. To accomplish their goals, the "crimes" were fabricated. For example, WILLIAMS and WHITE were arrested for roller skating on the sidewalk even though they were not on roller skates. Hundreds of white persons committed the same "crimes" as Black Americans, but did not get detained, arrested, jailed or prosecuted. Defendants were singularly focused on Black Americans because Black Americans as a race were unlawfully and unfairly deemed to be "criminals" Black Americans as a class were subjected to excessive force, false arrest, false imprisonment and malicious prosecution.

93. SPAGNOLI, DOWLING and RIVETTI set in motion a series of acts by their subordinates or knowingly refused to terminate a series of acts by their subordinates, that each knew or reasonably should have known would cause the subordinates to deprive Black Americans of their rights under law. Having learned of the unconstitutional conduct by BHPD officers, Defendants CITY, SPAGNOLI, DOWLING and RIVETTI failed to act to prevent their subordinates from engaging in such conduct which continues into the present.

94. BHPD officers were SPAGNOLI, RIVETTI, and DOWLING's subordinate, and following their orders, directions, policies, practices and customs to deprive the class of Black Americans of their constitutional rights and based on information and belief were involved in the detention and arrest of the Plaintiffs and class members. Defendants DRUMMOND and ILUSORIO were involved in the unconstitutional arrest of Plaintiffs WHITE and WILLIAMS.

95. Accordingly, Defendants CITY, SPAGNOLI, DOWLING and RIVETTI engaged in conduct that showed a reckless or callous indifference to the deprivation by the subordinates of the rights of Black Americans.

96. On or about November 25, 2019, YORK was racially profiled and detained by BHPD Officers for allegedly having expired registration. Under the pretext of expired registration, BHPD officers conducted a warrant check, absent any legal basis. YORK was allegedly arrested for outstanding warrants. There was Body Worn Camera and Dash Cam footage of this arrest. Despite a timely letter to preserve that evidence, defendants have lost, destroyed and concealed the videotape of this arrest. Despite being prosecuted for two alleged warrant violations, YORK received nothing more than a traffic violation.

97. On or about August 5, 2020, NETT and SWIFT were driving through Beverly Hills on Wilshire Boulevard, on their way to the beach, when they were racially profiled and followed by BHPD officers. SWIFT was driving. NETT was a passenger. After approximately one mile of being followed, BHPD officers pulled them over based on the pretext that they were approximately three inches over the limit line. NETT and SWIFT were both handcuffed and detained. NETT was taken to jail and held there for more than 72 hours. Neither NETT, nor SWIFT were ever charged with any criminal act. Despite spending three days in jail, Defendants claimed NETT was “merely detained.” and not arrested. Neither of them was convicted of any charges. Neither of them plead to any crimes.

98. Like other members of the class, NETT and SWIFT were racially profiled detained, and arrested, by BHPD Officers who deprived them of their constitutional rights. The BHPD officers played racist and menacing songs while driving NETT

99. On or about September 7, 2020, WILLIAMS & WHITE were riding a scooter and not violating any laws. Nevertheless, they were racially profiled, detained, falsely arrested, subjected to excessive force, grabbed and threatened with being tased, handcuffed, jailed, and maliciously prosecuted with false charges by ILUSORIO & SGT. DRUMMOND all of which were then dismissed by the prosecution in the interest of justice. Before being arrested and handcuffed, Ms. WILLIAMS was pushed, hit or struck by a male officer then jailed. Neither WHITE nor WILLIAMS was convicted of any crime. Neither of them plead to any crimes.

100. On or about September 15, 2020, ROGERS was driving a rental car. ROGERS was racially profiled and detained by BHPD officers under the pretext of not having a front license plate. Upon detaining ROGERS, the officers falsely claimed to have smelled marijuana. Subsequently, the officers undertook an illegal search of the rental vehicle, and allegedly uncovered evidence of EDD fraud. BHPD officers falsely arrested ROGERS. On information and belief, prosecutors refused to charge ROGERS given the numerous unlawful actions taken by the BHPD officers.

101. During the class period and continuing BHPD officers racially profiled and detained plaintiffs and the Class Members due to their immutable characteristic of being Black Americans..

102. Defendant CITY had a common policy, practice and widespread custom to stop, detain and arrest Black people in Beverly Hills when they would not engage in similar conduct to White people.

103. The actions of the defendants in racially profiling all of the plaintiffs in the class because of their race is a violation of constitutional rights and was the proximate or legal cause of the injuries. A reasonable person would see the actions of the

defendants and the resultant injury to the plaintiffs as a likely result of the conduct in question.

104. Each class member was not convicted of any crime.

105. Each of the plaintiffs in this action and class members have suffered harm and injuries as a direct and legal result of the actions of the plaintiffs and class members are entitled to economic and non-economic damages in a sum in excess of the minimum jurisdiction of this court, to fees, costs, penalties, fines, and such further relief as the court deems just. Punitive damages are justified against the individual defendants.

106. An injunction is requested to compel the City of Beverly Hills to only arrest Black Americans in accordance with Federal Constitutional requirements, to stop repetitions of racial profiling, selective enforcement and unconstitutional conduct towards Black Americans.

**FIRST CAUSE OF ACTION**
**FOR UNREASONABLE SEIZURES**
**ON BEHALF OF PLAINTIFFS WHITE AND WILLIAMS**
**AGAINST DEFENDANTS DRUMMOND and ILUSORIO**

107. Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

108. This action is brought pursuant to 42 U.S.C. §1983 and the Fourth Amendment of the United States Constitution.

109. At all times relevant hereto, Plaintiffs WHITE and WILLIAMS possessed the right, guaranteed by the Fourth Amendment of the United States Constitution, to be free from unreasonable seizures by peace officers acting under the color of law.

110. As described in above, Defendants DRUMOND and ILUSORIO violated Plaintiffs WHITE and WILLIAMS' Fourth Amendment rights by unlawfully and unreasonably detaining, handcuffing, arresting and imprisoning them without reasonable suspicion or probable cause. the arrests were without a warrant. They were intentional and the seizures were unreasonable.

111. As delineated above, WILLIAMS, and WHITE were wrongfully detained, handcuffed and/or arrested without probable cause, and detained without any justification and/or charged with multiple criminal counts based upon the false charges, statements, police reports, evidence and testimony.

112. On or about September 7, 2020, WILLIAMS & WHITE were wrongfully detained, handcuffed and/or arrested without probable cause, and detained without any justification and/or charged with multiple criminal counts based upon the false charges, statements, police reports, evidence and testimony by Defendants ILUSORIO, DRUMMOND, and pursuant to BHPD policies and common operational plan.

113. As the actual and proximate result of the acts and omissions of said defendants as described herein, Plaintiffs WHITE and WILLIAMS were made to lose their freedom and liberty, this in violation of the Fourteenth Amendment's procedural and substantive due process guarantees.

114. As a direct and legal result of the actions of defendants and each of them, plaintiffs WHITE and WILLIAMS suffered harm and economic and non-economic damages in a sum according to proof and in excess of the minimum jurisdiction of this court and are entitled to costs of suit. Further, plaintiffs have incurred attorney's fees and costs for defending the criminal claims. Plaintiffs WHITE and WILLIAMS have also incurred costs in relation to the criminal

case, including without limitation charges for bail, attorneys fees and other special damages all in a sum according to proof at time of trial.

115. Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health. "There's evidence to show that worsened mental health can occur even after lower levels of contact not involving an arrest or incarceration." These seemingly minor police interactions can trigger a variety of responses such as harmful stigma, stress and depressive symptoms. Further, studies show a significant association between police interactions and lowered mental health, including "psychotic experiences, psychological distress, depression, post-traumatic stress. disorder, anxiety, suicidal ideation and attempts, indicating a nearly twofold higher prevalence of poor mental health among those reporting a prior police interaction compared to those with no interaction." "Racial discrimination has been associated with a range of poorer health outcomes including respiratory conditions, diabetes, somatic complaints and chronic health conditions." A 2019 study suggests that racism can lead to increased inflammation, increased risk of developing heart and kidney. disease and decreased quality of sleep. The effects of defendants DRUMOND and ILUSORIO'S actions have harmful and severe health implication to Plaintiffs WHITE and WILLIAMS.

116. The aforementioned acts of defendants DRUMOND and ILUSORIO were willful, wanton, malicious, despicable and oppressive and said misconduct shocks the conscience thereby justifying the awarding of exemplary and punitive damages against the defendants DRUMOND and ILUSORIO.

**SECOND CAUSE OF ACTION**

**SUPERVISORY LIABILITY**

**ON BEHALF OF ALL PLAINTIFFS AND**

**CLASS MEMBERS AGAINST DEFENDANTS**
**SPAGNOLI, RIVETTI and DOWLING**

117. Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

118. This action is brought pursuant to 42 U.S.C. §1983 and the Fourteenth Amendment. of the United States Constitution

119. At all times relevant hereto, Plaintiffs and the Class Members possessed the right, guaranteed by the Fourteenth Amendments of the United States Constitution, to be free from and selective enforcement and racial profiling by peace officers acting under the color of law.

120. At all relevant times Defendants SPAGNOLII, RIVETTI and DOWLING acted under color of State Law.

121. As detailed above, Defendants SPAGNOLII, RIVETTI and DOWLING set in motion a series of acts by their subordinates or knowingly refused to terminate a series of acts by their subordinates, that each knew or reasonably should have known would cause the subordinates to deprive Plaintiffs NETT, SWIFT, WILLIAMS, WHITE, ROGERS and YORK and the Class Members of their rights under law.

122. From March 2016 to May 2020, SPAGNOLI was the chief of the BHPD. Defendant RIVETTI became the Interim Chief after SPAGNOLI was forced to resign following her misconduct.

123. RIVETTI was the Interim Chief From May 2020 to November 2021, of the BHPD.

124. While serving as police chief, SPAGNOLI and RIVETTI, respectively, were the final policy-making authorities for police policy in the City of Beverly Hills.

125. RIVETTI like his predecessor SPAGNOLI exercised control and management over the City's police department and they were the final policymakers for Defendants. DOWLING was allowed to set policy by RIVETTI and SPAGNOLI which they ratified. At all relevant times, each defendant acted under color of law.

126. As police chief, SPAGNOLI and RIVETTI promulgated policies wherein police officers were ordered and encouraged to racially profile, stop, detain, arrest, forcefully seize, and/or prosecute Black Americans who visited the City of Beverly Hills. SPAGNOLI and RIVETTI implemented policies, procedures and practices that deprived Black Americans of their rights under the laws of the United States and the United States Constitution.

127. Defendants espoused the false belief that Black Americans were a criminal threat in the City. This is demonstrated by the long standing practice and custom of racially profiling Black Americans, with stops, detentions and arrests that did not lead to any convictions.

128. To further their discriminatory policies, SPAGNOLI and RIVETTI promoted and delegated implementation of their policies to DOWLING. SPAGNOLI and RIVETTI were both aware DOWLING harbored racial beliefs towards Black Americans and other minorities. However, DOWLING was continually rewarded and delegated policymaking authority by SPAGNOLI and RIVETTI.

129. SPAGNOLI and RIVETTI were aware of the racial profiling and constitutional violations of Black Americans because of complaints received from citizens, various lawsuits and newspaper articles. Moreover, SPAGNOLI and RIVETTI were aware of continuous prosecutorial rejections for charges against Black Americans improperly arrested and charged by BHPD. However, SPAGNOLI and RIVETTI implemented an express policy, custom, or widespread typical

practice of racial profiling and targeting Black Americans as criminals rather than engaging in constitutional policing. Defendants SPAGNOLI, RIVETTI, and DOWLING had deliberate indifference to the violations of constitutional rights for Black Americans. CITY, BHPD, SPAGNOLI, RIVETTI and DOWLING had a policy to violate Federal Law and the US Constitution by deprivation of equal protection, of Black Americans implemented, fostered and promoted by Defendants SPAGNOLI, RIVETTI and DOWLING.

130. At all relevant times herein, class members suffered constitutional deprivations by BHPD officers implementing the unconstitutional policies of Chiefs SPAGNOLI and RIVETTI and Captain DOWLING and the CITY of Beverly Hills.

131. SPAGNOLI and RIVETTI ratified the unconstitutional actions of subordinates by continually rewarding officers for unconstitutional conduct through awards, positive evaluations, better assignments, promotions, and increased income/overtime. For instance, Defendants DRUMMOND, ILUSORIO, and the other members of the RDT received awards, accolades, positive evaluations, better assignments, promotions, and increased income/overtime from the City and its' police chiefs because they implemented the CITY OF BEVERLY HILLS AND BHPD's unconstitutional policies.

132. Defendants SPAGNOLI, RIVETTI, and DOWLING further set in motion a series of acts by their subordinates, or knowingly refused to stop unconstitutional actions by the subordinates, that they knew or reasonably should have known would cause the subordinates to deprive the civil rights of all the Plaintiffs and class members , but failed to act to prevent their subordinates from engaging in such conduct.

133. Accordingly, the defendants SPAGNOLI, RIVETTI, and DOWLING engaged in conduct that showed a reckless or callous indifference to the deprivation by the subordinate of the rights of others.

134. Defendants' SPAGNOLI, RIVETTI, and DOWLING's conduct was so closely related to the deprivation of Plaintiffs' WILLIAMS, WHITE, NETT, SWIFT, ROGERS and YORK and the Class Members rights as to be the moving force that caused the ultimate injuries to each of them.

135. SPAGNOLI, RIVETTI, and DOWLING subjected all Plaintiffs and class members to the aforementioned deprivations by either actual malice, deliberate indifference or a reckless disregard of their rights under the U.S. Constitution.

136. Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health. "There's evidence to show that worsened mental health can occur even after lower levels of contact not involving an arrest or incarceration." These seemingly minor police interactions can trigger a variety of responses such as harmful stigma, stress and depressive symptoms. Further, studies show a significant association between police interactions and lowered mental health, including "psychotic experiences, psychological distress, depression, post-traumatic stress. disorder, anxiety, suicidal ideation and attempts, indicating a nearly twofold higher prevalence of poor mental health among those reporting a prior police interaction compared to those with no interaction." "Racial discrimination has been associated with a range of poorer health outcomes including respiratory conditions, diabetes, somatic complaints and chronic health conditions." A 2019 study suggests that racism can lead to increased inflammation, increased risk of developing heart and kidney. disease and decreased quality of sleep. The effects of defendants SPAGNOLI, RIVETTI, and DOWLING's actions have harmful and severe health implications causing a

common constellation of injuries to the Plaintiffs and Class Members.

137. As a direct and legal result of the actions of defendants SPAGNOLI, RIVETTI, and DOWLING and each of them, plaintiffs and the class members suffered harm and economic and non economic damages in a sum according to proof and in excess of the minimum jurisdiction of this court. Plaintiffs and the class are entitled to costs of suit and attorneys fees.

138. The aforementioned acts of defendants SPAGNOLI, RIVETTI, and DOWLING were willful, wanton, malicious, despicable and oppressive and said misconduct shocks the conscience thereby justifying the awarding of exemplary and punitive damages against them.

**THIRD CAUSE OF ACTION**

**MUNICIPAL LIABILITY FOR VIOLATION**

**OF EQUAL PROTECTION CLAUSE**

**ON BEHALF OF ALL PLAINTIFFS AND CLASS MEMBERS**

**AGAINST DEFENDANT CITY OF BEVERLY HILLS**

139. Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein. However, there are no punitive damages sought against the City.

140. This action is brought pursuant to 42 U.S.C. §1983 for violation of Plaintiffs' rights under the Fourteenth Amendment.

141. Here, there is an identifiable class of the 1,085 Black individuals who because of CITY'S wide spread policies, practices and customs were racially profiled and arrested or detained by BHPD officers during the class period without a conviction of any crime, and no plea agreement. There are two identifiable sub classes totaling 179 Black Americans.

142. A Class action is the preferred method to resolve the Equal Protection claim because there are multiple parties with essentially identical claims.

143. Plaintiffs are part of a recognized, identifiable and protected class.

144. Defendant City had a widespread practice and custom of treating Black people differently than other races in Beverly Hills. Black people were viewed by Defendants as "suspicious," "terrorists" "animals" "lazy" part of the "Black mafia" as "criminals" as thugs, making the city look too ghetto and otherwise inferior to White people and those who were not Black.

145. Defendant City was deliberately indifferent to the discriminatory treatment towards Black Americans - a recognized class.

146. The policy of the CITY to view Black people as inferior, suspicious, "terrorists," "animals" and otherwise differently than non-Black people was a moving force behind the constitutional violations alleged herein, and explains why 1.9% of the City is Black, and under 6% of the State is Black, but over 90% of the people arrested in the RDT Task Force were Black. Defendant CITY'S policy, practice and custom was to racially profile Black people and subject them to selective enforcement.

147. The CITY'S policies, practices and customs had a discriminatory effect and intent - over 90% of the arrests during the RDT and EDD subclass period were of Black people while only 5 White people were arrested amounting to just .027% of the arrests. 34% of the arrests during the total class period were of Black people while less than 2% of the people in Beverly Hills are Black. In contrast Beverly Hills is over 80% White but over the total class period White people made up only 29% of the arrests. Black people are part of an identifiable group of citizens. They were treated differently than other races.

148. Black people are readily apparent as a race, and the Courts have treated race as a protected characteristic.

149. Here, characteristics that identify the plaintiffs in this class as Black are ascertainable and demonstrate that Black Americans suffered discrimination because of their race. (179 out of 197 people arrested by the RDT Task Force and EDD arrests are Black (90%) while only 5 White people were arrested (.027%) and 34% of the persons arrested in the total class period were Black while only 29% of the arrests were White.)

150. Based on information and belief: In the two years of the class approximately 3,213 people arrested and approximately 1,088 were Black. 1,085 of those Black individuals were not convicted of any crime. If there was not a wide spread custom and practice to target Black American's, based on the statistics in Beverly Hills that less than 2% of the City is black, the RDT task force should have arrested 4 Black American's. During the two year period when 3,213 people were arrested, statistically absent racial profiling and selective enforcement only 64 of them should have been arrested, not 1,088.

151. Defendant CITY'S policies and widespread practices and customs had a discriminatory effect or discriminatory intent towards Black people.

152. Plaintiffs and all Class Members lawfully sought to travel through or visit the City of Beverly Hills.

153. Under the guise of various euphemisms, Defendant CITY believed Black Americans were an undesirable presence in the City of Beverly Hills. Defendant CITY adopted the false belief of constituents that Black Americans had criminal propensities. As such, Black individuals, in sharp statistical contrast to any other racial group, were racially profiled and regularly stopped and harassed for engaging in innocent conduct. Other racial groups were not

stopped and harassed for similar conduct. The arrests of the members of the class and sub classes were unconstitutional as demonstrated by the lack of convictions for any alleged crime, the disparities in their arrests and CITY'S bias and animus against Black people.

154. Defendant CITY prevented Plaintiffs and the Class Members from lawfully walking in, driving through or otherwise visiting the City of Beverly Hills because they were Black Americans. Defendant CITY implemented policies to intimidate and deter Black Americans from coming to the City. Defendant CITY utilized the BHPD to violate the constitutional rights of Plaintiffs and the Class Members because of their race which resulted in deterring Black individuals from visiting or traveling through the City of Beverly Hills.

155. Defendant CITY did not take similar actions against White people and non-Black Americans. Black Americans were treated differently than similarly situated White people and non-Black Americans.

156. Illustratively, Black Americans were falsely stopped, detained, arrested, imprisoned, maliciously prosecuted and subjected to false, and perjured police reports for "crimes" that only Black people were detained or arrested for, specifically: "Roller Skating on the Sidewalk" when they were not even on Roller Skates; stopping one inch or less over a limit line in a car; For J-walking one inch out of a cross walk just before stepping onto the curb; For making a U turn. For smoking cigarettes. White people were not stopped for these same types of activities. The discriminatory impact, coupled with years of racially insensitive and derogatory comments, and repeated acts of discrimination shows conclusively that Defendant CITY had a discriminatory purpose which was a motivating factor of the policy and widespread practices and customs to

racially profile and target and treat Black people differently than any other racial group.

157. Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendant CITY will continue to treat Black Americans worse, i.e., engaging racial profiling and selective enforcement and violating their constitutional rights, who travel through the City of Beverly Hills. It is extremely likely that defendants will continue with such unconstitutional violations. The same policies and practices giving rise to the unconstitutional racial profiling and selective enforcement are ongoing and present a continuing risk of harm to all African Americans who visit Beverly Hills. They are targeted based on their race and cannot prevent the possibility of the same injury being repeated without injunctive relief.

158. Defendant CITY espoused the false belief that Black Americans were a criminal threat in the City. This is demonstrated by the long standing practice and custom of racially profiling Black Americans, with stops, detentions and arrests that did not lead to any convictions.

159. To further their discriminatory policies, CITY promoted and delegated implementation of their policies to officers who harbored racial beliefs towards Black Americans and other minorities. However, such officers were continually rewarded and delegated granted policymaking authority by CITY.

160. City was aware of the racial profiling and constitutional violations of Black Americans because of complaints received from citizens, various lawsuits and newspaper articles. Moreover, CITY was aware of continuous prosecutorial rejections for charges against Black Americans improperly arrested and charged by BHPD. However, CITY implemented express policies, customs, and widespread common practices of targeting Black Americans as criminals rather

than engaging in constitutional policing. The CITY had deliberate indifference to the violations of constitutional rights for Black Americans. CITY and BHPD had a policy to violate Federal Law and the US Constitution by deprivation of the Fourth and Fourteenth Amendments such as equal protection,

161. At all relevant times herein, class members suffered constitutional deprivations by BHPD officers implementing the unconstitutional policies of CITY.

162. CITY ratified the unconstitutional actions of BHPD management and officers by continually rewarding officers for unconstitutional conduct through awards, positive evaluations, better assignments, promotions, and increased income/overtime. For instance, Defendants DRUMMOND, ILUSORIO, and theother members of the RDT received awards, accolades, positive evaluations, better assignments, promotions, and increased income/overtime from the City and its' police chiefs because they implemented the CITY OF BEVERLY HILLS AND BHPD's unconstitutional policies toward Black Americans.

163. Thus, the policies, practices and customs of defendant CITY resulted in violating the rights of Black Americans to be free from equal protection violations and racial profiling.

164. At the time of these constitutional violations, defendants CITY OF BEVERLY HILLS had policies in place, and had ratified customs and practices which permitted and encouraged their police officers to violate the US Constitution.

165. CITY'S policies, customs and practices also called for the City of Beverly Hills and its Police Department not to discipline, prosecute, or objectively or independently investigate known incidents and complaints of unconstitutional violations of the rights of Black individuals' rights under the Fourteenth Amendment to the U.S. Constitution. These violations were exacerbated by CITY'S lack of properly training its police officers in constitutional policing.

166. Defendant CITY OF BEVERLY HILLS was aware of and deliberately indifferent to a pervasive and widespread pattern and practice within the BHPD, including the RDT task force to violate the rights of Black individuals' rights under the Fourteenth Amendment to the U.S. Constitution. CITY failed to take any reasonable measures to correct this pattern and practice and as a result ratified the actions, and CITY has been deliberately indifferent to the civil rights violations which resulted to Black Americans as a class, including those which are described herein.

167. CITY'S customs, policies and practices by means of inaction and coverup, and rewarding unconstitutional policing promoted and encouraged an atmosphere of lawlessness within the police department and to encouraged their BHPD officers to believe that engaging in racial profiling, selective enforcement and violations of Equal Protection was permissible, and that such conduct would be overlooked or would not result in any discipline for BHPD employees violating the civil rights of Black Americans demonstrating ratification of these customs and practices towards Black Americans as a group.

168. Said policies, customs and practices of CITY evidenced a deliberate indifference to the violations of the constitutional rights of Plaintiffs and class members. This indifference was manifested by the failure to change, correct, revoke, or rescind or otherwise address said customs and practices in light of prior knowledge by said defendants and their subordinate policymakers of indistinguishably similar incidents of unjustified, unreasonable and unlawful racial profiling, arrests, falsification of evidence and police reports, excessive force and other constitutional violations against the class of Black citizens.

169. CITY demonstrated a deliberate indifference to the civil rights of Black victims of the BHPD's actions as further evidenced by defendant CITY ignoring the

history and pattern of prior civil lawsuits alleging civil rights violations, similar to those alleged herein, arising from such misconduct and the related payment of judgments or settlements of such suits, including those alleging racial discrimination and harassment, which revealed racial animus harbored by BHPD management and officers showing a belief by them that African Americans are inferior to other groups and ratification of racial animus towards the class of Black Americans.

170. City's deliberate indifference is also evidenced by an absence of or by maintenance of an inadequate system of tort claims tracking and by maintaining an inadequate system of officer discipline and independent and objective investigation by the City of Beverly Hills and its police department which failed to identify and investigate instances of racial profiling, denial of equal protection and other acts of wrong doing towards Black Americans.

171. CITY'S deliberate indifference to the civil rights of victims of the BHPD's racial profiling, was also evidenced by CITY's failure to adequately train and more closely supervise or retrain officers and/or discipline or recommend prosecution of those officers who engaged in unconstitutional actions towards Black Americans. Tellingly no BHPD officers were disciplined for racial profiling during the class period and continuing.

172. Other systemic deficiencies of CITY which indicated, and continue to indicate, a deliberate indifference to the violations of the civil rights by the officers of the BHPD towards Black Americans include:

a. Systemic racial profiling and selective enforcement of Black Americans,

b. CITY also maintained a system of grossly inadequate training pertaining to the lawful making of stops, arrests, police ethics, the law pertaining to

selective enforcement and racial profiling regarding the arrests of Black Americans.

173. The foregoing acts, omissions, and systemic deficiencies and practices and customs of CITY caused, permitted and/or allowed under official sanction CITY and BHPD management and officers to be unaware of, or intentionally overlook and ignore, the rules and laws governing the unconstitutional actions towards African Americans.

174. The foregoing acts, omissions, and systemic deficiencies and practices and customs of CITY caused, permitted and/or allowed under official sanction BHPD officers to believe that unconstitutional arrests would not result in any discipline of them.

175. Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendant CITY will continue with its unconstitutional policies and practices towards Black Americans and the Plaintiffs and class members subjecting them to a likelihood of suffering racial profiling and constitutional violations in the City of Beverly Hills. It is extremely likely that CITY will continue with such unconstitutional violations. CITY has indicated it plans to set up new task forces which are likely to harm the civil rights of Black people. The same policies and practices giving rise to the unconstitutional racial profiling and selective enforcement are ongoing and present a continuing risk of harm to all African Americans who visit Beverly Hills. They are targeted based on their race and cannot prevent the possibility of the same injury being repeated without injunctive relief.

176. Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health. "There's evidence to show that worsened mental health can occur even after lower levels of contact not involving an

arrest or incarceration." These seemingly minor police interactions can trigger a variety of responses such as harmful stigma, stress and depressive symptoms. Further, studies show a significant association between police interactions and lowered mental health, including "psychotic experiences, psychological distress, depression, post-traumatic stress. disorder, anxiety, suicidal ideation and attempts, indicating a nearly twofold higher prevalence of poor mental health among those reporting a prior police interaction compared to those with no interaction." "Racial discrimination has been associated with a range of poorer health outcomes including respiratory conditions, diabetes, somatic complaints and chronic health conditions." A 2019 study suggests that racism can lead to increased inflammation, increased risk of developing heart and kidney. disease and decreased quality of sleep. The effects of CITY'S actions have harmful and severe health implications causing a common constellation of injuries to the Plaintiffs and Class Members.

177. As a direct and legal result of the defendants actions, the plaintiffs and the class members were harmed, and are entitled to economic and non economic damages in excess of the minimum jurisdiction of this court, to attorneys fees, litigation costs, fines, penalties, interest and such other relief as the court deems just and proper.

WHEREFORE, Plaintiffs pray for the following:

1. Compensation for both economic and non-economic damages suffered and to be suffered in a sum according to proof at time of trial;
2. Medical, legal and other expenses incurred by Plaintiffs;
3. Compensatory damages and nominal damages caused by deprivation of Plaintiffs' constitutional rights;

4. Litigation costs;
5. Attorneys' fees, as allowed by statute;
6. Interest;
7. Civil Penalties as allowed by law.
8. Punitive damages against individual defendants but not as to Defendant CITY;
9. Injunctive Relief in the form of a consent decree to prevent BHPD from ` engaging in racial profiling of Black Americans again in the future.
10. Any other relief or damages allowed by law, or statutes not set out above, and such further relief as this Court deems just and proper at conclusion of trial.

Dated: April 6, 2026

Respectfully Submitted,
BRAD GAGE LAW, APC
The BEN CRUMP LAW FIRM
The SPENCER LAW FIRM

By *__/s/ Milad Sadr__*
Bradley C. Gage
Ben Crump
Milad Sadr
Jeffrey Spencer
Attorneys for Plaintiffs